**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISCTRICT OF MARYLAND**

**AMERITRUST MORTGAGE CORPORATION**
3201 CROSS TIMBERS ROAD,
BUILDING 3
FLOWER MOUND, TEXAS 75028

**Plaintiff,**

**v.**

**FIRSTLOANS INC.,**
1109 MCDONALD AVENUE
BROOKLYN, NEW YORK 11230

SERVE:
AARON SPIELMAN
1109 MCDONALD AVENUE,
BROOKLYN, NEW YORK 11230

**JASON TAYLOR D/B/A CAPITAL SERVICES GROUP,**
4044 GANFORD COURT
JARRETSVILLE, MARYLAND 21229

**CHRISTOPHER ACTIE,**
739 WESTHILLS PARKWAY
BALTIMORE, MARYLKAND 21229

**REXTAR TITLE SERVICES, LLC,**
1004 DULANEY VALLEY ROAD
TOWSON, MARYLAND 21204

SERVE:
MARCO RODRIGUEZ
1004 DULANEY VALLEY ROAD,
TOWSON, MARYLAND 21204

**FIDELITY NATIONAL TITLE INSURANCE COMPANY,**
601 RIVERSIDE AVENUE
JACKSONVILLE, FLORIDA 32204

Case No. ________________

SERVE:
THE CORPORATION TRUST INC.
2405 YORK ROAD,
SUITE 201
TIMONIUM, MARYLAND 21093

**SHRAGA CHAIM LERNER,**
3205 NORTHBROOK ROAD,
PIKESVILLE, MARYLAND 21208

**SLDL PROPERTIES LLC,**
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

SERVE:
SHRAGA LERNER
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

**SUNRAY MGMT LLC,**
3500 BOSTON STREET,
SUITE C,
BALTIMORE, MARYLAND 21224

SERVE:
SHRAGA LERNER
3500 BOSTON STREET,
SUITE C,
BALTIMORE, MARYLAND 21224

**1258 GLYNDON LLC,**
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

SERVE:
SHRAGA LERNER
1517 REISTERSTOWN ROAD,
BALTIMORE, MARYLAND 21208

**CARDINAL MGMT LLC,**
3500 BOSTON STREET,
BALTIMORE, MARYLAND 21224

SERVE:
SHRAGA LERNER
3500 BOSTON STREET,

BALTIMORE, MARYLAND 21224

**BENJAMIN EIDLISZ,**
10 BROOKSIDE DRIVE,
POMONA, NEW YORK 10970

**STANFORD POWELL, LLC,**
6340 SECURITY BLVD,
SUITE 100 PMB 1006
BALTIMORE, MARYLAND 21207

SERVE:
VICTOR SIMON
6340 SECURITY BOULEVARD,
SUITE 100 PMB 1006
BALTIMORE, MARYLAND 21207

**MAPLE & GREEN LLC,**
1660 E COLD SPRINGS LANDE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE,
BALTIMORE, MARYLAND 21218

**KENYON WINCHESTER LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319
BALTIMORE, MARYLAND 21224

**GLOVER COLLINS, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE,
BALTIMORE, MARYLAND 21218

**POPLAND STREET PROPERTIES, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE,
BALTIMORE, MARYLAND 21218

**GRACE POPLAND, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

**FAIRHAVEN AVENUE PROPERTIES, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**CANCUN BERNAL, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**DUKELAND ROSE, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**1613 SPRUCE STREET, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

**FAYETTE NOBLE, LLC,**
6340 SECURITY BLVD,
SUITE 100 PMB 1006,
BALTIMORE, MARYLAND 21207

SERVE:
VICTOR SIMON
6340 SECURITY BLVD,
SUITE 100 PMB 1006,
BALTIMORE, MARYLAND 21207

**ORLEANS STREET, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**ELUZER GOLD,**
6 MARMON PLACE,
SPRING VALLEY, NEW YORK 10977

**KESEF VENTURES, LLC,**
2611 GARRISON LVD
BALTIMORE, MARYLAND 21216

SERVE:

ELUZER GOLD
2611 GARRISON LVD
BALTIMORE, MARYLAND 21216

**EGBE VENTURES, LLC,**
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550

SERVE:
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550

**ZAHAV VENTURES, LLC,**
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550

SERVE:
ELUZER GOLD
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550

**LEVY VENTURES, LLC,**
2718 ORLEANS AVENUE
BALTIMORE, MARYLAND 21224

SERVE:
ELUZER GOLD
2718 ORLEANS AVENUE
BALTIMORE, MARYLAND 21224

**GELT VENTURES, LLC,**
3500 BOSTON STREET,
BALTIMORE, MARYLAND 21224

SERVE:
SIMMY VANDERHOOF
3500 BOSTON STREET,
BALTIMORE, MARYLAND 21224

**ZAHAV PLUS VENTURES,**
5000 THAYER CENTER,
SUITE C,

OAKLAND, MARYLAND 21550

SERVE:
ELUZER GOLD
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550,

**Defendants.**

## COMPLAINT

Plaintiff, Ameritrust Mortgage Corporation sues Defendants, FirstLoans, Inc.; Jason Taylor d/b/a Capital Services Group; Christopher Actie; REXTAR Title Services, LLC; Fidelity National Title Insurance Company; Shraga Chaim Lerner; SLDL Properties LLC; Sunray MGMT LLC; 1258 Glyndon LLC; Cardinal MGMT LLC; Benjamin Eidlisz; Standford Powell, LLC; Maple & Green LLC; Kenyon Winchester LLC; Glover Collins, LLC; Popland Street Properties, LLC; Grace Popland, LLC; Fairhaven Avenue Properties, LLC; Cancun Bernal, LLC; Dukeland Rose, LLC; 1613 Spruce Street, LLC; Fayette Noble, LLC; Orleans Street, LLC; Eluzer Gold; Kesef Ventures, LLC; EGBE Ventures, LLC; Zahav Ventures, LLC; Levy Ventures, LLC; Gelt Ventures, LLC; and Zahav Plus Ventures states as follows:

## NATURE OF SUIT

1. The Defendants acted in concert to organize and effectuate an extensive real estate fraud ring involving approximately 90 loans secured by real property that has caused approximately $14,076,00.00 of harm to Ameritrust and that has severely disrupted the mortgage lending market for investment properties in Baltimore and its surrounding areas.

2. The fraudulent scheme was principally orchestrated by Defendants Shraga Chaim Lerner, Benjamin Eidlisz, and Eluzer Gold, who acted individually and through their various special purpose entities they created to mask their scheme.

3. To effectuate the fraud, a special purpose vehicle created and managed by either Lerner or Eidlisz would purchase a property in or around Baltimore city for an amount in the range of $40,000-$50,000.00.

4. Only a few months later, without any property improvements or changes in the market, the new property owner would contract to sell the property to another special purpose entity owned by either Lerner, Eidlisz, or Gold for a purchase price approximately three hundred percent (300%) higher – usually in the $200,000.00 range.

5. The purchaser would apply for a loan using a pre-prepared appraisal and title report omitting the sale and its significantly lesser sale price only a few months earlier. 91 of the loan applications, which are the subject of this lawsuit, were applications to Ameritrust, but the Defendants perpetrated the same fraud on other lenders involving hundreds of other properties.

6. Each of the pre-prepared appraisals affirmed the new sale price as a reasonable reflection of the property's value. The appraisers were either prepared negligently by failing to review even the most recent property sale records or were prepared in concert with the fraud and purposefully omitted the prior sale, despite knowing that the only arms-length sale occurred on a few months prior for 25% of the purported appraised value.

7. Ultimately, when the loan was made, the proceeds were paid to the seller at the closing. The buying entity had no intention of ever repaying the loan and knew full well that the lender was grossly under-collateralized, given that the actual reflection of the property's value was only a fraction of the loan amount.

8. The buying entity defaulted virtually immediately by failing to pay even the first few months of loan payments.

9. Ameritrust was left to collect the defaulted loan from a defunct special purpose entity without any assets, except a property worth only a fraction of the sale price represented by the pre-prepared appraisal.

10. Certain of the borrowing entities also filed for protection under the bankruptcy laws of the United States – further insulating Lerner, Gold, and Eidlisz from potential liability. Each bankruptcy has now been voluntarily dismissed and, as such, Ameritrust is permitted to pursue its claims against those entities in this action without violating the automatic stay.

11. In addition to Ameritrust, the conspirators have caused a ripple effect that has far-reaching implications on the Baltimore real estate market; the vitality of the neighborhoods in which the properties are located; and the secondary distressed debt market at large by copying and pasting its scheme hundreds of times involving multiple lenders.

12. The anticipated influx of foreclosed properties onto the real estate market threatens to trigger a sharp decline in the local property values. Meanwhile, the distressed loan assets secured by these properties are being circulated through the secondary mortgage market, as counterparties attempt to shift the financial burden in a manner akin to a metaphorical "hot potato." During this time, the abandoned homes have been overtaken by squatters, with local residents referring to several of these properties as "crack houses," exacerbating the decline in the stability and safety of Baltimore neighborhoods.

13. Demonstrating the brazenness of the scheme, one of the participants submitted a fraudulent declaration to the Bankruptcy Court, concealing his involvement in the conspiracy. Relying on this false representation, the Court appointed him to manage the very properties held

in bankruptcy – the properties his entities initially purchased and subsequently sold to the other subsequent straw purchaser borrower entities – and he is currently being compensated for that role.

**PARTIES**

14. Plaintiff, Ameritrust Mortgage Corporation, is, and at all relevant times was, a corporation formed and existing under the laws of the State of Illinois, with its offices located at 3201 Cross Timbers Road, Building 3, Flower Mound, Texas 75028. Ameritrust is a mortgage lender that operates a wholesale mortgage channel whereby mortgage brokers submit residential mortgage loans to Ameritrust for underwriting and funding. Ameritrust has held a Maryland Mortgage Lender License since September 16, 2022.

15. Defendant, FirstLoans, Inc., is, and at all relevant times was, a corporation formed and existing under the laws of the State of New York having a principal place of business located at 1109 McDonald Avenue, Brooklyn, NY 11230. FirstLoans entered into a certain Business Purpose Broker Agreement with Ameritrust, effectively dated as of March 26, 2024. FirstLoans sourced potential applicants for business purpose mortgage loans, completed loan packages to Ameritrust for underwriting and funding. FirstLoans sourced the loans identified in this Complaint from borrowers organized under the laws of the State of Maryland for the purchase of real property in the State of Maryland. The allegations identified against Firstloans in this Complaint arise from transactions occurring in the State of Maryland.

16. Defendant Jason Taylor d/b/a Capital Services Group, is, and at all relevant times was, an individual residing in the State of Maryland. Taylor's principal place of business is 4044 Ganford Court, Jarrettsville, Maryland 21084. Taylor registered the trade name "Capital Services Group" under his individual name. Taylor is an appraiser of residential real property and appraised

various properties for FirstLoans related to applications for residential mortgage loans submitted by FirstLoans to Ameritrust.

17. Defendant Christopher Actie, is, and at all relevant times referenced herein, was, an individual residing in the State of Maryland. Actie's principal place of business is 739 Westhills Pkwy, Baltimore, Maryland, 21229. Actie is an appraiser of residential real property and appraised various properties for FirstLoans related to applications for residential mortgage loans submitted by FirstLoans to Ameritrust.

18. Defendant REXTAR Title Services, LLC, is and at all relevant times referenced herein, was, a Maryland limited liability company with a principal place of business at 1004 Dulaney Valley Road, Towson, Maryland 21204. REXTAR is in the business of providing title and closing related services for residential and commercial real estate transactions in the State of Maryland. REXTAR performed title and closing related services for Applications submitted by FirstLoans to Ameritrust. REXTAR's website now identifies REXTAR as "Marvel Title Company."

19. Defendant Fidelity National Title Insurance Company, is, and at all relevant times referenced herein, was, a Florida corporation with a principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity is a national title insurance company for residential and commercial real estate and mortgages. Fidelity was named insurer for title insurance policies and Closing Protection Letters issued by REXTAR for Applications submitted to by First Loans to Ameritrust, and as a result Fidelity served as the insurer in more than ninety (90) purchase transactions for real property in the State of Maryland.

20. Defendant Shraga Chaim Lerner, is, and at all relevant times herein, was an individual residing in the State of Maryland with a principal residence at 3205 Northbrook Road,

Pikesville, Maryland 21208. Lerner formed each of the Lerner Participant Sellers (further defined below and collectively, the "Lerner Participant Sellers") to serve as his alter ego. Ameritrust's belief that the Lerner Participant Sellers serve as Lerner's alter ego is based on the fact that Lerner signed, in his capacity as "sole member" or "member," each of the settlement statements for each of the properties sold by a Lerner Participant Seller under this conspiracy. Lerner formed the Lerner Participant Sellers as special-purpose entities to acquire and sell real estate in transactions that artificially inflated the value of the real estate to maximize the loan proceeds flowing to the seller. Lerner formed the special-purpose entities to mask his and his co-conspirators' (including Gold's and Eidlisz's) personal involvement and Lerner caused all of the proceeds of the sale to be ultimately paid to him personally and did not retain any of the funds realized from the sale of the properties at issue in the special-purpose entities formed.

21. Defendant SLDL Properties LLC ("SLDL Properties" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3205 Northbrook Road, Baltimore, Maryland, 21208. SLDL Properties was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

22. Defendant Sunray MGMT LLC ("Sunray MGMT" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite C, Baltimore, Maryland, 21224. Sunray MGMT was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

23. Defendant 1258 Glyndon LLC ("1258 Glyndon" or a "Lerner Participant Seller"), is and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3205 Northbrook Road, Baltimore, Maryland, 21208. 1258 Glyndon was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

24. Defendant Cardinal MGMT LLC ("Cardinal MGMT" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3500 Boston Street, Baltimore, Maryland 21224. Cardinal MGMT was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

25. Benjamin Eidlisz, is, and at all relevant times herein was an individual residing in the State of New York with a principal residence at 10 Brookside Drive, Pomona, New York 10970. Ameritrust is informed and believes, and based thereon alleges, Eidlisz formed each of the Eidlisz Participant Sellers (further defined below and collectively, the "Eidlisz Participant Sellers") to serve as his alter ego. Ameritrust's belief that the Eidlisz Participant Sellers serve as Eidlisz's alter ego is based on the fact that Eidlisz signed as the "sole member" or "managing member" for each of the settlement statements for each of the properties sold by the Eidlisz Participant Sellers under this conspiracy. Eidlisz formed the Eidlisz Participant Sellers, which are all entities organized under the laws of the State of Maryland, as special-purpose entities to purchase real properties located in the State of Maryland in transactions that artificially inflated the value of the real estate to maximize the loan proceeds flowing to the seller. Eidlisz formed the

special-purpose entities to mask his and his co-conspirators' (including Gold's and Lerner's) personal involvement in the transactions involving real property in the State of Maryland and Eidlisz caused all of the proceeds of the sale of real property located in the State of Maryland to be ultimately paid to him personally and did not retain any of the funds realized from the sale of the properties located in the State of Maryland in the special-purpose entities formed.

26. Defendant Stanford Powell, LLC ("Stanford Powell" or a "Eidlisz Participant Seller"), is, and at all relevant times herein, was a Maryland limited liability company with a principal place of business at 6340 Security BLVD, Suite 100 PMB 1006, Baltimore, Maryland 21207. Stanford Powell was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

27. Defendant Maple & Green, LLC ("Maple & Green" or a "Eidlisz Participant Seller"), is, and at all times relevant herein, was a Maryland limited liability company with a principal place of business at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Maple & Green was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

28. Defendant Kenyon Winchester, LLC ("Kenyon Winchester" or a "Eidlisz Participant Seller"), is, and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Kenyon Winchester was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

29. Defendant Glover Collins ("Glover Collins" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal place of business at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Glover Collins was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

30. Defendant Popland Street Properties, LLC ("Popland Street Properties" or a "Eidlisz Participant Seller"), is, and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 1660 E Cold Spring Lane, Baltimore, Maryland 21218. Popland Street Properties was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

31. Defendant Grace Popland, LLC ("Grace Popland" or a "Eidlisz Participant Seller"), is and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 1660 E Cold Spring Lane, Baltimore, Maryland 21218. Grace Popland was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

32. Defendant Fairhaven Avenue Properties, LLC ("Fairhaven Avenue Properties" or a "Eidlisz Participant Seller") is, and was at all relevant times herein was, a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Fairhaven Avenue Properties was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

33. Defendant Cancun Bernal, LLC ("Cancun Bernal" or a "Eidlisz Participant Seller") is, and at all relevant times herein was, a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Cancun Bernal was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

34. Defendant Dukeland Rose, LLC ("Dukeland Rose" or a "Eidlisz Participant Seller"), is, and was at all relevant times herein was, a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Dukeland Rose was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

35. Defendant 1613 Spruce Street, LLC ("Spruce Street" or a "Eidlisz Participant Seller"), is, and at all relevant time herein, was a Maryland limited liability company with a principal office at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Spruce Street was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

36. Defendant Fayette Noble, LLC ("Fayette Noble" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 6340 Security BLVD, Suite 100 PMB 1006, Baltimore, Maryland 21207. Fayette Noble was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

37. Defendant Orleans Street, LLC ("Orleans Street" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Orleans Street was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

38. Eluzer Gold, is, and at all relevant times herein was an individual residing in the State of New York with a principal residence at 6 Marmon Place, Spring Valley, New York 10977. Ameritrust is informed and believes, and based thereon alleges, Gold formed each of the Gold Participant Purchasers (further defined below and collectively, the "Gold Participant Purchasers") to serve as his alter ego. Ameritrust's belief that the Gold Participant Purchasers serve as Gold's alter ego is based on the fact that Gold signed as the "sole member" or "managing member" for each of the settlement statements for each of the properties located in the State of Maryland purchased by a Gold Participant Purchaser under this conspiracy. Gold formed the Gold Participant Purchasers, which are all entities organized under the laws of the State of Maryland, as special-purpose entities to acquire properties in the State of Maryland with little or no actual capital invested in a scheme where funds represented as down payments were returned directly or indirectly through sham renovation invoices and improper settlement disbursements. Gold formed the special-purpose entities to mask his and his co-conspirators' (including Lerner's and Eidlisz's) personal involvement in their fraudulent activity involving real property in the State of Maryland and funneled any capital investment back to himself through payments for fake renovations, thereby effectively making any funds invested into the Gold Participant Purchasers his personal funds.

39. Defendant Kesef Ventures, LLC ("Kesef Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 2611 Garrison Boulevard, Baltimore, Maryland 21216. Kesef Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

40. Defendant EGBE Ventures, LLC ("EGBE Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland Maryland 21550. EGBE Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

41. Defendant Zahav Ventures, LLC ("Zahav Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland MD 21550. Zahav Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

42. Defendant Levy Ventures, LLC ("Levy Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 2718 Orleans Avenue, Baltimore, Maryland 21224. Levy Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly

inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

43. Defendant Gelt Ventures, LLC ("Gelt Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 3500 Boston Street, Baltimore, Maryland 21224. Gelt Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

44. Defendant Zahav Plus Ventures ("Zahav Plus" or a "Gold Participant Purchaser") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland, Maryland 21550. Zahav Plus was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

45. Defendants Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers, at all times relevant hereto, conspired and acted in concert with each other to commit the wrongs against Ameritrust alleged herein, and in doing so were at all relevant times the agents, servants, employees, principals, joint venturers, alter egos, co-conspirators and/or partners of each other. Each of the Eidlisz Participant Sellers, the Lerner Participant Sellers, and the Gold Participant Purchasers was created for the sole purpose of perpetrating the fraud and masking the interconnection of their principals and served no other purpose other than to funnel money directly between their principals. Ameritrust is further informed and believes, and based upon such information and belief alleges, that in doing the things

alleged in this Complaint, Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers were each acting within the scope of authority conferred upon them by the consent, approval, and/or ratification of each other, whether said authority was actual or apparent. Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers were each aware, agreed, and intended that the others engaged in the tortious misconduct alleged in this Complaint. Further, Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers each gave substantial assistance and/or encouragement to each other, which was a substantial factor in causing Ameritrust the harm outlined herein.

## JURSIDICTION AND VENUE

46. This Court has federal question subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Ameritrust asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, including claims under 18 U.S.C. §§ 1962(c) and 1962(d).

47. This Court has supplemental jurisdiction over Ameritrust's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts and form part of the same case or controversy as Ameritrust's federal RICO claims.

48. In the alternative, and independent of federal-question jurisdiction, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between Ameritrust and Defendants.

49. Ameritrust Mortgage Corporation is, and at all relevant times was, a corporation organized and existing under the laws of the State of Illinois with its offices located in California

until 2025 and thereafter in Texas and is therefore a citizen of Illinois or Texas for purposes of 28 U.S.C. § 1332(c).

50. Upon information and belief, none of the Defendants are citizens of Illinois or Texas and the ultimate individual owners of the limited liability company Defendants are not citizens of Illinois or Texas.

51. This Court has personal jurisdiction over Defendants because they are either residents of the State of Maryland, entities organized under the laws of the State of Maryland, purposefully directed activities toward the State of Maryland, transacted business in Maryland, participated in mortgage loan transactions involving Maryland properties, provided appraisal, settlement, title, brokerage, and related services in Maryland, and/or committed tortious acts in Maryland giving rise to the claims asserted herein.

52. This Court has personal jurisdiction over REXTAR Title Services, LLC because REXTAR is a Maryland limited liability company with its principal place of business in Maryland and conducted the settlement, escrow, title, closing, and related services that are the subject of this action in Maryland.

53. This Court has personal jurisdiction over Jason Taylor and Christopher Actie because they performed appraisal services concerning real property located in Maryland, prepared appraisal reports intended for use in Maryland mortgage transactions, and purposefully directed their activities to Maryland in connection with the conduct alleged herein.

54. This Court has personal jurisdiction over FirstLoans, Inc. because it originated, brokered, processed, and submitted mortgage loan transactions involving Maryland real estate and purposefully availed itself of the privilege of conducting business within Maryland.

55. This Court has personal jurisdiction over Gold, Lerner, Eidlisz, the Gold Participant Purchasers, the Lerner Participant Sellers, the Eidlisz Participant Sellers, and the remaining Defendants because they owned, purchased, sold, financed, transferred, controlled, or otherwise participated in transactions involving Maryland real property and the claims asserted herein arise directly from those contacts and the Gold Participant Purchasers, the Lerner Participant Sellers, the Eidlisz Participant Sellers are organizations organized under the laws of the State of Maryland.

56. Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this District and a substantial part of the events or omissions giving rise to Ameritrust's claims occurred in this District.

57. Venue is further proper because the mortgage loans, appraisals, property transfers, title work, settlement services, closings, escrow activities, and related conduct that form the basis of Ameritrust's claims concerned real property located in Maryland, including numerous properties located within this District.

58. Venue is additionally proper pursuant to 18 U.S.C. § 1965(a) because one or more Defendants reside, are found, have agents, or transact their affairs within this District.

## FACTUAL ALLEGATIONS

### I. Ameritrust's Business.

59. Ameritrust is a mortgage banker licensed in approximately 36 states and the District of Columbia. Ameritrust has held a Maryland Mortgage Lender License since September 16, 2022. Ameritrust operates a wholesale division whereby mortgage brokers source prospective mortgage

applicants, complete applications with the applicants, and submit their applications to Ameritrust for underwriting and funding.

60. As is customary in any lender's wholesale mortgage division, when the lender is deciding whether to underwrite a loan, Ameritrust relies on mortgage brokers to submit honest, truthful, and complete loan applications.

61. Ameritrust also relies on various third-party service providers – including those providing title, closing, and appraisal services – to furnish reports that contain complete, accurate, and truthful information concerning the applicants, the subject matter transactions, and the real property securing the mortgage loans.

62. Frequently, the mortgage broker submitting the application orders, compiles, and submits title work and appraisals in support of their application.

63. As a wholesaler, Ameritrust sells the various loans that it originates on the open secondary market, which also relies on the premise that the applications soliciting the loans were honest, truthful, and complete.

**II. Participating Broker.**

64. FirstLoans was one of the mortgage brokers on whom Ameritrust relied when determining whether to underwrite and make various loans.

65. FirstLoans and Ameritrust entered into a certain Business Purpose Broker Agreement, effective as-of March 26, 2024 (the "Agreement"), pursuant to which FirstLoans agreed to source potential loan applicants, complete loan applications, submit such applications with supporting documentation to Ameritrust (each submission an "Application Package.")

66. Pursuant to the Broker Agreement, FirstLoans agreed that Ameritrust could rely on FirstLoans to originate and submit legitimate loan transactions suitable for underwriting and sale on the secondary mortgage market.

67. FirstLoans utilized its role under the Broker Agreement to conceal material information, channel appraisal assignments to pre-selected appraisers, and submit transactions that it knew contained material omissions, false information, and that would otherwise not satisfy the terms of the Agreement.

**III. The First of Many Fraudulent Loans.**

68. Approximately thirteen (13) days after entering into the Agreement, on or about April 8, 2024, FirstLoans, acting as the Participating Broker, submitted an initial Application Package to Ameritrust.

69. The Application Package requested a purchase-money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from Sunray MGMT, a Lerner Participant Seller, located at 2806 Ellicott Dr., Baltimore, Maryland 21216, for $215,000. Ameritrust was asked to provide a loan in the amount of $172,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-five thousand dollars ($43,000).

70. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either: (a) worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and Sunray MGMT without conducting even the most basic of independent searches to verify the information provided to them.

71. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

72. The preliminary title report prepared by REXTAR was dated April 4, 2024, four days prior to FirstLoans submitting the Application Package to Ameritrust.

73. Also prior to submitting the Application Package, FirstLoans had also already ordered the appraisal from Taylor, acting as a Participating Appraiser.

74. The appraisal prepared by Taylor was dated three days prior to FirstLoans submitting the Application Package to Ameritrust.

75. FirstLoans emailed a copy of the appraisal to Ameritrust on or about April 8, 2024.

76. The purchase contract between Sunray MGMT, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated April 4, 2024, four days prior to FirstLoans submitting the Application Package to Ameritrust.

77. Taylor's appraisal report reflected a value of $215,000 and affirmatively stated "the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months."

78. The Participating Title Agent represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-five thousand dollars ($43,000).

79. In reliance on FirstLoan's representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $172,000 on April 22, 2024, by sending a wire transfer to REXTAR.

80. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business. Also, as is customary in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an "early payment default."

81. Sometime after the new year, Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loan.

82. Ameritrust commenced an investigation and discovered that the subject property had, in fact, been purchased by Sunray MGMT, a Lerner Participant Seller, only three months before the purchase Ameritrust financed, on January 18, 2024.

83. Shockingly, the January 18, 2024 sale was for only $57,000, an amount approximately seventy-five percent (75%) less than the April 4, 2024 contract purchase price.

84. Ameritrust reviewed the preliminary title report and the Chain of Title contained therein and prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and it's significantly lower sale price. REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry by failing to review the most basic of title information or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.

85. Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy and would not have funded the loan.

86. Ameritrust also reviewed the appraisal report prepared by Taylor in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

87. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust; or negligently failed to review even the most basic title information to ascertain the property's value.

88. If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

89. Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that the appraised value was inflated, and would not have funded the loan.

90. Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months.

91. Upon default, Ameritrust has learned that the real property securing Kesef Ventures's obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

92. Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers, devised this scheme in concert, using wire transfers in interstate commerce; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant Sellers devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

**IV. The Second of Many Fraudulent Loans.**

93. Approximately sixteen (16) days after entering into the Agreement, on or about April 11, 2024, FirstLoans, acting as the Participating Broker, submitted another Application Package to Ameritrust.

94. The Application Package requested a purchase money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from SLDL Properties, a Lerner Participant Seller, located at 3413 Lyndale Avenue, Baltimore, Maryland 21213, for $215,000. Ameritrust was to provide a loan in the amount of $172,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-five thousand dollars ($43,000).

95. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either (a) worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and SLDL Properties without conducting even the most basic of independent searches to verify the information provided to them.

96. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

97. The preliminary title report prepared by REXTAR was dated April 5, 2024, six days prior to FirstLoans submitting the Application Package to Ameritrust.

98. Also prior to submitting the Application Package, FirstLoans had also already ordered the appraisal from Taylor, acting as a Participating Appraiser.

99. The appraisal prepared by Taylor was dated April 2, 2024, nine days prior to FirstLoans submitting the Application Package to Ameritrust.

100. The purchase contract between SLDL Properties, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated March 20, 2024, twenty-two days prior to FirstLoans submitting the Application Package to Ameritrust.

101. Taylor's appraisal report reflected a value of $215,000 and affirmatively stated "the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months."

102. The Participating Title Agent represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-five thousand dollars ($43,000).

103. In reliance on FirstLoans' representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $172,000 on April 19, 2024, by sending a wire transfer to REXTAR.

104. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business. Also as is customer in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an "early payment default."

105. Sometime after the new year, Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loan.

106. Ameritrust commenced an investigation and discovered that the subject property had, in fact, been purchased by SLDL Properties, a Lerner Participant Seller, on January 8, 2024.

107. Shockingly the January 8, 2024 sale was for only $35,000, an amount approximately eighty-four percent (84%) less than the March 20, 2024 contract purchase price.

108. Ameritrust reviewed the preliminary title report, and the Chain of Title contained therein and prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and its significantly lower sale price. REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry by failing to review the most basic of title information or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.

109. Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy and would not have funded the loan.

110. Ameritrust also reviewed the appraisal report prepared by Taylor, in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

111. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust; or negligently failed to review even the most basic title information to ascertain the property's value.

112. If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

113. Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that eh appraised value was inflated, and would not have funded the loan.

114. Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months.

115. Upon default, Ameritrust learned that the real property securing Kesef Ventures' obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

116. Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers devised this scheme in concert, using wire transfers in interstate commerce; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant Purchasers devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

**V. The Third Fraudulent Loan.**

117. Approximately twenty-three (23) days after entering into the Agreement, on or about April 12, 2024, FirstLoans, acting as the Participating Broker, submitted the initial Application Package to Ameritrust.

118. The Application Package requested a purchase-money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from 1258 Glyndon, a Lerner Participant Seller, located at 1602 Darley Avenue, Baltimore, Maryland 21213, for $217,500. Ameritrust was to provide a loan in the amount of $174,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-five thousand dollars ($43,500).

119. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either (a): worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and 1258 Glyndon without conducting even the most basic of independent searches to verify the information provided to them.

120. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

121. The preliminary title report prepared by REXTAR was dated April 4, 2024, eight days prior to FirstLoans submitting the Application Package to Ameritrust.

122. Also prior to submitting the Application Package, FirstLoans had also already ordered the appraisal from Taylor, acting as a Participating Appraiser.

123. The appraisal prepared by Taylor was dated April 3, 2024, nine days prior to FirstLoans submitting the Application Package to Ameritrust.

124. The purchase contract between 1258 Glyndon, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated March 20, 2024, twenty-three days prior to FirstLoans submitting the Application Package to Ameritrust.

125. Taylor's appraisal report reflected a value of $218,000 and specifically stated "the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months."

126. The Participating Title Agent represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-five thousand dollars ($43,500).

127. In reliance on FirstLoans' representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $174,000 on April 19, 2024, by sending a wire transfer to REXTAR.

128. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business. Also, as is customary in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an "early payment default."

129. Sometime after the new year, Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loan.

130. Ameritrust commenced an investigation and discovered that the subject property had, in fact, been purchased by 1258 Glyndon, a Lerner Participant Seller, on December 27, 2023.

131. Shockingly, the December 27, 2023 for only $45,000, an amount approximately seventy-nine percent (79%) less than the March 20, 2023 contract purchase price.

132. Ameritrust reviewed the preliminary title report, and the Chain of Title contained therein and prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and its significantly lower sale price. REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.

133. Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy and would not have funded the loan.

134. Ameritrust also reviewed the appraisal report prepared by Taylor in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

135. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust or negligently failed to review even the most basic title information to ascertain the property's value.

136. If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

137. Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that the appraised value was inflated, and would not have funded the loan.

138. Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months.

139. Upon default, Ameritrust learned that the real property securing Kesef Ventures' obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

140. Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers devised this scheme in concert, using wire transfers in interstate commerce ; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant Sellers

devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

## VI. General Pattern of Repeat Transactions.

141. During the period between April 8, 2024, and September 11, 2024, the conspiracy was ongoing as FirstLoans, acting as the Participating Broker, submitted over ninety (90) Application Packages to Ameritrust. A table providing detailed information about each of these fraudulent mortgage loan acquisitions is attached hereto as **Exhibit A**, which is hereby incorporated into the body of this Complaint, as if fully restated herein.

142. These Application Packages pertained to purchase money loans all made to various Gold Participant Purchasers to acquire properties from Lerner Participant Sellers and Eidlisz Participant Sellers for purchase prices ranging from $175,000 to $235,000. Ameritrust was to provide a loan in the amount of $131,250 to $180,000 with each of the respective Gold Participant Purchasers contributing down payments ranging from three thousand dollars ($3,000) to seventy-eight eight thousand seven hundred and fifty dollars ($78,750).

143. Prior to submitting the Application Packages, FirstLoans had already ordered the preliminary title reports from REXTAR, acting as the Participating Title Agent. The reports REXTAR prepared predated most, if not all of, the submissions of the Application Packages to Ameritrust.

144. Also prior to submitting the Application Packages, FirstLoans had already ordered the appraisals on the transactions from Actie or Taylor, acting as Participating Appraisers. The appraisals prepared by Actie and Taylor were all initially made in the name of FirstLoans prior to the Application Package being submitted to Ameritrust and subsequently transferred to Ameritrust.

145. The purchase contracts between the various Lerner Participant Sellers and Eidlisz Participant Sellers, and the various Gold Participant Purchasers, were all dated prior to the Application Packages being submitted by FirstLoans to Ameritrust.

146. The Gold Participant Purchasers executed loan documents representing that the corresponding purchase price reflected an arm's-length transaction and that the required borrower contribution and down payment had been made.

147. That representation was materially false and the Gold Participant Purchasers knew that such representations were materially false because they knew that the properties serving as collateral had recently been acquired by the Lerner Participant Sellers or the Eidlisz Participant Sellers for a fraction of the stated purchase prices and had worked in concert with the Lerner Participant Sellers or the Eidlisz Participant Sellers to effectuate the scheme of obtaining properties and then making an insider sale masking the prior purchase at the appropriate value.

148. The pattern of Gold and the Gold Participant Purchasers in obtaining ninety (90) mortgage loan acquisitions with Ameritrust alone (and hundreds of other with other lenders), causing early payment defaults, and diverting down-payment funds demonstrates that Gold and the Gold Participant Purchasers never intended to make the stated down payments or repay the mortgage loans.

149. Lerner, Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers knowingly participated in transactions involving purchase prices that bore no reasonable relationship to the prices they had recently paid to acquire the same properties and that actively concealed and misrepresented the value of the properties they were selling and their receipt purchase at a fraction of the cost.

150. All of the appraisal reports prepared by Actie and Taylor dramatically overinflated the purchase price, whether by negligence or intentional concealment and obfuscation of the recent prior sale at a fraction of the cost.

151. Taylor and Actie prepared the appraisal reports for the specific purpose of inducing mortgage lenders, including Ameritrust, to rely upon their opinions of value when deciding whether to extend credit secured by the subject properties.

152. Taylor and Actie knew that Ameritrust, and the other lenders who were defrauded in the scheme, would receive, review, and rely upon their appraisal reports in determining whether to fund the mortgage loans.

153. Each of the Defendants received direct or indirect financial benefits generated by the mortgage loan transactions funded by Ameritrust, including, but not limited to, the collection of fees.

154. REXTAR received settlement fees, title fees, examination fees, escrow fees, courier fees, recording fees, and other compensation generated from the transactions funded by Ameritrust.

155. FirstLoans received broker compensation, origination fees, processing fees, and other remuneration generated by mortgage loans funded by Ameritrust.

156. By way of example, closing documentation for transactions funded by Ameritrust reflects that FirstLoans received originator compensation and processing fees paid from transaction proceeds.

157. Taylor received appraisal fees and related compensation generated by the appraisal assignments associated with the transactions funded by Ameritrust.

158. By way of example, appraisal management company records relating to transactions funded by Ameritrust reflect an appraisal fee was allocated to Taylor in connection with appraisals performed for the mortgage loans that are the subject of this action.

159. Actie likewise received appraisal fees and related compensation generated by appraisal assignments associated with the mortgage loans funded by Ameritrust.

160. Actie performed appraisal services on numerous transactions involving Gold Participant Purchasers, Lerner Participant Sellers, and Eidlisz Participant Sellers and accepted such assignments for compensation. Actie received appraisal compensation in connection with those assignments.

161. All such benefits would not have been obtained absent the fraudulent scheme, inflated appraisals, concealed transfer histories, concealed purchase prices, false down-payment representations, and improper diversion of mortgage loan proceeds described herein.

162. Ameritrust funded more than ninety (90) mortgage loans that were originated, processed, appraised, closed, and settled through the coordinated activities of the Defendants.

163. Gold, the Gold Participant Purchasers, Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers received, retained, and shared amongst themselves, substantial portions of the mortgage loan proceeds funded by Ameritrust.

164. The purchase prices paid to the Lerner Participant Sellers and Eidlisz Participant Sellers substantially exceeded the amounts those entities paid to acquire the same properties only weeks or months earlier.

165. The Gold Participant Purchasers acquired properties with little or no actual capital invested and that funds represented as down payments were returned directly or indirectly through sham renovation invoices, improper settlement disbursements, or other diversions.

166. Ameritrust did not consent to the Conspiracy and took no part in these actors' wrongful conduct.

167. Ameritrust has been forced to repurchase and holds one or more of the defaulted mortgage loans which are the subject of this Complaint.

**VII. Appraisal Pattern of Repeat Misconduct.**

168. For each property identified on Exhibit A, either Taylor or Actie (the applicable appraiser for each property is identified on Exhibit A), appraised the property significantly in excess of the property's sale price on the open market on a few months earlier, sometimes by over 400%, without any improvements thereto or other market forces that would justify such a dramatic increase in value.

169. By way of example either Actie or Taylor gave the following appraisal opinions and reports to Ameritrust on which they expected Ameritrust to rely:

a. With respect to a property sold by Dukeland Rose, an Eidlisz Participant Purchaser, the prior sale occurred on March 24, 2021, for $70,000; However, Actie appraised the same property for $190,000 on May 19, 2024.

b. With respect to a property sold by Cancun Bernal, an Eidlisz Participant Purchaser, the prior sale occurred on February 08, 2023, for $60,000; However, Actie appraised the same property for $215,000 on June 7, 2024.

c. With respect to a property sold by Stanford Powell, an Eidlisz Participant Purchaser, the prior sale occurred on February 08, 2023, for $36,500; However, Actie appraised the same property for $200,000 on June 7, 2024.

d. With respect to a property sold by Stanford Powell, an Eidlisz Participant Purchaser, the prior sale occurred on September 02, 2021, for $27,000. However, Taylor appraised the same property for $180,000 on May 23, 2024.

i. Despite the prior same date of September 02, 2021, being less than three years from the date of the appraisal report, Taylor specifically stated, "the subject [property] ... [has] not transferred ownership or been listed for sale in the past 36 months."

170. Each and every appraisal prepared by Taylor and Actie either willfully inflated the appraised value as part of this conspiracy; or, in the alternative, Taylor and Actie's omissions of the prior purchase prices was a result of Taylor and Actie's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry by failing to review even the most basic of recent transaction history information.

## VIII. REXTAR's Pattern of Repeat Misconduct.

171. Ameritrust reviewed the preliminary title reports provide to Ameritrust by REXTAR concerning all of the over ninety (90) transaction where a Gold Participant Purchaser purchased a property from a Lerner Participant Seller or a Eidlisz Participant Seller, and each Chain of Title contained therein failed to disclose the prior sale or the sale price that occurred only a few months prior.

172. Had REXTAR not omitted the prior purchase price — which was readily apparent from a simple review of the prior deed, which REXTAR must have either obtained in preparing the preliminary title report, as it clearly showed title vested in the corresponding Lerner Participant Seller or Eidlisz Participant Seller, or never seen because REXTAR failed to conduct even the most basic of title searches — Ameritrust would have been alerted to the discrepancy and would not have funded the loan.

173. REXTAR either willfully deceived Ameritrust as to the down payments contributed by the Gold Participant Purchaser on each transaction; or negligently failed to conduct even the most cursory review of the property's title history on which it was opining.

174. The aggregate amount of the down payments allegedly contributed by the Gold Participant Purchasers according to REXTAR related to the loans Ameritrust funded would have exceeded $4.7 Million.

175. The conspiracy would not have been possible without REXTAR's wrongful passing of funds back to the Gold Participant Purchasers, Gold himself, or one of its affiliates.

176. It is unfathomable that Gold Participant purchaser would contribute in excess of $4.7 million, default within the first three payments, and let the properties go into foreclosure, all while continuing to purchase more and more properties without being part of a greater fraudulent scheme.

177. Ameritrust, promptly after the funding of each loan, sold each of the loans to investors on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business.

178. Sometime after the new year, Ameritrust received demand letters to repurchase the loans, with the secondary market investors advising that the respective Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loans.

179. Given that the Gold Participant Purchasers, made a combined down payment in excess of $4.7 Million, defaulted on the loan within the first few months, and subsequently obtained over ninety (90) additional loans from Ameritrust, Ameritrust believes these facts

strongly support the existence of an artifice to divert funds back to Kesef Ventures, another Gold Participant Purchaser, or one of its affiliates.

180. It at least some of the transactions REXTAR helped the Gold Participant Purchasers retain or never actually make the down payments represented on the settlement statement provided by REXTAR to Ameritrust.

181. In such cases, REXTAR falsely represented on paper that proceeds were paid to the Eidlisz Participant Seller or Lerner Participant Seller, when in fact the funds were diverted back to various participants in this conspiracy.

182. A close nexus existed between Ameritrust and Taylor, Actie, and REXTAR because each knew Ameritrust was the specific lender for whom the reports, settlement services, title work, and appraisals were being prepared.

## IX. Additional Fraudulent Statement by FirstLoans.

183. Furthermore, the appraisals were initially conducted in the name of FirstLoans and were subsequently transferred to Ameritrust. In executing appraisal transfer authorizations titled Transfer of Nationwide Property and Appraisal Services to Ameritrust Mortgage Corporation, FirstLoans certified that it had "complied with Federal, State, and FNMA Appraisal Independence Requirements."

184. This certification is materially false. FNMA's Appraisal Independence Requirements expressly provide: "For the purposes of these Appraisal Independence Requirements, the following are 'Restricted Parties': Mortgage Brokers. Restricted Parties are prohibited from: selecting, retaining, recommending, or influencing the selection of any appraiser for a particular appraisal assignment ..." FirstLoans, acting as a mortgage broker, was a Restricted Party and therefore prohibited from engaging in such conduct.

185. FirstLoans representation that the ordering of the appraisal complied with FNMA's Appraisal Independence Requirements was a willfully and materially fraudulent statement.

186. Ameritrust relied on FirstLoans representation as it relates to the over ninety (90) loans that form the basis for this action.

187. FNMA's Appraisal Independence Requirements ensure that a Restricted Party, such as FirstLoans, does not influence the appraiser's independent judgement regarding the appraised value of the property.

188. Had FirstLoans not falsely and materially misrepresented that the ordering of the appraisal complied with applicable requirements, Ameritrust would have obtained an uninflated appraised value that did not conceal the prior purchase or the prior purchase price. Ameritrust would have been alerted to the discrepancy and would not have funded the loans.

**XI. Buyer/Borrower Default and Filed Bankruptcy.**

189. Shortly after acquiring over ninety properties and obtaining over ninety mortgage loans from Ameritrust, the Gold Participant Purchasers defaulted within the first three monthly payments.

190. Zahav Ventures, a Gold Participant Purchaser, filed bankruptcy in the United State District Southern District of New York on June 17, 2025, which bankruptcy has since been dismissed. As reported in the bankruptcy filing, since its inception in September of 2022, Zahav Ventures, the debtor, had acquired approximately 130 residential home properties.

191. In connection with that proceeding, Eidlisz submitted a narrowly tailored declaration to the Bankruptcy Court omitting his role in the conspiracy while asserting that he had no conflict with either the creditors or debtor. Specifically, the declaration omitted that the fact that the Eidlisz Participant Sellers sold the real properties – now managed by Eidlisz through one

of his other limited liability companies – to the Debtor, causing unsuspecting creditors, including Ameritrust, to suffer significant financial losses.

192. There may not exist any conflict of interest more severe or disqualifying than that presented by Eidlisz's conduct.

193. In essence Eidlisz was being paid to manage the same real properties placed into bankruptcy as part of the scheme he participated in and helped operate.

194. Levy Ventures, a Gold Participant Purchaser filed bankruptcy in the United State District Southern District of New York on March 05, 2025, which bankruptcy has since been dismissed. As reported in the bankruptcy filing, the debtor had acquired over 140 residential home properties.

195. Since its inception on February 09, 2023, Defendant Levy Ventures had acquired approximately 140 residential home properties, which were included in its bankruptcy petition.

196. Also in connection with that proceeding, Eidlisz submitted a narrowly tailored declaration to the Bankruptcy Court omitting his role in the Conspiracy while asserting that he had no conflict with either the creditors or debtor. Specifically, the declaration omitted the fact that the Eidlisz Participant Sellers sold the real properties – now managed by Eidlisz through one of his other limited liability companies – to the Debtor, causing unsuspecting creditors, including Ameritrust, to suffer significant financial losses.

**XII. Fidelity Liability.**

197. Fidelity served as the insurer in each of the more than ninety (90) purchase transactions in which a Gold Participant Purchaser acquired a property from either a Lerner Participant Seller or an Eidlisz Participant Seller.

198. Fidelity was identified as the insurer on the preliminary title reports, title commitments, closing protection letters, and final title insurance policies.

199. The Maryland legislature enacted a statute requiring title insurers to "conduct [annual] on-site review[s] of the underwriting, claims, and escrow practices of each title insurance producer appointed by the insurer as a principal agent as designated in the title insurance contract between the insurer and the producer. Md. Code. Ann., Ins. § 10-121(5)(1)(i)(emphasis added).

200. REXTAR acted as a common law agent of Fidelity, and Fidelity is vicariously liable for the wrongful conduct committed by its agent within the scope of that agency relationship.

201. Ameritrust has it on good information and does believe, and based thereon, alleges, that Fidelity was negligent in the manner in which it conducted, or outright failed to conduct, required audits and/or oversight over REXTAR.

202. Ameritrust relied on the accuracy of the chain of title and the accuracy of the disclosure of the terms of the prior purchase, including the prior purchase price. Given the reputation of Fidelity, Ameritrust's reliance was reasonable.

**COUNT ONE**
**BREACH OF CONRACT**
**(against Defendant FirstLoans, Inc.)**

203. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

204. FirstLoans entered into a certain Business Purpose Broker Agreement which was effective March 26, 2024 (the "Agreement") pursuant to which FirstLoans sourced potential loan applicants, completed loan applications, submitted such applications with supporting documentation to Ameritrust, and ordered various third-party services such as appraisals through an appraisal management company and title and closing services.

205. The Agreement contained various representations, warranties, and covenants which governed the relationship with Ameritrust and FirstLoans and contained remedies for their breaches.

206. **Section 4 of the Agreement** provides: "Broker represents and warrants that as of the date of this Agreement, and as of each date on which Broker submits an Application to [Ameritrust], and as of the Funding Date of any Loan, all of the following are true and active:

207. **(G)** No instance of fraud, misrepresentation or material omission occurred, exists, or was committed with respect to any Loan or Application."

208. The Agreement clearly shifted the economic risk of fraud on the Loan to FirstLoans.

209. The Loans and Applications submitted by FirstLoans contained multiple instances of fraud, misrepresentations, and material omissions. Specifically, as of the Funding Date, many of the appraisal reports prepared by Taylor and Actie contain material omissions related to the prior purchase of the subject property including whether or not a transfer of ownership occurred within the prior thirty-six (36) months and the price at which the subject property was previously sold.

210. Furthermore, the preliminary title reports provided by REXTAR contained material omissions related to the price paid by the prior purchaser of the subject property.

211. **(Q):** "Broker has no knowledge with respect to any Loan, the Applications for the Loan, or the Subject Property, that can reasonably be expected to cause an institutional secondary market investor to regard the purchase of the Loan as an unacceptable investment, cause any Loan to become delinquent, or adversely affect the value or marketability of any such Loan."

212. Ameritrust has it on good information and does believe, and based on that information and belief alleges, that FirstLoans conspired with Actie and Taylor to ensure that the appraisal assignment was received by them so that they could artificially inflate the appraised value.

213. **Section 7 of the Agreement provides: (A):** "To the extent permitted by law, Broker hereby indemnifies and holds harmless [Ameritrust] and its past, present, and future directors, officers, shareholders, employees, attorneys, agents, representatives, subsidiaries, affiliates, and assigns, and holds them harmless from and against, any claims, losses, damages, demands, costs or other liabilities, including reasonable attorney's fees and the costs of investigations, arising out of any of the following:"

214. **(A)(i):** "Broker's breach or failure to perform any of Broker's covenants, representations, warranties, agreements, duties, and/or obligations arising under this Agreement."

215. Ameritrust has it on good information and does believe, and based thereon alleges, that FirstLoans breached Sections 4(G) of the Agreement and Section 4(Q) of the Agreement.

216. As such, Pursuant to Section 7(A)(i) of the Agreement, FirstLoans is obligated to "indemnify and hold Ameritrust harmless from and against any claims, losses, damages, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from Defendants breaches of the Agreement.

217. **7(A)(ii):** "Any third-party claims, including third party repurchase claims related to actions or inactions of Broker."

218. Ameritrust has received third-party repurchase demands related to FirstLoans wrongful actions and inactions as alleged herein.

219. As such, Pursuant to Section 7(A)(i) of the Agreement, FirstLoans is obligated to indemnify and hold Ameritrust harmless "from and against any claims, losses, damages, demands, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from the third-party repurchase demands received by Ameritrust based on FirstLoans wrongful actions and inactions, as alleged herein.

220. **7(A)(iii) provides**: "Any acts, omissions, or services provided by Broker, its agents, employees, representatives, attorneys, officers, directors, or partners."

221. FirstLoans conspired with Actie and Taylor to ensure that the appraisal assignment was received by them so that they could artificially inflate the appraised value.

222. As such, Pursuant to Section 7(A)(i) of the Agreement, FirstLoans is obligated to indemnify and hold Ameritrust "harmless from and against any claims, losses, damages, demands, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from the third-party repurchase demands received by Ameritrust based on FirstLoans wrongful actions and inactions, as alleged herein.

**COUNT TWO**
**VIOLATIONS OF THE FEDERAL RACKTEERING AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962(a)**
**(Against All Defendants except Fidelity)**

223. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

224. Ameritrust is a "person" which the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

225. The Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

226. The association in fact described above was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise was engaged in, and the activities of which affect, interstate commerce.

227. The Defendants in this Count as co-conspirators conspired to use or invest income derived from a pattern of unlawful activity under section 1961 to acquire an interest in, establish or operate the enterprise and have done so through a pattern of unlawful activities including to evade taxes, to commit wire fraud in violation of 18 U.S.C. § 1961 and to commit financial institution fraud in violation of 18 U.S.C. § 1344.

228. Additionally, the actions of all Defendants other than REXTAR were aided by REXTAR's fraudulent diversion of funds to them as it provided them with the ability to carry out their illegal scheme and evade taxes.

229. Sections 1692(c) and (d) of the RICO Act (18 U.S.C. § 1961 et seq.) provide that "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt; and (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

230. The Defendants conspired to or engaged in a continuous pattern of ongoing racketeering activity, while conducting and participating themselves, or with their associated alter ego enterprises, and/or in the coordination of conduct and operation of various named entity defendants as multiple enterprises acting in concert as a larger organized enterprise.

231. The enterprises individually or together acting as one organized enterprise committed or conspired to commit multiple predicate acts in the state of Maryland against

Ameritrust, an out of state mortgage lender that had at all times operated principally from California or Texas and was formed under Illinois law.

232. Fidelity, REXTAR, and FirstLoans, Inc participated in controlling other entities and affiliates who participated in controlling each of these defendant entities to conspire or to engage in continuous and ongoing racketeering activity involving multiple predicate acts.

233. Taylor, Actie, Eidlisz, Gold, and Lerner participated individually and/or with their alter ego enterprises to conspire or to engage in continuous and ongoing racketeering activity involving multiple predicate acts.

234. The conduct of Defendants participating in the enterprises included falsifying and mailing fraudulent documents in violation of Title 18, United States Code section 1341.

235. Eidlisz fraudulently participated in a federal bankruptcy proceeding involving the various alter ego limited liability companies of Gold in violation of the provisions of Title 11 of the United States Code.

236. The Defendants engaged in financial institution fraud in violation of Title 18, United States Code section 1344.

237. The participation by the Defendants in the enterprises directly led to loan approvals by Ameritrust based on fraudulent information and ultimately to the default of such loans secured by properties with actual valuations far below the inflated valuations established by Defendants that conspired, orchestrated and participated in the scheme.

238. The racketeering activity began as early as, or earlier than, January 2024 and involved at least 90 properties, the acquisition of which was funded by loans made by Ameritrust.

239. The Defendants participated in the scheme for almost two years, as the scheme is still ongoing while the Gold Participant Purchasers seek to alleviate their liability through bankruptcy.

240. Ameritrust has been forced to repurchase and holds one or more of the defaulted mortgage loans which are the subject of this Complaint.

241. The participation by the Defendants in the enterprises has also directly led to Ameritrust being forced to no longer offer loans in Baltimore County given soft investor demand due to the widespread racketeering scheme, which has also impaired Ameritrust's competitiveness in the Maryland marketplace.

**COUNT THREE**
**COMMON LAW FRAUD**
**(Defendants FirstLoans, REXTAR, Taylor and Actie)**

242. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

243. Taylor and Actie made affirmative misrepresentations regarding the appraised values to Ameritrust regarding over ninety (90) mortgage loan transactions.

244. Based on the vast discrepancies in the values, some properties increasing 400% in two-months, and Taylor and Actie's affirmative misrepresentations that the appraised properties had not transferred ownership or been listed in for sale in the past 36 months, it is clear Actie and Taylor know the falsity of their statements to Ameritrust or the representations were made with reckless indifference to the truth, as the appraisal they provided clearly showed the corresponding Eidlisz Participant Purchaser or Lerner Participant Purchase was being the current holder to record title.

245. The overinflated values were made in connection with an overarching conspiracy for the purpose of defrauding Ameritrust.

246. Ameritrust funded the loans in reliance on the representations made by Taylor and Actie in their appraisal reports.

247. Ameritrust has been diligently trying to resolve the outstanding repurchase demands from the secondary market investors who bought these loans.

248. In light of two Gold Participant Purchasers filing for bankruptcy and including an estimated 270 properties in the bankruptcy, these mortgage loans do not have any readily available buyers and the only offers that are being received result in taking millions of dollars in losses.

249. FirstLoans made fraudulent representations to Ameritrust on each of the transaction subject to this action, that the appraisal provided to Ameritrust, by FirstLoans, and prepared by Actie and Taylor, complied with FNMA's Appraisal Independence Requirements.

250. The appraisal provided to Ameritrust for each transaction subject this action did not comply with FNMA Appraisal Independence Requirements.

251. FirstLoans knew the appraisals did not comply with FNMA Appraisal Independence Requirements or made such representation with reckless disregard for the truth.

252. FNMA's Appraisal Independence Requirements were designed, in part, to prevent fraud in appraisal.

253. Ameritrust funded the loans in reliance on the representations made by FirstLoans in FirstLoans representations to Ameritrust that the appraisal complied with FNMA Appraisal Independence Requirements.

254. REXTAR willfully concealed the Lerner Participant Seller and Gold Participant Seller's prior purchase of the properties for the transactions subject to these actions.

255. REXTARs concealment was willful as despite the chain of title missing these conveyances and the prior purchase price, REXTAR listed the respective Eidlisz Participant Seller or Lerner Participant Seller as the current title holder.

256. Ameritrust funded the loans in reliance on the representations made by REXTAR to Ameritrust regarding the prior purchase of the properties by the respective Eidlisz Participant Seller or Lerner Participant Seller.

257. Ameritrust has been diligently trying to resolve the outstanding repurchase demands from the secondary market investors who bought these loans.

258. In light of two Gold Participant Purchasers filing for bankruptcy and including an estimated 270 properties in the bankruptcy, these mortgage loans do not have any readily available buyers and the only offers that are being received result in Ameritrust taking millions of dollars in losses.

**COUNT FOUR**
**COMMON LAW FRAUD**
**(Against All Defendants except Fidelity, FirstLoans, REXTAR, Taylor and Actie)**

259. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

260. Defendants agreed to accomplish their unlawful property flipping scheme in which Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers acquired properties in and around Baltimore City at market value.

261. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers then conspired with Gold and the Gold Participant Purchasers to create a false contract of sale for a significantly inflated purchase price. The contract of sale was a deliberate ruse designed to have

a lender loan Gold and the Gold Participant Purchasers money based on the insider and inflated sales price.

262. Gold and the Gold Participant Purchasers, through FirstLoans, then applied for the extension of credit representing that the contracts with Lerner, the Lenner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers were legitimate arms-length contracts.

263. They all buttressed the false loan application and fake contract of sale with title reports and appraisals purposefully concealing the prior sale on the open market.

264. As such, they were able to obtain the extension of credit from Ameritrust, the proceeds of which they all split between them.

265. Immediately thereafter, Gold and the Gold Participant Purchasers defaulted on all of the loans and left Ameritrust greatly undercollateralized.

266. Each Defendant committed overt acts in furtherance of the conspiracy and each Defendants contributed to a writing that was ultimately submitted to Ameritrust that contained false and fraudulent information upon which they intended Ameritrust to rely, including, but not limited to, the contract of sale, the loan application, the appraisal, and the title report.

**COUNT FIVE**
**NEGLIGENT MISREPRESENTATION**
**(Against Defendant FirstLoans, REXTAR, Actie, and Taylor)**

267. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

268. Taylor and Actie made affirmative misrepresentations to Ameritrust concerning the appraised values in connection with more than ninety (90) mortgage loan transactions.

269. Based on the significant discrepancies in the appraised values — including instances where property values increased by as much as 400% within two months — and Taylor

and Actie's affirmative misrepresentations that the appraised properties had neither transferred ownership nor been listed for sale within the past 36 months, it is evident that Taylor and Actie made the representations with at least negligent disregard for the truth.

270. An appraiser, when exercising ordinary diligence, will assess whether the property they are appraising has been recently sold and will use that information to inform the appraiser's report and opinion.

271. Each of the properties at issue had sold in the months preceding the appraisal.

272. Each of the sales on the open market were for a fraction of the appraised value as determined by Taylor and Actie.

273. By failing to review, assess, and include the prior sales in their appraisal opinions and reports, Actie and Taylor negligently misrepresented the properties' value and prior transaction history.

274. In justifiable reliance on the representations contained in the appraisal reports prepared by Taylor and Actie, Ameritrust proceeded to fund the mortgage loans.

275. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.

276. FirstLoans was, at the very least, negligent in its representations to Ameritrust that the appraisals were prepared in compliance with FNMA's Appraisal Independence Requirements.

277. FirstLoans knew that the appraisals failed to contain the prior sale only months earlier or, in the exercise of reasonable diligence, should have known the appraisals failed to contain the prior sale information.

278. In justifiable reliance on the representations made by FirstLoans, Ameritrust proceeded to fund the mortgage loans.

279. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.

280. REXTAR, at the very least, negligently omitted the prior sale transaction wherein each Eidlisz Participant Seller and each Lerner Participant Seller purchased the properties for a fraction of the price the properties were being resold for.

281. Any reasonable title company will conduct a title search of the property on which they are providing title information and even the most basic title report will contain information on a sale occurring only a few months earlier.

282. REXTAR failed to disclose the prior sale on its title reports provided to Ameritrust.

283. In justifiable reliance on the representations made by REXTAR, Ameritrust proceeded to fund the mortgage loans.

284. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.

**COUNT SIX**
**BREACH OF CONTRACT**
**(Against Defendant Fidelity)**

285. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

286. On each on the transaction which are the subject of this action, Fidelity issued Closing Protection Letters ("CPL") which were drafted on Fidelity's letterhead, signed by Fidelity's President and Secretary, and identified REXTAR as the "Settlement Agent."

287. In each of the Closing Protection Letters, Fidelity "agree[d] to indemnify [Ameritrust] for actual loss of Funds incurred by [Ameritrust] in connection with the closing of the referenced real estate transaction (the "Real Estate Transaction") conducted by the [REXTAR] ... on or after the Date of this letter, subject to the Requirements and Conditions and Exclusions set forth below."

288. The CPL contained the following four (4) enumerated requirements:

289. **First,** Fidelity "issues or is contractually obligated to issue a Policy for [Ameritrust's] protection in connection with the Real Estate Transaction."

290. Fidelity did in fact issue title Policies for each of the transactions subject to this action.

291. **Second,** Ameritrust was to be, "a lender secured by or a borrower on the Insured Mortgage on the Title to the Land ..."

292. Ameritrust was in fact a lender secured by the Insured Mortgage on the Title to the Land for each of the transactions subject to this action.

293. **Third,** "The aggregate of all Funds [Ameritrust] transmit[ed] to the Settlement Agent or Approved attorney for the Real Estate Transaction does not exceed $5,000,000.00.

294. Ameritrust did not transmit to the Settlement Agent for each of the Real Estate Transactions an amount in excess of $5,000,000.00.

295. **Fourth:** (b): [Ameritrust's] loss is solely caused by: fraud, theft, dishonesty, or misappropriation by the Settlement Agent or Approved Attorney in handling [Ameritrust's] Funds

or documents in connection with the closing, but only to the extent that the fraud, theft, dishonesty, or misappropriation adversely affects the status of Title to the Land or the validity, enforceability, or priority of the lien on the Insured Mortgage on the Title to the Land.

296. The term "solely caused by: fraud, theft, dishonesty, or misappropriation by the Settlement Agent..." must include the common conspiracy that REXTAR, acting as the Settlement Agent, participated in to facilitate the loss.

297. Furthermore, the Defendant's common conspiracy placing the properties in the bankruptcies of various Gold Participant Purchaser's bankruptcy case has prevented the enforceability of Ameritrust's lien on the Insured Mortgage on the Title to the Land.

298. Finally, Ameritrust will never to able to collect the amount of the lien due to REXTAR's willful concealment of the prior purchase price.

299. Said differently, Fidelity Insured Mortgages ranging from $131,250 to $180,000 on properties that REXTAR knew were worth fractions of that amount.

300. The CPL was provided by Fidelity, as part of its contract of adhesion, and any ambiguities contained therein must be interpreted in a light most favorable to Ameritrust.

301. Fidelity has refused to pay on these claims, despite their contractual agreements, as restated herein.

**COUNT SEVEN**
**COMMON LAW VICARIOUS LIABILITY**
**(Against Defendant Fidelity)**

302. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

303. Fidelity, by and through the issuance of Closing Protection Letters, identified REXTAR as the "Settlement Agent" and provided coverage therein for specific wrongful acts conducted on its Agent's behalf.

304. Fidelity issued such Closing Protection Letters on each of the over ninety (90) loans which are subject of this Action.

305. in each of the Closing Protection Letters, Fidelity "agree[d] to indemnify [Ameritrust] for actual loss of Funds incurred by [Ameritrust] in connection with the closing of the referenced real estate transaction (the "Real Estate Transaction") conducted by the [REXTAR] ... on or after the Date of this letter, subject to the Requirements and Conditions and Exclusions set forth below."

306. Furthermore, many of the documents referenced herein which were either prepared by Fidelity itself or were prepared by REXTAR but were drafted as if they were prepared by Fidelity. Specifically, each such fraudulent document appeared to be on Fidelity's letterhead, and many were signed by officers.

307. Fidelity engaged in practices which created unequal bargaining power between Ameritrust and Fidelity and based on public policy should invalidate the exculpatory provisions contained therein.

308. REXTAR had a common law agency relationship with Fidelity.

309. REXTAR's agency relationship was expanded with the passage of Md.Code Ann., Ins. § 10-121(k)(1)(i).

310. REXTAR held itself out through the issuance of its respective fraudulent documents, giving the appearance that they were acting on behalf Fidelity.

311. Even if REXTAR did not posses' actual authority by and through its agreements with Fidelity, REXTAR held itself out as Fidelity's agent, creating an apparent agency relationship.

312. REXTAR engaged in the conspiracy as described above, thus Fidelity is vicariously liable for REXTAR's unlawful conduct.

**COUNT EIGHT**
**AIDING AN ABETTING FRAUD**
**(Against All Defendants Except Fidelity)**

313. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

314. Defendants each committed various torts laws in the commission of the conspiracy, including fraud, negligence, and negligent misrepresentation.

315. Each of the Defendants knew about the scheme described above; actively participated in the scheme; gave substantial assistance or encouragement to the others participating in the scheme; and committed acts in furtherance thereof, including, but not limited to:

a. FirstLoans originated, packaged, processed, and submitted loan applications and supporting loan documentation to Ameritrust that falsely represented that the transactions were legitimate arm's-length transactions, that the borrowers had made the required equity contributions, that the information supplied to Ameritrust was accurate, and that the loans satisfied Ameritrust's underwriting requirements.

b. REXTAR made false representations and omissions through title commitments, settlement statements, escrow records, closing packages, certifications, disbursement records, and related settlement documentation that concealed material facts regarding the source disposition of funds, the true nature of the

transactions, the existence of diverted loan proceeds, and the purported borrower contributions reflected in the loan files.

c. Taylor prepared, signed, certified, and delivered false appraisal reports that materially misrepresented the market value of the subject properties and failed to accurately disclose, account for, or analyze prior transfers, prior purchase prices, and other information material to value and lending risk.

d. Actie prepared, signed, certified, and delivered false appraisal reports that materially misrepresented the market value of the subject properties and failed to accurately disclose, account for, or analyze prior transfers, prior purchase prices, and other information material to value and lending risk.

e. Gold and the Gold Participant Purchasers executed fraudulent purchase contracts, loan applications, affidavits, settlement documents, borrower certifications, and closing documents representing that the transactions were legitimate arm's-length transactions, that required borrower funds had been contributed, and that the information submitted to Ameritrust was accurate and complete.

f. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers participated in the fraudulent transactions involving grossly inflated purchase prices while concealing their recent acquisition of the same properties for substantially lower amounts, and by executing settlement and transfer documents that failed to disclose material facts concerning the true nature of the transactions.

316. Ameritrust has suffered significant harm thereby, including in making over ten million dollars in loans that are now uncollectable and undercollateralized.

**COUNT NINE**
**(BREACH OF IMPLIED COVENANT/DUTY OF GOOD FAITH)**

**(Against Defendant FirstLoans)**

317. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

318. The Business Purpose Broker Agreement constituted a valid contract between Ameritrust and FirstLoans.

319. Every contract includes an implied covenant requiring the parties to act in good faith and deal fairly with one another.

320. FirstLoans breached that covenant by steering appraisal assignments to selected appraisers; submitting application packages supported by inflated appraisals; concealing material information regarding the underlying transactions; submitting applications it knew were unsuitable for sale into the secondary mortgage market; and participating in a scheme designed to shift losses to Ameritrust.

321. Through this conduct, FirstLoans caused Ameritrust significant harm, including, but not limited to the inducement to extend millions of dollars of credit on now uncollectable and undercollateralized loans.

**COUNT TEN**
**(VIOLATION OF THE MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. CODE ANN., REAL PROPERTY §§ 7-401 *et seq*.)**
**(Against All Defendants Except Fidelity)**

322. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.

323. Plaintiff is a "mortgage lender" and "person" within the meaning of the Maryland Mortgage Fraud Protection Act.

324. The transactions described herein involved "mortgage lending processes" within the meaning of Md. Code Ann., Real Property § 7-401.

325. Defendants knowingly participated in a scheme involving false and fraudulent statements, omissions, representations, certifications, appraisals, settlement documents, and loan-origination materials submitted during the mortgage lending process.

326. Defendants knowingly participated in a scheme involving false and fraudulent statements, omissions, representations, certifications, appraisals, settlement documents, and loan – origination materials submitted during the mortgage lending process.

327. Defendants knowingly misrepresented and concealed materials facts concerning, among other things, the true value of the subject properties; the true purchase prices and prior transfers of the subject properties; the existence and amount of borrower equity and down payments; the source and disposition of settlement funds; the financial condition and bona fides of the transactions; and the true nature of the transactions submitted to Ameritrust for funding.

328. Taylor and Actie knowingly prepared, participated in, or supplied appraisal reports containing false, misleading, or materially omitted information regarding value, market conditions, prior transfers, or other matters material to Plaintiff's lending decisions.

329. FirstLoans knowingly originated, processed, packaged, submitted, and facilitated mortgage loan applications and supporting documents containing false statements, misrepresentations, omissions, and fraudulent information.

330. REXTAR knowingly prepared, controlled, facilitated, or participated in settlement services, escrow services, title services, closing services, settlement statements, and disbursements that concealed material facts and facilitated the fraudulent mortgage lending scheme.

331. The Gold Participant Purchasers, Lerner Participant Sellers, Eidlisz Participant Sellers, and their affiliated entities knowingly participated in transactions involving inflated

values, false loan documentation, false down-payment representations, concealed transfer history, and other material misrepresentations made during the mortgage lending process.

332. Defendants knowingly made deliberate misstatements, misrepresentations, and material omissions during the mortgage lending process in violation of Md. Code Ann., Real Property § 7-402(a).

333. Defendants knowingly used or facilitated the use of deliberate misstatements, misrepresentations, and material omissions during the mortgage lending process in violation of Md. Code Ann., Real Property § 7-402(a).

334. Defendants knowingly received proceeds, funds, fees, commissions, settlement charges, appraisal fees, broker compensation, sale proceeds, or other benefits derived directly or indirectly from mortgage fraud in violation of Md. Code Ann., Real Property § 7-402.

335. Defendants assisted, conspired with, solicited, and facilitated others in committing acts constituting mortgage fraud in violation of Md. Code Ann., Real Property § 7-402.

336. Ameritrust reasonably relied upon the integrity of the mortgage lending process and upon the information, documents, appraisals, settlement materials, and representations supplied by Defendants.

337. As a direct and proximate result of Defendants' violations of the Maryland Mortgage Fraud Protection Act, Plaintiff suffered substantial damages, including loan losses, repurchase liabilities, investigation expenses, carrying costs, attorneys' fees, and other damages according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ameritrust Mortgage Corporation respectfully requests that judgment be entered in its favor and against Defendants, and each of them, and requests the following relief:

(a) For compensatory damages in an amount of $14,076,00.00;

(b) For consequential damages according to proof;

(c) For restitution, disgorgement, and recovery of all benefits unjustly received and retained by Defendants as a result of the conduct alleged herein;

(d) For treble damages pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

(e) For treble damages pursuant to Md. Code Ann., Real Property § 7-406;

(f) For punitive damages against those Defendants whose conduct is found to constitute actual fraud, fraudulent misrepresentation, malice, or other conduct for which punitive damages are recoverable under Maryland law;

(g) For rescissory, equitable, and restitutionary relief as the Court deems appropriate;

(h) For an accounting of all funds, fees, commissions, appraisal fees, origination fees, settlement fees, loan proceeds, diverted funds, and other money received by Defendants in connection with the transactions that are the subject of this action;

(i) For imposition of a constructive trust upon any proceeds, profits, fees, commissions, or other property traceable to the wrongful conduct alleged herein;

(j) For avoidance and recovery of any transfers, distributions, or proceeds determined to have been wrongfully diverted from loan proceeds funded by Ameritrust;

(k) For pre-judgment interest at the highest rate permitted by law;

(l) For post-judgment interest as allowed by Maryland law;

(m) For costs of suit incurred herein;

(n) For reasonable attorneys' fees where authorized by contract, statute, equity, or other applicable law, including but not limited to the Business Purpose Broker Agreement, the RICO Act, Md. Code Ann., Real Property § 7-406, and any applicable indemnity provisions;

(o) For such other and further legal or equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: September 9, 2026

*<u>/s/ Gregory L. Arbogast</u>*

Gregory L. Arbogast, Esq. (AIS #1012140026)
Rebekah P. Nickerson (AIS #2012180005)
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland 21231
Tel.: 410-230-0660
Fax: 410-230-0667
GArbogast@coleschotz.com
RNickerson@coleschotz.com

Tiffany Castillo (*pro hac vice forthcoming*)
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Tel: 201-561-7037
Fax: 201-489-1536
Tcastillo@coleschotz.com
*Attorneys for Plaintiff*