**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DIS~~C~~TRICT OF MARYLAND**

**AMERITRUST MORTGAGE CORPORATION,**
3201 CROSS TIMBERS ROAD~~,~~
BUILDING 3
FLOWER MOUND, TEXAS 75028

**Plaintiff, v.**

**FIRSTLOANS INC.,**
1109 MCDONALD AVENUE
BROOKLYN, NEW YORK 11230

SERVE:
AARON SPIELMAN
1109 MCDONALD AVENUE~~,~~
BROOKLYN, NEW YORK 11230

**JASON TAYLOR D/B/A CAPITAL SERVICES GROUP,**
Case No. 1:26-cv-03574-ELH 4044 GANFORD COURT
JARRETSVILLE, MARYLAND 21229

**CHRISTOPHER ACTIE,**
739 WESTHILLS PARKWAY
BALTIMORE, MARYL~~K~~AND 21229

**REXTAR TITLE SERVICES, LLC,**
1004 DULANEY VALLEY ROAD
TOWSON, MARYLAND 21204

SERVE:
MARCO RODRIGUEZ
1004 DULANEY VALLEY ROAD~~,~~
TOWSON, MARYLAND 21204

**FIDELITY NATIONAL TITLE INSURANCE COMPANY,**
601 RIVERSIDE AVENUE
JACKSONVILLE, FLORIDA 32204

Case 1:26-cv-03574-ELH Document 2 Filed 09/09/26 Page 2 of 66

SERVE:
THE CORPORATION TRUST INC.
2405 YORK ROAD,
SUITE 201
TIMONIUM, MARYLAND 21093

**SHRAGA CHAIM LERNER,** 3205
NORTHBROOK ROAD,
PIKESVILLE, MARYLAND 21208

**SLDL PROPERTIES LLC,**
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

SERVE:
SHRAGA LERNER
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

**SUNRAY MGMT LLC,**
3500 BOSTON STREET,
SUITE C,
BALTIMORE, MARYLAND 21224

SERVE:
SHRAGA LERNER
3500 BOSTON STREET,
SUITE C,
BALTIMORE, MARYLAND 21224

**1258 GLYNDON LLC,**
3205 NORTHBROOK ROAD,
BALTIMORE, MARYLAND 21208

SERVE:
SHRAGA LERNER
1517 REISTERSTOWN ROAD,
BALTIMORE, MARYLAND 21208

**CARDINAL MGMT LLC,**
3500 BOSTON STREET,
BALTIMORE, MARYLAND 21224

SERVE:
SHRAGA LERNER 3500
BOSTON STREET,

Case 1:26-cv-03574-ELH Document 3 Filed 09/09/26 Page 3 of 66

BALTIMORE, MARYLAND 21224

**BENJAMIN EIDLISZ,**
10 BROOKSIDE DRIVE,
POMONA, NEW YORK 10970

**STANFORD POWELL, LLC,**
6340 SECURITY BLVD,
SUITE 100 PMB 1006 BALTIMORE,
MARYLAND 21207

SERVE:
VICTOR SIMON
6340 SECURITY BOULEVARD,
SUITE 100 PMB 1006 BALTIMORE,
MARYLAND 21207

**MAPLE & GREEN LLC,**
1660 E COLD SPRINGS LANDE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE,
BALTIMORE, MARYLAND 21218

**KENYON WINCHESTER LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319
BALTIMORE, MARYLAND 21224

**GLOVER COLLINS, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE, BALTIMORE,
MARYLAND 21218 **POPLAND STREET PROPERTIES, LLC,** 1600 E COLD SPRINGS LANE, BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1660 E COLD SPRING LANE,
BALTIMORE, MARYLAND 21218

**GRACE POPLAND, LLC,**
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1600 E COLD SPRINGS LANE,
BALTIMORE, MARYLAND 21218

**FAIRHAVEN AVENUE PROPERTIES, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**CANCUN BERNAL, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

**DUKELAND ROSE, LLC,**
3500 BOSTON STREET,
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET,
SUITE 319,

BALTIMORE, MARYLAND 21224

**1613 SPRUCE STREET, LLC,** 1600
E COLD SPRINGS LANE~~,~~
BALTIMORE, MARYLAND 21218

SERVE:
BENJAMIN EIDLISZ
1600 E COLD SPRINGS LANE~~,~~
BALTIMORE, MARYLAND 21218

**FAYETTE NOBLE, LLC,**
6340 SECURITY
~~BLVD,~~BOULEVARD
SUITE 100 PMB 1006, BALTIMORE,
MARYLAND 21207

SERVE:
VICTOR SIMON
6340 SECURITY
~~BLVD,~~BOULEVARD
SUITE 100 PMB 1006, BALTIMORE,
MARYLAND 21207

**ORLEANS STREET, LLC,**
3500 BOSTON STREET~~,~~
SUITE 319,
BALTIMORE, MARYLAND 21224

SERVE:
BENJAMIN EIDLISZ
3500 BOSTON STREET~~,~~
SUITE 319,
BALTIMORE, MARYLAND 21224

**ELUZER GOLD,**
6 MARMON PLACE~~,~~
SPRING VALLEY, NEW YORK 10977

**KESEF VENTURES, LLC,**
2611 GARRISON ~~LVD~~BOULEVARD
BALTIMORE, MARYLAND 21216

SERVE:

ELUZER GOLD

2611 GARRISON ~~LVD~~BOULEVARD
BALTIMORE, MARYLAND 21216

**EGBE VENTURES, LLC,**
5000 THAYER CENTER~~,~~
SUITE C,
OAKLAND, MARYLAND 21550

SERVE:
5000 THAYER CENTER~~,~~
SUITE C,
OAKLAND, MARYLAND 21550

**ZAHAV VENTURES, LLC,**
5000 THAYER CENTER~~,~~
SUITE C,
OAKLAND, MARYLAND 21550

SERVE:
ELUZER GOLD
5000 THAYER CENTER~~,~~
SUITE C,
OAKLAND, MARYLAND 21550

**LEVY VENTURES, LLC,**
2718 ORLEANS AVENUE
BALTIMORE, MARYLAND 21224

SERVE:
ELUZER GOLD
2718 ORLEANS AVENUE
BALTIMORE, MARYLAND 21224

**GELT VENTURES, LLC,**
3500 BOSTON STREET~~,~~
BALTIMORE, MARYLAND 21224

SERVE:
SIMMY VANDERHOOF
3500 BOSTON STREET~~,~~
BALTIMORE, MARYLAND 21224

**ZAHAV PLUS VENTURES,**
5000 THAYER CENTER~~,~~
SUITE C,

OAKLAND, MARYLAND 21550

SERVE:
ELUZER GOLD
5000 THAYER CENTER,
SUITE C,
OAKLAND, MARYLAND 21550,

**Defendants.**

**FIRST AMENDED COMPLAINT**

Plaintiff, Ameritrust Mortgage Corporation sues Defendants, FirstLoans, Inc.; Jason Taylor d/b/a Capital Services Group; Christopher Actie; REXTAR Title Services, LLC; Fidelity National Title Insurance Company; Shraga Chaim Lerner; SLDL Properties LLC; Sunray MGMT LLC; 1258 Glyndon LLC; Cardinal MGMT LLC; Benjamin Eidlisz; Standford Powell, LLC; Maple & Green LLC; Kenyon Winchester LLC; Glover Collins, LLC; Popland Street Properties, LLC; Grace Popland, LLC; Fairhaven Avenue Properties, LLC; Cancun Bernal, LLC; Dukeland Rose, LLC; 1613 Spruce Street, LLC; Fayette Noble, LLC; Orleans Street, LLC; Eluzer Gold; Kesef Ventures, LLC; EGBE Ventures, LLC; Zahav Ventures, LLC; Levy Ventures, LLC; Gelt Ventures, LLC; and Zahav Plus Ventures and states as follows:

**NATURE OF SUIT**

1. The Defendants acted in concert to organize and effectuate an extensive real estate fraud ring involving ~~approximately 90~~at least one hundred forty-nine (149) loans secured by real property ~~that has caused approximately $14,076,00.00 of harm to Ameritrust~~in or around the Baltimore, Maryland area. The fraud has resulted in millions of dollars of damages to multiple lenders and ~~that~~ has severely disrupted the mortgage lending market for investment properties in Baltimore and its surrounding areas.

2. Ameritrust, one of the lenders who was victimized by the fraud, suffered

approximately thirteen million eight hundred ninety-eight thousand three hundred fifty dollars ($13,898,350.00) of principal balance losses in connection to ninety (90) fraudulent loans.

3. In addition to Ameritrust, Commercial Lender LLC and RCN Capital, LLC also suffered approximately nine million six hundred sixty-nine thousand seven hundred dollars ($9,669,700.00) in principal balance losses in connection to fifty-nine (59) fraudulent loans, as alleged in *Commercial Lender, LLC, et al. v. Actie, et al.*, Case No. 1:26-cv-03725-BAH, filed in the United States District Court for the District of Maryland on September 20, 2026 ("Commercial Lender Complaint").

4. The fraudulent scheme was principally orchestrated by Defendants Shraga Chaim Lerner, Benjamin Eidlisz, and Eluzer Gold, who acted individually and through their various special purpose entities they created to mask their scheme.

5. Defendants Shraga Chaim Lerner, Benjamin Eidlisz, and Eluzer Gold created an enterprise of themselves, various special purpose entities they created to mask their involvement, as well as a mortgage broker, appraisers, and a title company, to work in concert to defraud various lenders, including Ameritrust, and to profit from the loan proceeds they obtained.

6. The whole of their scheme has spanned over at least six years. Lerner, Eidlisz, and their affiliated special-purpose entities acquired some of the real properties at issue in this lawsuit ("Subject Properties") as early as 2020, and Gold and his affiliated special-purpose entities sold numerous Subject Properties acquired in the fraudulent scheme to third parties as recently as September 2026.

~~3~~7. To effectuate the fraud, a special purpose vehicle created, wholly-owned, and managed by either

Lerner or Eidlisz would purchase a Subject ~~p~~Property in or around Baltimore

Ceity for ana low amount, often in the range of $430,000- to $560,000.00, but in many cases for no consideration.

48. Oftentimes Oonly a few months later, without any property improvements or changes in the

market, the new property owner would contract to sell the Subject pProperty to another special purpose entity owned by either Lerner, Eidlisz, or Gold for a purchase price approximately three hundred percent (300%) higher – usually in the $200,000.00 range.

59. The purchaser, together with the assistance of a mortgage loan broker, would apply for a loan in an iterative loan application process using a pre-preparedpackaged appraisal and title report

omitting the recent prior sale and its significantly lesser sale price. only a few months earlier.Ninety (90) 91 of the loan applications, which are the subject of this lawsuit, were applicationssubmitted to Ameritrust (the "Loan Applications" or "Application Packages"), but the Defendants perpetrated the same fraud on other lenders involving hundreds of other properties.

610. Each of the pre-preparckaged appraisals reports submitted with the Loan Applications affirmed the new sale price as a reasonable

reflection of the Subject pProperty's value. The appraisersal reports were either prepared negligently by failing to review even the most recent property sale records or were prepared in concert with the fraud and purposefully omitted the prior sale, despite knowing that knowledge that in many instances the only arms-length sale occurred on a few months prior for 25% of the purported appraised value.

711. Ultimately, when the loan was made, the proceeds were paid to the seller at the

closing. The ~~buying entity~~purchaser had no intention of ever repaying the loan and knew full well that the lender was grossly under-collateralized, given that the actual reflection of the property's value was only a fraction of the loan amount.

~~8~~12. The ~~buying entity~~purchaser defaulted virtually immediately by failing to pay even the first

few

months of loan payments.

13. The Defendants then shared the loan proceeds amongst their enterprise and reinvested some of the proceeds to purchase new properties, pay off the mortgage broker, title company, and appraisers, and recycle their scheme.

~~9~~14. Ameritrust was left to collect the defaulted loans from ~~a~~ defunct special purpose entit~~y~~ies without any assets, except ~~a~~ propert~~y~~ies worth only a fraction of the sale price (if anything) represented by the pre-~~prepared~~packaged appraisals. The conduct effectively left Ameritrust with an unsecured loan.

~~10~~15. Certain of the borrowing entities also filed for protection under the bankruptcy laws of the United States – further insulating Lerner, Gold, and Eidlisz from potential liability. Each bankruptcy has now been voluntarily dismissed and, as such, Ameritrust is permitted to pursue its claims against those entities in this action without violating ~~the~~any automatic stay.

~~11~~16. In addition to Ameritrust, the conspirators have caused a ripple effect that has far-reaching implications on the Baltimore real estate market; the vitality of the neighborhoods in which the properties are located; and the secondary distressed debt market at large by copying and pasting its scheme hundreds of times and involving multiple lenders.

~~12~~17. The anticipated influx of foreclosed properties onto the real estate market threatens

to trigger a sharp decline in the local property values. Meanwhile, the distressed loan assets secured by these properties are being circulated through the secondary mortgage market, as counterparties attempt to shift the financial burden in a manner akin to a metaphorical "hot potato." During this time, the abandoned homes have been overtaken by squatters, with local residents referring to several of these properties as "crack houses," exacerbating the decline in the stability and safety of Baltimore neighborhoods—and further eviscerating any value that Ameritrust's lien on the various properties held.

~~13~~18. Demonstrating the brazenness of the scheme, one of the participants submitted ~~a~~ fraudulent declarations under penalty of perjury pursuant to 28 U.S.C. § 1746 to the Bankruptcy Court, concealing his involvement in the conspiracy. Relying on this false representation, the Court appointed him to manage the very properties held

in bankruptcy – the properties his entities initially purchased and subsequently sold to the other ~~subsequent~~ straw purchaser ~~borrower~~ entities – and he is currently being compensated for that role.

**PARTIES**

~~14~~19. Plaintiff, Ameritrust Mortgage Corporation, is, and at all relevant times herein, was~~, a~~ a corporation formed and existing under the laws of the State of Illinois, with its offices located at 3201 Cross Timbers Road, Building 3, Flower Mound, Texas 75028. Ameritrust is a mortgage lender that operates a wholesale mortgage channel whereby mortgage brokers submit residential mortgage loans to Ameritrust for underwriting and funding. Ameritrust has held a Maryland Mortgage Lender License since September 16, 2022.

~~15~~20. Defendant, FirstLoans, Inc., is, and at all relevant times herein, was~~,~~ a corporation formed

and existing under the laws of the State of New York having a principal place of business located at 1109 McDonald Avenue, Brooklyn, NY 11230. FirstLoans entered into a certain Business Purpose Broker Agreement with Ameritrust, with an effective~~ly~~ date~~d as~~ of March 26, 2024. FirstLoans sourced potential applicants for business purpose mortgage loans~~,~~ ~~completed~~and submitted loan packages to Ameritrust for underwriting and funding. FirstLoans sourced the loans identified in this Complaint from borrowers organized under the laws of the State of Maryland for the purchase of real property in the State of Maryland. The allegations identified against First~~l~~Loans in this Complaint arise from transactions occurring in the State of Maryland.

~~16~~21. Defendant Jason Taylor d/b/a Capital Services Group, is, and at all relevant times herein, was~~,~~ an individual residing in the State of Maryland. Taylor's principal place of business is 4044 Ganford Court, Jarrettsville, Maryland 21084. Taylor registered the trade name "Capital Services Group" under his individual name. Taylor is an appraiser of residential real property and appraised various Subject ~~p~~Properties for FirstLoans related to the Loan ~~a~~Applications for residential mortgage loans submitted by FirstLoans to Ameritrust.

~~17~~22. Defendant Christopher Actie, is, and at all relevant times referenced herein, was~~,~~ an

individual residing in the State of Maryland. Actie's principal place of business is 739 Westhills ~~Pkwy~~Parkway, Baltimore, Maryland, 21229. Actie is an appraiser of residential real property and appraised various Subject ~~p~~Properties for FirstLoans related to the Loan ~~a~~Applications for residential mortgage loans submitted by FirstLoans to Ameritrust.

~~18~~23. Defendant REXTAR Title Services, LLC, is, and at all relevant times referenced herein, was~~,~~ a Maryland limited liability company with a principal place of business at 1004 Dulaney Valley Road, Towson, Maryland 21204. REXTAR is in the business of providing title and

closing related services for residential and commercial real estate transactions in the State of Maryland. REXTAR performed title and closing related services for Loan Applications submitted by FirstLoans to Ameritrust. REXTAR's website now identifies REXTAR as "Marvel Title Company."

~~19~~24. Defendant Fidelity National Title Insurance Company, is, and at all relevant times referenced herein, was~~,~~ a Florida corporation with a principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity is a national title insurance company for residential and commercial real estate and mortgages. Fidelity was the named insurer for title insurance policies and Closing Protection Letters issued by REXTAR for Loan Applications submitted ~~to~~ by First~~-~~Loans to Ameritrust, and as a result Fidelity served as the insurer in ~~more than~~at least ninety (90) purchase transactions for real property in the State of Maryland.

~~20~~25. Defendant Shraga Chaim Lerner, is, and at all relevant times herein, was an individual residing in the State of Maryland with a principal residence at 3205 Northbrook Road, Pikesville, Maryland 21208. Lerner formed each of the Lerner Participant Sellers (further defined below and collectively, the "Lerner Participant Sellers") to serve as his alter ego. Ameritrust's belief that the Lerner Participant Sellers serve as Lerner's alter ego is based on the fact that Lerner signed, in his capacity as "sole member" or "member," each of the settlement statements for each of the Subject ~~p~~Properties sold by a Lerner Participant Seller under this conspiracy. Lerner formed the Lerner Participant Sellers as special-purpose entities to acquire and sell real estate in transactions that artificially inflated the value of the real estate to maximize the loan proceeds flowing to the seller. Lerner formed the special-purpose entities to mask his and his co-conspirators' (including Gold's and Eidlisz's) personal involvement and Lerner caused all of the

proceeds of the sale to be ultimately paid to him personally and did not retain any of the funds realized from the sale of the Subject ~~p~~Properties ~~at issue~~ in the special-purpose entities formed.

~~21~~26. Defendant SLDL Properties LLC ("SLDL Properties" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3205 Northbrook Road, Baltimore, Maryland, 21208. SLDL Properties was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~22~~27. Defendant Sunray MGMT LLC ("Sunray MGMT" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite C, Baltimore, Maryland, 21224. Sunray MGMT was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~23~~28. Defendant 1258 Glyndon LLC ("1258 Glyndon" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3205 Northbrook Road, Baltimore, Maryland, 21208. 1258 Glyndon was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~24~~29. Defendant Cardinal MGMT LLC ("Cardinal MGMT" or a "Lerner Participant Seller"), is, and at all relevant times referenced herein, was a Maryland limited liability company with a principal place of business at 3500 Boston Street, Baltimore, Maryland 21224. Cardinal

MGMT was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~25~~30. Benjamin Eidlisz, is, and at all relevant times herein, was an individual residing in the State of New York with a principal residence at 10 Brookside Drive, Pomona, New York 10970. Ameritrust is informed and believes, and based thereon alleges, Eidlisz formed each of the Eidlisz Participant Sellers (further defined below and collectively, the "Eidlisz Participant Sellers") to serve as his alter ego. Ameritrust's belief that the Eidlisz Participant Sellers serve as Eidlisz's alter ego is based on the fact that Eidlisz signed as the "sole member" or "managing member" for each of the settlement statements for each of the Subject ~~p~~Properties sold by the Eidlisz Participant Sellers under this conspiracy. Eidlisz formed the Eidlisz Participant Sellers, which are all entities organized under the laws of the State of Maryland, as special-purpose entities to purchase real properties located in the State of Maryland in transactions that artificially inflated the value of the real estate to maximize the loan proceeds flowing to the seller. Eidlisz formed the special-purpose entities to mask his and his co-conspirators' (including Gold's and Lerner's) personal involvement in the transactions involving real property in the State of Maryland, and Eidlisz caused all of the proceeds of the sale of real property located in the State of Maryland to be ultimately paid to ~~him~~himself personally and did not retain any of the funds realized from the sale of the properties located in the State of Maryland in the special-purpose entities formed.

~~26~~31. Defendant Stanford Powell, LLC ("Stanford Powell" or a "Eidlisz Participant Seller"), is, and at all relevant times herein, was a Maryland limited liability company with a principal place of business at 6340 Security ~~BLVD~~Boulevard, Suite 100 PMB 1006, Baltimore, Maryland 21207. Stanford Powell was created as a special purpose entity to acquire real property at

market value and then sell such property to affiliated entities in a transaction masking the original purchase price at an inflated value.

~~27~~32. Defendant Maple & Green, LLC ("Maple & Green" or a "Eidlisz Participant Seller"), is, and at all times relevant herein, was a Maryland limited liability company with a principal place of business at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Maple & Green was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~28~~33. Defendant Kenyon Winchester, LLC ("Kenyon Winchester" or a "Eidlisz Participant Seller"), is, and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Kenyon Winchester was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~29~~34. Defendant Glover Collins ("Glover Collins" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal place of business at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Glover Collins was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~30~~35. Defendant Popland Street Properties, LLC ("Popland Street Properties" or a "Eidlisz Participant Seller"), is, and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 1660 E Cold Spring Lane, Baltimore, Maryland 21218. Popland Street Properties was created as a special purpose entity to acquire real property at

market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~31~~36. Defendant Grace Popland, LLC ("Grace Popland" or a "Eidlisz Participant Seller"), is and at all relevant times herein was, a Maryland limited liability company with a principal place of business at 1660 E Cold Spring Lane, Baltimore, Maryland 21218. Grace Popland was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~32~~37. Defendant Fairhaven Avenue Properties, LLC ("Fairhaven Avenue Properties" or a "Eidlisz Participant Seller") is, and ~~was~~ at all relevant times herein was, a Maryland limited liability company with a principal place of business at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Fairhaven Avenue Properties was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~33~~38. Defendant Cancun Bernal, LLC ("Cancun Bernal" or a "Eidlisz Participant Seller") is, and at all relevant times herein was, a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Cancun Bernal was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~34~~39. Defendant Dukeland Rose, LLC ("Dukeland Rose" or a "Eidlisz Participant Seller"), is, and ~~was~~ at all relevant times herein was, a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Dukeland Rose was created as a special purpose entity to acquire real property at market value and then sell such

property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~35~~40. Defendant 1613 Spruce Street, LLC ("Spruce Street" or a "Eidlisz Participant Seller"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 1660 E Cold Springs Lane, Baltimore, Maryland 21218. Spruce Street was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~36~~41. Defendant Fayette Noble, LLC ("Fayette Noble" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 6340 Security ~~BLVD~~Boulevard, Suite 100 PMB 1006, Baltimore, Maryland 21207. Fayette Noble was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~37~~42. Defendant Orleans Street, LLC ("Orleans Street" or a "Eidlisz Participant Seller") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 3500 Boston Street, Suite 319, Baltimore, Maryland 21224. Orleans Street was created as a special purpose entity to acquire real property at market value and then sell such property to affiliated entities in ~~a~~ transactions masking the original purchase price at an inflated value.

~~38~~43. Eluzer Gold, is, and at all relevant times herein, was an individual residing in the State of New York with a principal residence at 6 Marmon Place, Spring Valley, New York 10977. Ameritrust is informed and believes, and based thereon alleges, Gold formed each of the Gold Participant Purchasers (further defined below and collectively, the "Gold Participant Purchasers") to

serve as his alter ego. Ameritrust's belief that the Gold Participant Purchasers serve as Gold's alter ego is based on the fact that Gold signed as the "sole member" or "managing member" for each of the settlement statements for each of the Subject ~~p~~Properties located in the State of Maryland purchased by a Gold Participant Purchaser under this conspiracy. Gold formed the Gold Participant Purchasers, which are all entities organized under the laws of the State of Maryland, as special-~~-~~purpose entities to acquire properties in the State of Maryland with little or no actual capital invested in a scheme where funds represented as down payments were returned directly or indirectly through sham renovation invoices and improper settlement disbursements. Gold formed the special-purpose entities to mask his and his co-conspirators' (including Lerner's and Eidlisz's) personal involvement in their fraudulent activity involving real property in the State of Maryland and funneled any capital investment back to himself through payments for fake renovations, thereby effectively making any funds invested into the Gold Participant Purchasers his personal funds.

~~39~~44. Defendant Kesef Ventures, LLC ("Kesef Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 2611 Garrison Boulevard, Baltimore, Maryland 21216. Kesef Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~40~~45. Defendant EGBE Ventures, LLC ("EGBE Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland Maryland 21550. EGBE Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at

overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~41~~46. Defendant Zahav Ventures, LLC ("Zahav Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland MD 21550. Zahav Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~42~~47. Defendant Levy Ventures, LLC ("Levy Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 2718 Orleans Avenue, Baltimore, Maryland 21224. Levy Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~43~~48. Defendant Gelt Ventures, LLC ("Gelt Ventures" or a "Gold Participant Purchaser"), is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 3500 Boston Street, Baltimore, Maryland 21224. Gelt Ventures was created as a special purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~44~~49. Defendant Zahav Plus Ventures ("Zahav Plus" or a "Gold Participant Purchaser") is, and at all relevant times herein, was a Maryland limited liability company with a principal office at 5000 Thayer Center, Suite C, Oakland, Maryland 21550. Zahav Plus was created as a special

purpose entity to acquire real property with little or no actual capital invested at overly inflated valuations for the purpose of funneling loan proceeds to its co-conspirators, purposefully defaulting on the loan, and leaving the lender woefully undercollateralized.

~~45~~50. Defendants Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers, at all times relevant hereto, conspired and acted in concert with each other to commit the wrongs against Ameritrust alleged herein, and in doing so were at all relevant times the agents, servants, employees, principals, joint venturers, alter egos, co-conspirators and/or partners of each other. Each of the Eidlisz Participant Sellers, the Lerner Participant Sellers, and the Gold Participant Purchasers was created for the sole purpose of perpetrating the fraud and masking the interconnection of their principals and served no other purpose other than to funnel money directly between their principals. Ameritrust is further informed and believes, and based upon such information and belief alleges, that in doing the things alleged in this Complaint, Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers were each acting within the scope of authority conferred upon them by the consent, approval, and/or ratification of each other, whether said authority was actual or apparent. Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers were each aware, agreed, and intended that the others engaged in the tortious misconduct alleged in this Complaint. Further, Gold, Gold Participant Purchasers, Eidlisz, Eidlisz Participant Sellers, Lerner, and Lerner Participant Sellers each gave substantial assistance and/or encouragement to each other, which was a substantial factor in causing Ameritrust the harm outlined herein.

## JURSIDICTION AND VENUE

### I. Subject-matter Jurisdiction.

~~46~~51. This Court has federal question subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Ameritrust asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, including claims under 18 U.S.C. §§ 1962(a), 1962(c), and 1962(d).

~~47~~52. This Court has supplemental jurisdiction over Ameritrust's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts and form part of the same case or controversy as Ameritrust's federal RICO claims.

~~48~~53. In the alternative, and independent of federal-question jurisdiction, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between Ameritrust and Defendants.

~~49~~54. Ameritrust Mortgage Corporation is, and at all relevant times was, either a corporation

organized and existing under the laws of the State of Illinois with its offices located in California until 2025 ~~and~~or thereafter in Texas and is therefore a citizen of Illinois or Texas for purposes of 28 U.S.C. § 1332(c).

~~50~~55. Upon information and belief, none of the Defendants are citizens of Illinois or Texas and the ultimate individual owners of the limited liability company Defendants are not citizens of Illinois or Texas.

## II. Personal Jurisdiction.

~~51~~56. This Court has personal jurisdiction over Defendants because they are either residents of the State of Maryland, entities organized under the laws of the State of Maryland, purposefully directed activities toward the State of Maryland, transacted business in Maryland, participated in mortgage loan transactions involving Maryland properties, provided appraisal,

settlement, title, brokerage, and related services in Maryland, and/or committed tortious acts in Maryland giving rise to the claims asserted herein.

~~52~~57. This Court has personal jurisdiction over REXTAR Title Services, LLC because REXTAR is a Maryland limited liability company with its principal place of business in Maryland and conducted the settlement, escrow, title, closing, and related services that are the subject of this action in Maryland.

~~53~~58. This Court has personal jurisdiction over Jason Taylor and Christopher Actie because they performed appraisal services concerning real property located in Maryland, prepared appraisal reports intended for use in Maryland mortgage transactions, and purposefully directed their activities to Maryland in connection with the conduct alleged herein.

~~54~~59. This Court has personal jurisdiction over FirstLoans, Inc. because it originated, brokered, processed, and submitted mortgage loan transactions involving Maryland real estate and purposefully availed itself of the privilege of conducting business within Maryland.

~~55~~60. This Court has personal jurisdiction over Gold, Lerner, Eidlisz, the Gold Participant Purchasers, the Lerner Participant Sellers, the Eidlisz Participant Sellers, and the remaining Defendants because they owned, purchased, sold, financed, transferred, controlled, or otherwise participated in transactions involving Maryland real property and the claims asserted herein arise directly from those contacts and the Gold Participant Purchasers, the Lerner Participant Sellers, the Eidlisz Participant Sellers are organizations organized under the laws of the State of Maryland.

## III. **Venue**

~~56~~61. Venue is proper in the United States District Court for the District of Maryland

pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this District and a substantial part of the events or omissions giving rise to Ameritrust's claims occurred in this District.

~~57~~62. Venue is further proper because the mortgage loans, appraisals, property transfers, title work, settlement services, closings, escrow activities, and related conduct that form the basis of Ameritrust's claims concerned real property located in Maryland, including numerous properties located within this District.

~~58~~63. Venue is additionally proper pursuant to 18 U.S.C. § 1965(a) because one or more Defendants reside, are found, have agents, or transact their affairs within this District.

**FACTUAL ALLEGATIONS**

I. **Ameritrust's Business.**

~~59~~64. Ameritrust is a mortgage banker licensed in approximately thirty-six (36) states and the District of Columbia. Ameritrust has held a Maryland Mortgage Lender License since September 16, 2022. Ameritrust operates a wholesale division whereby mortgage brokers source prospective mortgage applicants, complete applications with the applicants, and submit their applications to Ameritrust for underwriting and funding.

65. As a mortgage banker, Ameritrust makes loans to assist people in acquiring real property and secure its loans by obtaining a lien on the real property being purchased. Ameritrust ensures the value of its lien meets or exceeds the balance on the loan to ensure that, if the borrower does not repay the loan, Ameritrust has a source of recovery of the balance due.

6066. As is customary in any lender's wholesale mortgage division, when the lender is deciding whether to underwrite a loan, Ameritrust relies on mortgage brokers to submit honest, truthful, and complete loan applications.

6167. Ameritrust also relies on various third-party service providers – including those providing title, closing, and appraisal services – to furnish reports that contain complete, accurate, and truthful information concerning the applicants, the subject matter transactions, and the real property securing the mortgage loans.

6268. Frequently, the mortgage broker submitting the application orders, compiles, and submits title work and appraisals in support of their application in an iterative loan application process.

6369. As a wholesaler, Ameritrust sells the various loans that it originates on the open secondary market, which also relies on the premise that the applications soliciting the loans were honest, truthful, and complete.

II. **Participating Broker.**

6470. FirstLoans was one of the mortgage brokers on whom Ameritrust relied when determining whether to underwrite and make various loans.

6571. FirstLoans and Ameritrust entered into a certain Business Purpose Broker Agreement, effective as- of March 26, 2024 (the "Agreement"), pursuant to which FirstLoans agreed to source potential loan applicants, complete loan applications, in an iterative process, and submit such applications with supporting documentation to Ameritrust. (eEach submission an "Application Package.") referenced in this Compliant was opened and started long before it was officially finalized.

72. Pursuant to its terms, the Agreement must be interpreted using California state law.

6673. Pursuant to the Brokerwarranties contained in the Agreement, FirstLoans agreed that Ameritrust could rely on FirstLoans to originate and submit legitimate loan transactions suitable for underwriting and sale on the secondary mortgage market.

74. Ameritrust entered into the Agreement with the expectation that FirstLoans would provide truthful, accurate, complete, and reliable information sufficient to permit sound underwriting decisions and the origination of loans suitable for sale in the secondary mortgage market.

75. In the Agreement, FirstLoans represented and warranted that none of the loan applications had any instance of fraud, misrepresentation, or material omission.

6776. FirstLoans utilized its role under the Broker Agreement to conceal material information, channel appraisal assignments to pre-selected appraisers, and submit transactionsdocuments related to the Subject Properties that it knew contained material omissions, false information, and that would otherwise not satisfy the terms of the Agreement.

77. Each of the ninety (90) Loan Applications brokered and submitted by FirstLoans to Ameritrust and the resulting fraudulent transactions is detailed in a table attached hereto as **Exhibit A**, which is hereby incorporated into the body of this Complaint, as if fully restated herein. Exhibit A includes the address of each of the Subject Properties; the date each Loan Application was completed (which, through the iterative process, is not necessarily the date the Loan Application was started and when information was first supplied to Ameritrust) and the settlement date (often the same date as the date each Loan Application was completed); the value of the Subject Property attested to in each of the Loan Applications; the loan amount for each fraudulent

transaction; the purchaser; the signatory on the settlement statement for purchaser; the seller; the signatory on settlement statement for the seller; and the purchase price.

78. Further detail about each of the ninety (90) Loan Applications brokered and submitted by FirstLoans to Ameritrust is provided in another table attached hereto as **Exhibit B**, which is hereby incorporated into the body of this Complaint, as if fully restated herein. Exhibit B includes the address of each of the Subject Properties; the Participating Title Agent; the date of the preliminary title report; the name of the appraiser; the effective date of the appraisal; the appraisal amount; the most recent acquisition date of the Subject Properties prior to the fraudulent transactions at issue here; and the prior acquisition amount.

79. Finally, additional detail about each of the ninety (90) Loan Applications brokered and submitted by FirstLoans to Ameritrust and the fraudulent transactions is provided in another table attached hereto as **Exhibit C**, which is hereby incorporated into the body of this Complaint, as if fully restated herein. Exhibit C includes the property address of the Subject Properties; the dates of interstate electronic wires in connection to the Loan Application and/or fraudulent transactions; and the dates of interstate mail transmittals in connection with the Loan Application and/or fraudulent transactions.

III. **~~The First~~ One of Many Fraudulent Loans.**

80. As detailed more fully in Exhibits A, B, and C, the Defendants' employed the same fraudulent scheme with respect to each of the Loan Applications and Subject Properties.

81. By way of example, the following paragraphs detail the fraudulent scheme the Defendants employed with respect to the acquisition, sale, and receipt of loan proceeds for 2806 Ellicott Drive, Baltimore, Maryland 21216, which scheme the Defendants repeated with respect to the other Subject Properties.

~~68~~82. Approximately thirteen (13) days after entering into the Agreement, on or ~~about~~around April 8, 2024, FirstLoans, acting as the Participating Broker, submitted an initial Application Package to Ameritrust, which was later finalized on or around April 22, 2024. *See* Ex. A.

~~69~~83. The Application Package requested a purchase-money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from Sunray MGMT, a Lerner Participant Seller, located at 2806 Ellicott ~~Dr.~~Drive, Baltimore, Maryland 21216, for $215,000. Ameritrust was asked to provide a loan in the amount of $172,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-~~five~~three thousand dollars ($43,000). *See* Ex. A.

~~70~~84. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either: (a) worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and Sunray MGMT without conducting even the most basic of independent searches to verify the information provided to them.

~~71~~85. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

~~72~~86. The preliminary title report prepared by REXTAR was dated April ~~4~~5, 2024, ~~four~~three days prior to FirstLoans submitting the initial Application Package to Ameritrust. *See* Ex. B.

~~73~~87. Also prior to submitting the initial Application Package, FirstLoans had ~~also~~ already ordered the appraisal from Taylor, acting as ~~a~~the Participating Appraiser.

~~74~~88. The appraisal prepared by Taylor was ~~dated three~~ effective April 4, 2024, four days prior to

FirstLoans

submitting the Application Package to Ameritrust. *See* Ex. B.

~~75~~89. FirstLoans emailed a copy of the appraisal to Ameritrust on or about April 8, 2024.

~~76. The purchase contract between Sunray MGMT, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated April 4, 2024, four days prior to FirstLoans submitting the Application Package to Ameritrust.~~

~~77~~90. Taylor's appraisal report ~~reflected~~certified a value of $215,000 and affirmatively stated "the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months."

~~78~~91. The ~~Participating Title Agent~~Loan Application represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-~~five~~three thousand dollars ($43,000).

~~79~~92. In reliance on FirstLoan's representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $172,000 on April 22, 2024, by sending ~~a~~an interestate wire transfer to REXTAR.

~~80~~93. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business. Also, as is customary in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an "early payment default."

~~81~~94. ~~Sometime after the new year,~~ Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loan.

~~82~~95. Ameritrust commenced an investigation and discovered that the ~~s~~Subject ~~p~~Property had, in fact, been purchased by Sunray MGMT, a Lerner Participant Seller, only ~~three~~two months before the purchase Ameritrust financed, on ~~January 18~~February 2, 2024.

~~83~~96. Shockingly, the ~~January 18~~February 2, 2024 sale was for only $~~5~~73,000, an amount approximately ~~seventy~~sixty-five percent (~~75~~65%) less than the April 4, 2024 contract purchase price. *See* Ex. B.

~~84~~97. Ameritrust reviewed the ~~preliminary title report and the Chain of Title contained therein and prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and it's significantly lower sale price. REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry by failing to review the most basic of title information or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.~~

~~85. Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy and would not have funded the loan.~~

~~86. Ameritrust also reviewed the~~ appraisal report prepared by Taylor in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

~~87~~98. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust; or negligently failed to review even the most basic title information to ascertain the property's value.

~~88~~99. If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill ordinarily

possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

~~89~~100. Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that the appraised value was inflated, that Ameritrust would be woefully undercollateralized on the debt, and would not have funded the loan.

101. ~~90.~~ Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months~~.~~ by failing to pay the loan when and as payments were due.

~~91~~102. Upon payment default, Ameritrust ~~has~~ learned that the real property securing Kesef Ventures's obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

~~92~~103. Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers, devised this scheme in concert, using wire transfers in interstate commerce; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant Sellers devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

## IV. ~~The~~A Second of Many Fraudulent Loans.

104. Another example of the Defendants employing their fraudulent scheme involved the real property located at 3413 Lyndale Avenue, Baltimore, Maryland 21213.

~~93~~105. Approximately sixteen (16) days after entering into the Agreement, on or about

April 11, 2024, FirstLoans, acting as the Participating Broker, submitted another Application Package to Ameritrust, which was later finalized on April 19, 2024. *See* Ex. A.

~~94~~106. The Application Package requested a purchase money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from SLDL Properties, a Lerner Participant Seller, located at 3413 Lyndale Avenue, Baltimore, Maryland 21213, for $215,000. Ameritrust was to provide a loan in the amount of $172,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-~~five~~three thousand dollars ($43,000). *See* Ex. A.

~~95~~107. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either: (a) worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and SLDL Properties without conducting even the most basic of independent searches to verify the information provided to them.

~~96~~108. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

~~97~~109. The preliminary title report prepared by REXTAR was dated April 5, 2024, six days prior to FirstLoans submitting the Application Package to Ameritrust. *See* Ex. B.

~~98~~110. Also prior to submitting the Application Package, FirstLoans had ~~also~~ already ordered the appraisal from Taylor, acting as a Participating Appraiser.

~~99~~111. The appraisal prepared by Taylor was dated April 2, 2024, nine days prior to FirstLoans submitting the Application Package to Ameritrust. *See* Ex. B.

~~100.~~ 112. The purchase contract between SLDL Properties, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated March 20, 2024, twenty-two days prior to FirstLoans first submitting the Application Package to Ameritrust.

1~~0~~13. Taylor's appraisal report reflected a value of $215,000 and affirmatively stated "the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months."

~~102. The Participating Title Agent~~114. The Loan Application represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-~~five~~three thousand dollars ($43,000).

~~103.~~ 115. In reliance on FirstLoans' representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $172,000 on April 19, 2024, by sending ~~a~~an interstate wire transfer to REXTAR.

~~104~~116. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business. Also as is ~~customer~~customary in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an "early payment default."

~~105~~117. Sometime after the new year, Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loan.

~~106.~~ 118. Ameritrust commenced an investigation and discovered that the subject property had, in fact, been purchased by SLDL Properties, a Lerner Participant Seller, on January 8, 2024.

~~107. Shockingly~~ 119. ~~t~~The January 8, 2024 sale was for only $~~3~~55,000, an amount approximately ~~eighty~~seventy- four percent (~~84~~74%) less than the March 20, 2024 contract purchase price. *See* Ex. B.

12~~0~~8. Ameritrust reviewed the preliminary title report~~,~~ and the ~~C~~chain of ~~T~~title contained therein ~~and~~ prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and its significantly lower sale price~~.~~ despite certifying the chain of title contained "[t]he only conveyances affecting said land . . . recorded within twenty-four (24) months of the date of the report[.]"

121. REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry by failing to review the most basic of title information or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.

~~109.~~ 122. Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy, would have known that it would be woefully undercollateralized on the debt, and would not have funded the loan.

~~110.~~ 123. Ameritrust also reviewed the appraisal report prepared by Taylor, in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

~~111.~~ 124. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust; or negligently failed to review even the most basic title information to ascertain the property's value.

~~1~~125. If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill

ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

~~113.~~ 126. Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that ~~eh~~the appraised value was inflated, realized that it would be woefully undercollateralized on the debt, and would not have funded the loan.

~~114.~~ 127. Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months~~.~~ by failing to make the required payments when and as such payments became due and owing.

~~115.~~ 128. Upon default, Ameritrust learned that the real property securing Kesef Ventures' obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

~~116.~~ 129. Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers devised this scheme in concert, using wire transfers in interstate commerce; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant ~~Purchasers~~Sellers devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

## V. ~~The~~A Third Fraudulent Loan.

130. Another example of the Defendants employing their fraudulent scheme involved the real property located at 1602 Darley Avenue, Baltimore, Maryland 21213.

~~Case 1:26-cv-03574-ELH Document 36 Filed 09/09/26 Page 36 of 36~~

1317. Approximately twenty-three (23) days after entering into the Agreement, on or about April 12, 2024, FirstLoans, acting as the Participating Broker, submitted the initial Application Package to Ameritrust., which was later finalized on April 19, 2024. *See* Ex. A.

~~118.~~ 132. The Application Package requested a purchase-money loan in which Kesef Ventures, a Gold Participant Purchaser, was to acquire a property from 1258 Glyndon, a Lerner Participant Seller, located at 1602 Darley Avenue, Baltimore, Maryland 21213, for $217,500. Ameritrust was to provide a loan in the amount of $174,000, with Kesef Ventures, a Gold Participant Purchaser, purportedly contributing a down payment of twenty percent (20%), or forty-

three~~five~~ thousand five hundred dollars ($43,500).

~~119.~~ 133. In submitting the Application Package to Ameritrust, FirstLoans had already lined up its professionals and service providers to ensure that the Application Package, on its face, requested an underwritable and sellable loan. In actuality, the professionals and service providers had either (a): worked in concert to conceal and falsify material information; or (b) negligently provided the information spoon-fed to them by Kesef Ventures and 1258 Glyndon without conducting even the most basic of independent searches to verify the information provided to them.

~~120.~~ 134. Prior to submitting the Application Package, FirstLoans had already ordered the preliminary title report from REXTAR, acting as the Participating Title Agent.

~~121.~~ 135. The preliminary title report prepared by REXTAR was dated April 4, 2024, eight days prior to FirstLoans submitting the Application Package to Ameritrust. *See* Ex. B.

~~122.~~ 136. Also prior to submitting the Application Package, FirstLoans had also already ordered the appraisal from Taylor, acting as a Participating Appraiser.

1237. The appraisal prepared by Taylor was dated April 3, 2024, nine days prior to FirstLoans submitting the Application Package to Ameritrust. *See* Ex. B.

~~124.~~ 138. The purchase contract between 1258 Glyndon, a Lerner Participant Seller, and Kesef Ventures, a Gold Participant Purchaser, was dated March 20, 2024, twenty-three days prior to FirstLoans submitting the Application Package to Ameritrust.

~~125.~~ 139. Taylor’s appraisal report reflected a value of $218,000 and specifically stated “the subject [property] ... [had] not transferred ownership or been listed for sale in the past 36 months.”

~~126.~~ 140. The Participating Title Agent represented that Kesef Ventures, a Gold Participant Purchaser, contributed the requisite down payment of twenty percent (20%), or forty-~~five~~three thousand five hundred dollars ($43,500).

~~127.~~ 141. In reliance on FirstLoans’ representations, as well as those made by REXTAR and Taylor, Ameritrust funded the purchase loan of $174,000 on April 19, 2024, by sending ~~a~~an interstate wire transfer to REXTAR.

142~~8~~. Ameritrust promptly sold the loan to an investor on the secondary mortgage market, as is customary in the ordinary course of Ameritrust’s business. Also, as is customary in the market, the purchase agreement contained buy-back obligations upon the occurrence of certain designated events, such as an “early payment default.”

~~129~~143. Sometime after the new year, Ameritrust received a demand letter to repurchase the loan, with the secondary market investor advising that Kesef Ventures, a Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an “early payment default” and triggered Ameritrust’s contractual obligation to repurchase the loan.

~~130.~~ <u>144.</u> Ameritrust commenced an investigation and discovered that the subject property had, in fact, been purchased by 1258 Glyndon, a Lerner Participant Seller, on December 27, 2023.

~~131. Shockingly,~~ <u>145.</u> ~~t~~<u>T</u>he December 27, 2023 <u>sale was</u> for only $45,000, an amount approximately seventy-nine percent (79%) less than the March 20, 2023 contract purchase price. <u>*See* Ex. B.</u>

~~132.~~ <u>146.</u> Ameritrust reviewed the preliminary title report~~,~~ and the ~~C~~<u>c</u>hain of ~~T~~<u>t</u>itle contained therein ~~and~~ prepared by REXTAR. Upon review, Ameritrust learned that REXTAR omitted the prior sale and its significantly lower sale price~~.~~<u> despite certifying the chain of title contained "[t]he only conveyances affecting said land . . . recorded within twenty-four (24) months of the date of the report[.]"</u>

<u>147.</u> REXTAR's omission was a result of either REXTAR's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as title agents in the real estate title industry or a result of REXTAR's willful participation in the conspiracy with the other Defendants to perpetuate fraudulent transactions.

~~133.~~ <u>148.</u> Had REXTAR not omitted the prior sale and its purchase price, Ameritrust would have been alerted to the discrepancy<u>, would have known that it would be woefully undercollateralized on the debt,</u> and would not have funded the loan.

1~~3~~4<u>9</u>. Ameritrust also reviewed the appraisal report prepared by Taylor in which Taylor affirmatively stated that "the subject [property]... [had] not transferred ownership or been listed for sale in the past 36 months."

1~~3~~5<u>0</u>. Taylor either purposefully concealed the prior sale and its purchase price from Ameritrust or negligently failed to review even the most basic title information to ascertain the property's value.

~~136.~~ <u>151.</u> If Taylor did not purposefully conceal the prior purchase price, Taylor's omission of the prior purchase price was a result of his failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry.

~~137.~~ <u>152.</u> Had Taylor not omitted the prior purchase transaction and purchase price, Ameritrust would have been alerted to the prior transaction, recognized that the appraised value was inflated, <u>would have realized that it would be woefully undercollateralized on the debt,</u> and would not have funded the loan.

1<u>5</u>3~~8~~. Kesef Ventures, a Gold Participant Purchaser, defaulted on the loan within the first few months~~.~~ <u>by failing to make payments when and as such payments became due and owing.</u>

~~139.~~ <u>154.</u> Upon default, Ameritrust learned that the real property securing Kesef Ventures' obligations under the loan is worth only a fraction of the sales price and the value fraudulently described by Taylor.

~~140.~~ <u>155.</u> Either FirstLoans, REXTAR, Taylor, Gold, Gold Participant Purchasers, Lerner, and Lerner Participant Sellers devised this scheme in concert, using wire transfers in interstate commerce~~.~~; or Gold, Lerner, the Gold Participant Purchasers and the Lerner Participant Sellers devised the scheme and selected REXTAR and Taylor to provide services, who they knew would not conduct any independent investigation into any prior sales before providing their professional reports and opinions.

VI. **General Pattern of Repeat Transactions~~.~~ <u>Amongst the Enterprise Spanning Years.</u>** <u>156.</u>

<u>The general pattern of repeat transactions amongst various participants in the</u>

~~141.~~<u>enterprise began in or before 2020 when they first started acquiring the Subject Properties for little to no consideration and remained ongoing in 2026 when they were selling various properties acquired and sold in connection with the fraud.</u>

157. On September 22, 2020 the first of the Subject Properties, located at 1202 Clendenin St., Baltimore, MD 21217, was acquired by an Eidlisz Participant Seller, Maple & Green. Throughout 2020, thirty-two (32) of the Subject Properties were acquired by one of the Defendants. The remaining fifty-eight (58) Subject Properties were acquired by one of the Defendants from 2021 through 2024.

158. Upon information and belief, the conduct of the enterprise continued in 2023, as extensively alleged in the Commercial Lender Complaint.

159. The conspiracy was ongoing in 2024, during which time Ameritrust was a target of the enterprise's conduct. *See* Exs. A, B, and C.

160. Upon information and belief, the conduct of the enterprise continued in 2025, as alleged in *Pigtown Protfolia LLC, et al. vs. Champions Funding, LLC, et al.,* Case No. C-24-CV-26-001469, filed in the Circuit Court for Baltimore City on February 26, 2026 ("Pigtown Complaint") and further described in the Commercial Lender Complaint.

~~During the period between April 8, 2024, and September 11, 2024, the conspiracy was ongoing as~~ 161. From April 8, 2024 to October 2, 2024, FirstLoans, acting as the Participating Broker, submitted ~~over~~and finalized at least ninety (90) Application Packages to Ameritrust. ~~A table providing detailed information about each of these fraudulent mortgage loan acquisitions is attached hereto as **Exhibit A**, which is hereby incorporated into the body of this Complaint, as if fully restated herein~~*See* Ex. A.

1~~4~~62. The~~se~~ Application Packages pertained to purchase money loans all made to various Gold Participant Purchasers to acquire properties from Lerner Participant Sellers ~~and~~or Eidlisz Participant Sellers for purchase prices ranging from $175,000 to $235,000. Ameritrust was to provide a loan in the amount of $131,250 to $180,000 with each of the respective

Gold Participant Purchasers allegedly contributing down payments ranging from three thousand dollars ($3,000) to seventy- eight eight thousand seven hundred and fifty dollars ($78,750). in varied amounts. *See* Ex. A.

1463. Prior to submitting the Application Packages, FirstLoans had already ordered the preliminary title reports from REXTAR, acting as the Participating Title Agent. The reports REXTAR prepared predated most, if not all of, the submissions of the Application Packages to

Ameritrust. *See* Ex. B.

144. 164. Upon information and belief, FirstLoans repeatedly directed, coordinated, and caused title, settlement, and closing services relating to the Subject Loans to be performed by REXTAR.

165. Upon information and belief, FirstLoans maintained an ongoing business relationship with REXTAR and repeatedly utilized REXTAR in connection with fraudulent transactions. The entities acted in concert to perpetuate the scheme.

166. FirstLoans did not disclose to Ameritrust material facts concerning its relationship with REXTAR, including the extent of their recurring business dealings, coordination in connection with the Subject Transactions, and the role REXTAR played in facilitating transactions involving enterprise participants.

167. Also prior to submitting the Application Packages, FirstLoans had already ordered the appraisals on the transactions from Actie or Taylor, acting as Participating Appraisers in the enterprise. The appraisals prepared by Actie and Taylor were all initially made in the name of FirstLoans prior to the Application Package being submitted to Ameritrust and subsequently transferred to Ameritrust. *See* Ex. B.

145. 168. Upon information and belief, FirstLoans repeatedly directed, selected, or steered appraisal assignments relating to the Subject Properties to Taylor and Actie despite the existence of numerous other available appraisal professionals and appraisal firms serving the same geographic market.

169. Upon information and belief, FirstLoans failed to disclose to Ameritrust material relationships, recurring business dealings, or other facts relating to its use of Taylor and Actie in connection with the Subject Properties.

170. The purchase contracts between the various Lerner Participant Sellers and Eidlisz Participant Sellers, and the various Gold Participant Purchasers, were all dated prior to the Application Packages being submitted by FirstLoans to Ameritrust.

146. 171. The Gold Participant Purchasers executed loan documents representing that the corresponding purchase price reflected an arm's-length transaction and that the required borrower contribution and down payment had been made. *See* Ex. A.

1472. That representation was materially false and the Gold Participant Purchasers knew that such representations were materially false because they knew that the many of the properties serving as collateral had recently been acquired by the Lerner Participant Sellers or the Eidlisz Participant Sellers for a fraction of the stated purchase prices, and the Gold Participant Purchasers had worked in concert with the Lerner Participant Sellers or the Eidlisz Participant Sellers to effectuate the lengthy, six-year scheme of obtaining properties and then making an insider sale masking the prior purchase at the appropriate value. in order to obtain and distribute loan proceeds amongst the various participants in the enterprise and to further use the such proceeds to acquire new properties.

148. 173. The pattern of Gold and the Gold Participant Purchasers in obtaining ninety (90) mortgage loan acquisitions with Ameritrust alone (and hundreds of others with other lenders), causing early payment defaults, and diverting down-payment funds demonstrates that Gold and the Gold Participant Purchasers never intended to make the stated down payments or repay the mortgage loans.

1749. Lerner, Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers knowingly participated in transactions involving purchase prices that bore no reasonable relationship to the prices they had recently paid to acquire the same properties, and thatthey actively concealed and misrepresented the value of the Subject pProperties they were selling and their receipnt purchase at a fraction of the cost.

1750. All of the appraisal reports prepared by Actie and Taylor dramatically overinflated the purchase price, whether by negligence or intentional concealment and obfuscation of the recent prior sale at a fraction of the cost. *See* Ex. B.

151176. Taylor and Actie prepared the appraisal reports for the specific purpose of inducing mortgage lenders, including Ameritrust, to rely upon their opinions of value when deciding whether to extend credit secured by the subject properties. and to aid then co-conspirators in the enterprise of fraudulent activity.

152. 177. Taylor and Actie knew that Ameritrust, and the other lenders who were defrauded in the scheme, would receive, review, and rely upon their appraisal reports in determining whether to fund the mortgage loans.

153. 178. On or immediately before each of the settlement dates identified in Exhibit A, Ameritrust funded the loans via wire transfer.

179. Each of the Defendants received direct or indirect financial benefits generated by the mortgage loan transactions funded by Ameritrust, including, but not limited to, the collection of fees~~.~~, which were paid by reinvesting proceeds of the prior sales in the fraudulent scheme in order to make the various payments to FirstLoans, Taylor, Actie, and REXTAR.

~~154~~180. REXTAR received settlement fees, title fees, examination fees, escrow fees, courier fees, recording fees, and other compensation generated from the transactions funded ~~by Ameritrust.~~from the proceeds of the fraudulent activity by its victim, Ameritrust, on or around the date of each settlement set forth in Exhibit A.

~~155.~~ 181. FirstLoans received broker compensation, origination fees, processing fees, and other remuneration generated by mortgage loans funded by Ameritrust~~.~~ on or around the date of each settlement set forth in Exhibit A.

~~156.~~ 182. By way of example, closing documentation for transactions funded by Ameritrust reflects that FirstLoans received originator compensation and processing fees paid from transaction proceeds~~.~~, which were proceeds of the illegal activity of the Defendants' enterprise.

~~157~~183. Taylor received appraisal fees and related compensation generated by the appraisal assignments associated with the transactions funded by the proceeds of the Defendants' illegal activity, including payments from Ameritrust.

1~~5~~84. By way of example, appraisal management company records relating to transactions funded by Ameritrust reflect an appraisal fee was allocated to Taylor in connection with appraisals performed for the mortgage loans that are the subject of this action.

1859. Actie likewise received appraisal fees and related compensation generated by appraisal assignments associated with the mortgage loans funded by proceeds of the Defendants' illegal activity, including payments from Ameritrust.

1860. Actie performed appraisal services on numerous transactions involving Gold Participant Purchasers, Lerner Participant Sellers, and Eidlisz Participant Sellers and accepted such assignments for compensation. Actie received appraisal compensation in connection with those assignments.

161. 187. All such benefits would not have been obtained absent the fraudulent scheme, the Defendants' reinvestment of the proceeds obtained from the fraudulent scheme to pay its participants and to secure its participants' future cooperation and involvement, inflated appraisals, concealed transfer histories, concealed purchase prices, false down-payment representations, and improper diversion of mortgage loan proceeds described herein.

162. 188. Ameritrust funded more thanat least ninety (90) mortgage loans that were originated, processed, appraised, closed, and settled through the coordinated activities of the Defendants. and their enterprise.

163. 189. Gold, the Gold Participant Purchasers, Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers received, retained, and shared amongst themselves, substantial portions of the mortgage loan proceeds funded by Ameritrust. and used the proceeds to buy additional properties and pay Actie, Taylor, and REXTAR to participate in the conspiracy.

164. 190. The purchase prices paid to the Lerner Participant Sellers and Eidlisz Participant Sellers substantially exceeded the amounts those entities paid to acquire the same properties only weeks or months earlier.

~~165.~~ 191. The Gold Participant Purchasers acquired properties with little or no actual capital invested and ~~that~~the funds represented as down payments were returned directly or indirectly through sham renovation invoices, improper settlement disbursements, or other diversions.

~~166.~~192. REXTAR participated in concealing the lack of down payments by creating two sets of settlement statements, one to provide to Ameritrust concealing the insider payments, and the other reflecting all of the insider payments.

193. Upon information and belief, proceeds generated through earlier fraudulently financed sales were distributed to entities controlled by Lerner, Eidlisz, and their affiliates and were subsequently used to acquire additional residential properties later sold through the fraudulent enterprise.

194. For example, loan proceeds derived from the sale of real property located at 2529 Woodbrook Avenue, 1809 Rayner Avenue, 1942 Mosher Street, and numerous other properties detailed in the "Seller/Flipper Chart" at numbered paragraph ninety (90) of the Commercial Lender Complaint, were distributed to various Eidlisz Participant Sellers and Lerner Participant Sellers in transactions spanning throughout 2023 and into 2024, and were thereafter used by those same Participant Sellers to acquire Subject Properties listed in Exhibit A, which subsequently became the subject of a mortgage loans funded by Ameritrust. Had the Defendants not obtained ill-gotten loan proceeds detailed in Commercial Lender Complaint, they would not have had the funds needed to acquire many of the Subject Properties.

~~Ameritrust~~195. Ameritrust did not consent to the ~~C~~conspiracy and took no part in these actors' wrongful conduct.

19~~7~~6. Ameritrust has been forced to repurchase and holds one or more of the defaulted mortgage loans which are the subject of this Complaint.

VII. **Appraisal Pattern of Repeat Misconduct.**

~~168~~197. For each Subject ~~p~~Property ~~identified on Exhibit A~~, either Taylor or Actie (the applicable appraiser for each property is identified ~~on~~in Exhibit ~~A~~B), appraised the property significantly in excess of the property's sale price on the open market ~~on~~ often only a few months earlier, sometimes by over 400%, without any improvements thereto or other market forces that would justify such a dramatic increase in value.

1~~6~~98. By way of example either Actie or Taylor gave the following appraisal opinions and reports to Ameritrust on which they expected Ameritrust to rely:

a. With respect to ~~a~~ the Subject ~~p~~Property located at 2226 Orleans St. and sold by Dukeland Rose, an Eidlisz Participant ~~Purchaser, the prior sale occurred on March 24, 2021, for $70,000;~~Seller, the deed dated June 23, 2022 reflects a prior sale for $0.00. However, Actie appraised the same property for $190,000 on May 19, 2024, despite no renovations having been made to the property.

b. With respect to ~~a~~ the Subject ~~p~~Property located at 2907 Orleans St. and sold by Cancun Bernal, an Eidlisz Participant ~~Purchaser, the prior sale occurred on February 08, 2023, for $60,000;~~Seller, the deed dated November 8, 2022 reflects a prior sale for $0.00. However, Actie appraised the same property for $215,000 on June 7, 2024, despite no renovations having been made to the property.

c. With respect to a Subject ~~p~~Property located at 2519 Orleans St. and sold by Stanford Powell, an Eidlisz Participant ~~Purchaser, the prior sale occurred on February 08, 2023, for $36,500;~~Seller, the deed dated November 11, 2022 reflects a prior acquisition amount of $0.00. However, Actie appraised the same property for $200,000 on June 7, 2024, despite no renovations having been made to the property.

d. With respect to ~~a~~ the Subject ~~p~~Property located at 2026 Clifton Ave and sold by Stanford Powell, an Eidlisz Participant ~~Purchaser, the prior sale occurred on~~Seller,

the deed dated September ~~02~~2, 2021, ~~for~~ reflects a prior acquisition amount of $27,000. However, Taylor appraised the same property for $18~~0~~5,000 on May 23, 2024, despite no renovations having been made to the property.

i. Despite the prior sa~~m~~le date of September ~~02~~2, 2021, being less than three years

from the date of the appraisal report, Taylor specifically stated, "the subject [property] ... [has] not transferred ownership or been listed for sale in the past 36 months."

~~170.~~ 199. In many instances, Taylor and Actie omitted prior transaction history for the Subject Properties despite specifically stating that the property had not transferred ownership in the past 36 months.

200. In other instances, Taylor and Actie listed false prior transaction history in the appraisal reports.

201. For example, with respect to the Subject Property located at 2429 East Lanvale St., the deed dated February 23, 2024 reflects a prior sale for $42,500.00. However, Taylor stated that the same property had sold for $113,000 on November 4, 2022, which is not reflected by any recorded deed.

202. Each and every appraisal prepared by Taylor and Actie either willfully inflated the appraised value as part of this conspiracy; or, in the alternative, Taylor and Actie's omissions or false representations of the prior purchase prices was a result of Taylor and Actie's failure to exercise the care and skill ordinarily possessed by reasonably prudent professionals operating as real estate appraisers in the appraisal industry by failing to review even the most basic of recent transaction history information.

**VIII. REXTAR's Pattern of Repeat Misconduct.**

~~171.~~ 203. Ameritrust reviewed the preliminary title reports provided to Ameritrust by REXTAR concerning all of the ~~over~~ ninety (90) transactions where a Gold Participant Purchaser purchased a property from a Lerner Participant Seller or a Eidlisz Participant Seller, and each ~~C~~chain of ~~T~~title contained therein failed to disclose the prior sale or the sale price that, in many cases, occurred only a few months prior. *See* Ex. B.

~~172.~~ 204. Had REXTAR not omitted the prior purchase price — which was readily apparent from a simple review of the prior deed, which REXTAR must have either obtained in preparing the preliminary title report, as it clearly showed title vested in the corresponding Lerner Participant Seller or Eidlisz Participant Seller, or had never seen because REXTAR failed to conduct even the most basic of title searches — Ameritrust would have been alerted to the discrepancy and would not have funded the loan.

~~173~~205. REXTAR either willfully deceived Ameritrust as to the down payments contributed by the Gold Participant Purchaser on each transaction; or negligently failed to conduct even the most cursory review of the property's title history on which it was opining.

~~174.~~ 206. Ameritrust relied upon the title reports, title commitments, settlement documentation, and other title-related materials prepared by REXTAR in determining whether to approve and fund the mortgage loans for each Subject Property.

207. Had the title reports disclosed the omitted transfers, acquisition prices, and transactional history, Ameritrust would not have approved and funded the mortgage loans for each of the Subject Properties on the terms presented or would not have funded the loans at all.

208. The aggregate amount of the down payments allegedly contributed by the Gold Participant Purchasers ~~according to REXTAR related to~~in connection with the loans funded by Ameritrust ~~funded~~ would have exceeded ~~$4.7 Million.~~millions of dollars according to REXTAR.

~~175.~~ 209. The conspiracy would not have been possible without REXTAR's wrongful passing of funds back to the Gold Participant Purchasers, Gold himself, or one of hi~~t~~s affiliates.

~~176. It is unfathomable that Gold Participant purchaser would contribute in excess of $4.7 million, default within the first three payments, and let the properties go into foreclosure, all while continuing to purchase more and more properties without being part of a greater fraudulent scheme.~~

210. The only way the Gold Participant Purchasers would have been able to fund the total downpayments was to utilize funds illegally received from lenders in the course of engaging in the scheme and to reinvest those proceeds to make certain identified downpayments.

~~177.~~ 211. Ameritrust, promptly after the funding of each loan, sold each of the loans to investors on the secondary mortgage market, as is customary in the ordinary course of Ameritrust's business.

~~178.~~ 212. Sometime after the new year, Ameritrust received demand letters to repurchase the loans, with the secondary market investors advising that the respective Gold Participant Purchaser, had failed to make the first few monthly payments. This type of default is known in the industry as an "early payment default" and triggered Ameritrust's contractual obligation to repurchase the loans.

~~179. Given that the Gold Participant Purchasers, made a combined down payment in excess of $4.7 Million, defaulted on the loan within the first few months, and subsequently obtained over ninety (90) additional loans from Ameritrust, Ameritrust believes these facts strongly support the existence of an artifice to divert funds back to Kesef Ventures, another Gold Participant Purchaser, or one of its affiliates.~~

180. It 213. In at least some of the transactions REXTAR helped the Gold Participant Purchasers retain or never actually make the down payments represented on the settlement statement provided by REXTAR to Ameritrust.

181214. In such cases, REXTAR falsely represented on paper that proceeds were paid to the Eidlisz Participant Seller or Lerner Participant Seller, when in fact the funds were diverted back to various participants in this conspiracy.the fraudulent scheme.

182. 215. A close nexus existed between Ameritrust and Taylor, Actie, and REXTAR because each knew Ameritrust was the specific lender for whom the reports, settlement services, title work, and appraisals were being prepared.

**IX. Additional Fraudulent Statements by FirstLoans.**

183. 216. Furthermore, the appraisals were initially conducted in the name of FirstLoans and were subsequently transferred to Ameritrust. In executing appraisal transfer authorizations titled "Transfer of Nationwide Property and Appraisal Services to Ameritrust Mortgage Corporation," FirstLoans certified that it had "complied with Federal, State, and FNMA Appraisal Independence Rrequirements."

184. 217. This certification is materially false. FNMA's Appraisal Independence Requirements expressly provide: "For the purposes of these Appraisal Independence Requirements, the following are 'Restricted Parties':. . . Mortgage Brokers." Further, "Restricted Parties are prohibited from: . . . selecting, retaining, recommending, or influencing the selection of any appraiser for a particular appraisal assignment . . . ." FirstLoans, acting as a mortgage broker, was a Restricted Party and therefore prohibited from engaging in such conduct.

2185. FirstLoans' representation that the ordering of the appraisal complied with FNMA's Appraisal Independence Requirements was a willfully and materially fraudulent statement.

186. 219. Ameritrust relied on FirstLoans representation as it relates to the over ninety (90) loans that form the basis for this action.

187. 220. FirstLoans routinely selected, directed, or influenced the selection of Taylor and Actie for appraisal assignments involving the Subject Properties and repeatedly utilized the same appraisers in connection with each of the loans detailed in Exhibits A, B, and C.

221. FirstLoans' appraisal assignment process was not independent and was influenced by persons with a financial interest in the approval and funding of the loans detailed in Exhibits A, B and C. In fact, FirstLoans was receiving direct payments for its part in the Defendants' scheme.

222. FNMA's Appraisal Independence Requirements ensure that a Restricted Party, such as FirstLoans, does not influence the appraiser's independent judgement regarding the appraised value of the property.

188. 223. Had FirstLoans not falsely and materially misrepresented that the ordering of the appraisals detailed in Exhibit B complied with applicable requirements, Ameritrust would have obtained an uninflated appraised value that did not conceal the prior purchase or the prior purchase price. Ameritrust would have been alerted to the discrepancy and would not have funded the loans detailed in Exhibits A, B, and C.

XI. **Buyer/Borrower Default and Filed Bankruptcy.**

189. 224. Shortly after acquiring over ninety (90) Subject pProperties and obtaining over ninety (90) mortgage loans from Ameritrust, the Gold Participant Purchasers defaulted within the first three monthly payments.

~~190.~~ 225. Zahav Ventures, a Gold Participant Purchaser, filed bankruptcy in the United State District Southern District of New York on June 17, 2025, which bankruptcy has since been dismissed. As reported in the bankruptcy filing, since its inception in September of 2022, Zahav Ventures, the debtor, had acquired approximately one hundred thirty (130) residential home properties.

~~191.~~ 226. In connection with that proceeding, Eidlisz submitted a narrowly tailored declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 to the Bankruptcy Court omitting his role in the conspiracy while asserting that he had no conflict with either the creditors or debtor. Specifically, the declaration omitted that the fact that the Eidlisz Participant Sellers sold the real properties – now managed by Eidlisz through one of his other limited liability companies – to the Debtor, causing unsuspecting creditors, including Ameritrust, to suffer significant financial losses.

~~192.~~ 227. There may not exist any conflict of interest more severe or disqualifying than that presented by Eidlisz's conduct.

~~193.~~ 228. In essence Eidlisz was being paid to manage the same real properties placed into bankruptcy as part of the scheme he participated in and helped operate.

~~194.~~ 229. Levy Ventures, a Gold Participant Purchaser filed bankruptcy in the United States District Southern District of New York on March ~~05~~5, 2025, which bankruptcy has since been dismissed. As reported in the bankruptcy filing, the debtor had acquired over one hundred forty (140) residential home properties.

~~195. Since its inception on February 09, 2023, Defendant Levy Ventures had acquired approximately 140 residential home properties, which were included in its bankruptcy petition.~~

~~196.~~ 230. Also in connection with that proceeding, Eidlisz submitted a narrowly tailored declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 to the Bankruptcy Court omitting

~~Case 1:26-cv-03574-ELH Document 55 Filed 09/09/26 Page 54 of 66~~

his role in the ~~C~~conspiracy while asserting that he had no conflict with either the creditors or debtor. Specifically, the declaration omitted the fact that the Eidlisz Participant Sellers sold the real properties – now managed by Eidlisz through one of his other limited liability companies – to the Debtor, causing unsuspecting creditors, including Ameritrust, to suffer significant financial losses.

XII. **Fidelity Liability.**

~~197.~~ 231. Fidelity served as the insurer in each of the ~~more than~~ ninety (90) purchase transactions in which a Gold Participant Purchaser acquired a property from either a Lerner Participant Seller or an Eidlisz Participant Seller.

~~198.~~ 232. Fidelity was identified as the insurer on the preliminary title reports, title commitments, closing protection letters, and final title insurance policies.

~~199.~~ 233. The Maryland legislature enacted a statute requiring title insurers to "conduct [annual] on-site review[s] of the underwriting, claims, and escrow practices of each title insurance producer appointed by the insurer as a principal agent as designated in the title insurance contract between the insurer and the producer. Md. Code. Ann., Ins. § 10-121(5)(1)(i) (emphasis added).

~~200.~~ 234. REXTAR acted as a common law agent of Fidelity, and Fidelity is vicariously liable for the wrongful conduct committed by its agent within the scope of that agency relationship.

~~201. Ameritrust has it on good~~ 235. Upon information and ~~does~~ belie~~ve~~f, ~~and based thereon, alleges, that~~ Fidelity was negligent in the manner in which it conducted, or outright failed to conduct, required audits and/or oversight over REXTAR. Proper oversight would have picked up years of REXTAR's involvement in the conspiracy.

~~202.~~236. Upon information and belief, Fidelity appointed REXTAR to issue Fidelity title insurance products and authorized REXTAR to act on Fidelity's behalf in connection with the

issuance of title commitments, title policies, endorsements, and closing-related title services and to hold REXTAR out to the public as a Fidelity agent and to cloak REXTAR in the authority to act on Fidelity's behalf.

237. Fidelity cloaked REXTAR with signatory authority on Fidelity's behalf for legal documents. In connection with the subject transactions, title insurance policies issued by Fidelity were countersigned by representatives of REXTAR identified as an "Authorized Officer and Agent" of Fidelity.

238. Corresponding schedules attached to Fidelity title insurance policies were likewise executed by representatives of REXTAR acting in the capacity of Fidelity's "Authorized Officer and Agent."

239. In connection with the subject transactions, endorsements issued on Fidelity letterhead and attached to Fidelity title insurance policies were either countersigned by representatives of REXTAR or executed solely by representatives of REXTAR identified as Fidelity's "Authorized Signatory."

240. Each of these documents was distributed to Ameritrust, leading Ameritrust to believe that REXTAR was an authorized agent of Fidelity and to rely upon that agency in trusting the title reports that REXTAR provided to Ameritrust.

241. Fidelity designated REXTAR as its Settlement Agent in connection with the subject Transactions and identified REXTAR as the Settlement Agent in Closing Protection Letters issued to Ameritrust.

242. Through the issuance of title insurance policies, schedules, endorsements, Closing Protection Letters, title commitments, and related title-insurance products, Fidelity authorized

REXTAR to act on its behalf and to create contractual obligations binding upon Fidelity in connection with the subject transactions.

243. Fidelity knowingly permitted REXTAR to use Fidelity's name, title insurance forms, schedules, endorsements, policy forms, letterhead, Closing Protection Letters, and other documents identifying Fidelity in connection with the Subject Properties and related transactions.

244. Ameritrust relied upon Fidelity's designation of REXTAR as Fidelity's Settlement Agent and upon REXTAR's execution of Fidelity title policies, schedules, and endorsements as Fidelity's "Authorized Officer and Agent" and "Authorized Signatory" in concluding that REXTAR possessed authority to act on Fidelity's behalf. Fidelity is a nationally-recognized reputable title insurer. Fidelity's appointment of REXTAR as its agent lent weight and credibility to REXTAR's title reports on which Ameritrust relied.

~~Ameritrust~~245. Ameritrust further relied on the accuracy of the chain of title and the accuracy of the disclosure of the terms of the prior purchase, including the prior purchase price. Given the reputation of Fidelity, Ameritrust's reliance was reasonable.

**COUNT ONE**
**BREACH OF CONTRACT**
**(against Defendant FirstLoans, Inc.)**

~~203.~~ 246. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

247. On or about March 26, 2024~~.~~, FirstLoans entered into a certain Business Purpose Broker Agreement ~~which was effective March 26, 2024~~with Ameritrust (the "Agreement"). ~~p~~Pursuant to ~~which~~the Agreement, FirstLoans agreed to source~~d~~ potential loan applicants~~, completed loan applications, submitted such~~ and prepare and submit loan applications

withand supporting documentation to Ameritrust, and ordered various third-party services such as appraisals through an appraisal management company and title and closing services.

205248. The Agreement contained various representations, warranties, and covenants which governed the relationship with Ameritrust and FirstLoans and contained remedies for their breaches.

206. 249. Ameritrust performed all material obligations required of it under the Agreement. Specifically, among other things, Ameritrust reviewed and underwrote applications submitted by FirstLoans, prepared closing documentation, and funded ninety loans submitted by FirstLoans pursuant to **Section 2 of the Agreement**.

250. FirstLoans materially breached the Agreement by violating the representations and warranties contained in Sections 4(G), 4(N), 4(O), and 4(Q) of the Agreement.

251. **Section 4 of the Agreement** provides: "Broker represents and warrants that as of the date of this Agreement, and as of each date on which Broker submits an Application to [Ameritrust], and as of the Funding Date of any Loan, all of the following are true and active:

207. **(G)** No instance of fraud, misrepresentation or material omission occurred, exists, or was committed with respect to any Loan or Application."

252. Contrary to those representations and warranties, the loan 208. The Agreement clearly shifted the economic risk of fraud on the Loan to FirstLoans.

209. The Loans and Aapplications submitted by FirstLoans contained multiplenumerous instances of fraud, material misrepresentations, and material omissions.

Specifically, as of the Funding Date, many of the 253. Among other things, appraisal reports prepared by obtained by FirstLoans from Taylor and Actie contain material omissions related to the prior purchase of the subject property including whether or not a omitted prior

transfers of ownership occurr~~ed~~ing within the ~~prior~~preceding thirty-six ~~(36)~~ months and ~~the price at which the subject property was previously sold.~~omitted materially lower prior purchase prices. Preliminary title reports obtained by FirstLoans from REXTAR similarly omitted information regarding prior transfers and acquisition prices relevant to Ameritrust's underwriting decisions.

~~210. Furthermore, the preliminary title reports provided by REXTAR contained material omissions related to the price paid by the prior purchaser of the subject property.~~

254. Accordingly, FirstLoans breached Section 4(G) of the Agreement.

255. Subsection **(N)** of the representations and warranties provided that: "Broker shall conduct its affairs in connection with the Loans so as to avoid any ethical improprieties or conflicts of interest. Without limitation, Broker shall not have any direct or indirect ownership interest in any collateral for the Loan or any business or personal affiliation with, or ownership interest in, any third-party vendors providing services with respect to the Loan. . . Broker shall disclose in writing upon Loan submission to Company any and all personal or monetary involvement in the transactions associated with or relating to the Loan."

256. FirstLoans breached section 4(N) of the Agreement by failing to disclose material relationships and personal or monetary involvement relating to the transactions submitted to Ameritrust, including relationships among parties involved in originating, appraising, closing, and providing purported borrow funding for the subject loans.

257. FirstLoans repeatedly routed services for the fraudulent loans described herein to certain third-party vendors, including appraisal services to Taylor and Actie and title services to REXTAR.

258. Subsection **(O)** of the representations and warranties stated that: "All information submitted by Broker to Company in connection with the Loan Application, including all written materials and financial statements, is true, correct and complete."

259. FirstLoans further breached Section 4(O) of the Agreement because FirstLoans submitted false, incorrect, and incomplete information to Ameritrust in connection with the loan applications. Among other things, the Application Packages contained appraisal reports, title information, borrower-contribution information, transfer histories, and other material information that omitted or misrepresented facts material to Ameritrust's underwriting decisions.

~~211. **(Q)**~~260. Subsection **(Q)** of the representations and warranties stated that: "Broker has no knowledge with respect to any Loan, the Applications for the Loan, or the Subject Property, that can reasonably be expected to cause an institutional secondary market investor to regard the purchase of the Loan as an unacceptable investment, cause any Loan to become delinquent, or adversely affect the value or marketability of any such Loan."

26~~1~~~~2~~1. Upon ~~Ameritrust has it on good information and does believe, and based on that~~ information and belief ~~alleges, that~~, FirstLoans ~~conspired~~coordinated with Actie and Taylor to ensure that the appraisal ~~assignment was received by them so that they could~~values of the subject properties were artificially inflate ~~the appraised value.~~d.

~~213.~~ 262. FirstLoans knew or should have known of facts concerning the subject properties, appraisals, transfer histories, transaction structure, borrower contributions, and property valuations that rendered the loans unsuitable for sale into the secondary market and materially increased the likelihood of default.

263. Accordingly, FirstLoans breached Section 4(Q) of the Agreement.

264. **Section 7 of the Agreement provides: (A):** "To the extent permitted by law, Broker hereby indemnifies and holds harmless [Ameritrust] and its past, present, and future directors,

officers, shareholders, employees, attorneys, agents, representatives, subsidiaries, affiliates, and assigns, and holds them harmless from and against, any claims, losses, damages, demands, costs or other liabilities, including reasonable attorney's fees and the costs of investigations, arising out of any of the following:"

~~214.~~ **(A)(i):** "Broker's breach or failure to perform any of Broker's covenants, representations, warranties, agreements, duties, and/or obligations arising under this Agreement."

2~~1~~65. Upon ~~Ameritrust has it on good~~ information and ~~does~~ belie~~ve~~f, ~~and based thereon alleges, that~~ FirstLoans breached Sections 4(G), ~~of the Agreement and Section~~ 4(N), 4(O) and 4(Q) of the Agreement.

2~~1~~66. As such, Pursuant to Section 7(A)(i) of the Agreement, FirstLoans is obligated to "indemnify and hold Ameritrust harmless from and against any claims, losses, damages, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from Defendants' breaches of the Agreement.

2~~1~~67. Section **7(A)(ii)** states that: "Any third-party claims, including third party repurchase claims related to actions or inactions of Broker."

2~~1~~68. Ameritrust has received third-party repurchase demands related to FirstLoans' wrongful actions and inactions as alleged herein.

2~~1~~69. As such, Pursuant to Section 7(A)(~~i~~ii) of the Agreement, FirstLoans is obligated to indemnify and hold Ameritrust harmless "from and against any claims, losses, damages, demands, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from the third-party repurchase demands received by Ameritrust based on FirstLoans wrongful actions and inactions, as alleged herein.

~~2~~27~~0~~0. Section **7(A)(iii)** provides: "Any acts, omissions, or services provided by Broker, its agents, employees, representatives, attorneys, officers, directors, or partners."

~~2~~27~~1~~1. ~~—~~FirstLoans ~~conspired~~directed, selected, and coordinated with Actie and Taylor to ensure that the apprais~~al~~ed ~~assignment was received by them so that they could~~values of the subject properties were artificially inflated ~~the appraised value.~~and prior sale prices were concealed, and the resulting appraisal reports did in fact contain material inaccuracies and omissions.

~~222.~~ 272. Similarly, FirstLoans directed, selected, and coordinated with REXTAR to ensure that the title reports omitted information regarding prior transfers and acquisition prices.

273. As such, Pursuant to Section 7(A)(~~i~~iii) of the Agreement, FirstLoans is obligated to indemnify and hold Ameritrust "harmless from and against any claims, losses, damages, demands, costs or other liabilities, including reasonable attorneys' fees and the costs of investigation" arising from the third-party repurchase demands received by Ameritrust based on FirstLoans wrongful actions and inactions, as alleged herein.

274. As a direct and proximate result of FirstLoans' breaches, Ameritrust has incurred damages including, without limitation, repurchase liabilities, unpaid principal balances, accrued interest, foreclosure-related expenses, attorneys' fees, investigation costs, and other losses recoverable under the Agreement.

**COUNT TWO**
**VIOLATIONS OF THE FEDERAL RACKETEERING AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962 (a), (c), and (d)**
**(Against All Defendants except Fidelity)**

~~223.~~ **The Enterprise**

275. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

Case 1:26-cv-03574-ELH Document 65 Filed 09/09/26 Page 62 of 65

224. 276. Ameritrust is a "person" whichwithin the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

225. 277. The Defendants in this Count are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).a), (c), and (d).

226.278. The Defendants formed and participated in an association-in-fact enterprise for the common purpose of obtaining mortgage loan proceeds through a coordinated scheme involving inflated property valuations, concealed transfer histories, false down-payment representations, misleading title reports, and fraudulent appraisals, and materially false loan application materials submitted to Ameritrust, and a sharing the ill-gotten proceeds of the scheme (the "Enterprise").

The association in fact described above was279. The Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise was engaged in, and the activities of which affect, interstate commerce. and (c). The Enterprise operated as a continuing unit through ongoing relationships among the Defendants and operated pursuant to a common goal to perpetuate the fraudulent transactions described herein.

227. The Defendants in this Count as co-conspirators conspired to use or invest income derived from a pattern of unlawful activity under section 1961 to acquire an interest in, establish or operate the enterprise and have done so through a pattern of unlawful activities including to evade taxes, to commit wire fraud in violation of 18 U.S.C. § 1961 and to commit financial institution fraud in violation of 18 U.S.C. § 1344.

228. Additionally, the actions of all Defendants other than REXTAR were aided by REXTAR's fraudulent diversion of funds to them as it provided them with the ability to carry out their illegal scheme and evade taxes.

280. For purposes of 18 U.S.C. § 1962(c), the Enterprise was greater than any one individual Defendant. No single Defendant could have accomplished the scheme independently.

Rather, each Defendant performed recurring and specialized functions necessary to facilitate, conceal, and perpetuate the Enterprise's objectives.

281. The Enterprise was comprised of the following actors: Lerner, Lerner Participant Sellers, Eidlisz, Eidlisz Participant Sellers, Gold, Gold Participant Purchasers, FirstLoans, REXTAR, Taylor, and Actie.

282. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers knowingly participated in the Enterprise by acquiring residential properties at substantially lower market prices, reselling those properties at artificially inflated prices to affiliated purchasing entities, concealing the recent acquisition prices, and retaining proceeds generated by the inflated transactions.

283. Gold and the Gold Participant Purchasers knowingly participated in the Enterprise by purchasing properties from the Lerner Participant Sellers and the Eidlisz Participant Sellers, executing loan and settlement documents containing false representations concerning property values and borrower contributions, obtaining financing based on inflated valuations, and thereafter intentionally defaulting on the resulting loans.

284. FirstLoans knowingly participated in the Enterprise by soliciting borrowers, coordinating loan transactions, assembling loan packages, obtaining appraisals and title work, and submitting Application Packages to Ameritrust that contained material misrepresentations and omissions necessary to secure loan funding.

285. REXTAR knowingly participated in the Enterprise by preparing title reports, settlement documentation, closing packages, and disbursement records that omitted recent transfers, failed to disclose materially lower acquisition prices, misrepresented borrower contributions, and facilitated the disbursement of fraudulently obtained loan proceeds.

286. Taylor and Actie knowingly participated in the Enterprise by preparing appraisal reports that materially overstated property values, omitted relevant prior transfers and sale prices, and were intended to induce Ameritrust to fund mortgage loans that otherwise would not have been approved.

287. Each Defendant knowingly agreed that one or more members of the Enterprise would commit multiple acts of racketeering activity in furtherance of the Enterprise's common objectives. Each Defendant knowingly agreed to facilitate the submission of fraudulent loan applications, inflated appraisals, misleading title materials, false settlement information, and related interstate communications necessary to obtain mortgage loan proceeds.

**Predicate Acts: Mail Fraud and Wire Fraud**

288. The activities of the Enterprise depended on regular communications and transactions among its participants, including brokers, appraisers, title agents, sellers, purchasers, lenders, and affiliated entities located in multiple states.

289. In furtherance of the Enterprise and its objectives, the Defendants used, caused the use of, and reasonably foresaw the use of interstate wire communications and interstate mail and commercial carriers in violation of 18 U.S.C. §§ 1341 and 1343.

290. The interstate wire communications included, without limitation and as detailed in Exhibits A-C: (a) FirstLoans' transmission of application packages from New York to Ameritrust in California and/or Texas on or about ninety (90) separate instances; (b) transmission of appraisal reports prepared by Taylor and Actie in Maryland to FirstLoans in New York, and then to Ameritrust in California and/or Texas for use in underwriting the loans on or about ninety (90) separate instances; (c) transmission of preliminary title reports prepared by REXTAR in Maryland to FirstLoans in New York and then to Ameritrust in California and/or Texas on or about ninety (90) separate instances; and (d) transmission of settlement statements, closing documents, and

funding instructions among the Enterprise participants. Ameritrust operated principally from California and later Texas, while FirstLoans operated from New York, and REXTAR, Taylor and Actie operated from Maryland, causing interstate wire communications to be used repeatedly in furtherance of the scheme.

291. Ameritrust transmitted loan proceeds via interstate wire from its operations in California and/or Texas to REXTAR in Maryland, including for ninety (90) separate transactions, as more fully detailed in Exhibits A-C, including but not limited to wires funded on or about April 19, 2024, for the 3413 Lyndale Avenue transaction, April 19, 2024, for the 1602 Darley Avenue transaction, and April 22, 2024, for the 2806 Ellicott Drive transaction. REXTAR thereafter disbursed those funds to the participating sellers and other recipients as part of the Enterprise's scheme.

292. In some instances, numerous wires were sent by and between Ameritrust, REXTAR, Fidelity, and other parties over a period of days or even months in connection with a single transaction. For example, ten (10) separate wire transfers were recorded in connection to the 2806 Ellicott Drive transaction spanning from April 22, 2024 to June 11, 2024. The dates on which the Defendants used interstate electronic wire transmissions in connection to the loan application process for each of the Subject Properties are detailed in Exhibit C.

293. Upon information and belief, the Defendants further used interstate mail and commercial carriers, such as FedEx, to transmit original loan files, closing packages, and related mortgage documents between various states such as Maryland, New York, California, Tennessee, and Texas, including in connection with the April 2024 transactions involving 2806 Ellicott Drive, 3413 Lyndale Avenue, and 1602 Darley Avenue, among many others. Such mailings and shipments were an integral part of obtaining funding and completing the fraudulent transactions.

The dates on which the Defendants used interstate mail transmittal in connection to the loan application process for each of the Subject Properties are detailed in Exhibit C.

**Predicate Acts: Financial Institution Fraud**

294. Ameritrust is a mortgage lending business within the meaning of 18 U.S.C. §§ 20 and 27 because it originates, funds, purchases, and sells mortgage loans secured by interests in real property in transactions affecting interstate commerce. Accordingly, Ameritrust is a financial institution for purposes of 18 U.S.C. § 1344.

295. Defendants knowingly executed a scheme to defraud Ameritrust by submitting and causing to be submitted materially false appraisals, title reports, borrower-contribution information, transfer histories, and loan application materials for the purpose of inducing Ameritrust to approve and fund mortgage loans that it otherwise would not have approved or funded. Through those materially false representations and omissions, Defendants obtained and caused others to obtain monies and funds owned by and under the custody and control of Ameritrust, in violation of 18 U.S.C. § 1344(1) and (2).

296. Through those materially false representations and omissions, Defendants induced Ameritrust to disburse millions of dollars in mortgage loan proceeds, including funds advanced in connection with the 3413 Lyndale Avenue, 1602 Darley Avenue, and 2806 Ellicott Drive transactions, thereby obtaining monies and funds owned by and under the custody and control of Ameritrust.

297. The false appraisals, misleading title reports, concealed transfer histories, and false borrower-contribution representations were material to Ameritrust's underwriting decisions, and Ameritrust would not have approved or funded the subject loans had the true facts been disclosed.

**Predicate Acts: Bankruptcy-Related Concealment and False Declarations**

298. Further, Eidlisz knowingly participated in and furthered the Enterprise through his involvement in federal bankruptcy proceedings involving Gold Participant Purchasers and related entities. Shortly after acquiring at least ninety properties and obtaining at least ninety mortgage loans from Ameritrust, the Gold Participant Purchasers defaulted on their mortgage obligations, often within the first three monthly payments.

299. On March 5, 2025, Gold Participant Purchaser Levy Ventures filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York, which proceeding was subsequently dismissed. According to filings in that proceeding, Levy Ventures had acquired more than 140 residential properties. Similarly, on June 17, 2025, Gold Participant Purchaser Zahav Ventures filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York, which proceeding was likewise subsequently dismissed. According to filings in that proceeding, Zahav Ventures had acquired approximately 130 residential properties.

300. In connection with the Levy Ventures and Zahav Ventures bankruptcy proceedings, Eidlisz submitted declarations under penalty of perjury pursuant to 28 U.S.C. § 1746 to the Bankruptcy Court in support of applications to retain Better Mgmt LLC as property manager for the debtors' real estate portfolios.

301. In those declarations, Eidlisz represented that, among other things, neither he nor Better Mgmt LLC represented any creditors of the debtors, that neither he nor Better Mgmt LLC held any interest materially adverse to the debtors, their estates, or their creditors by reason of any direct or indirect relationship, and that Better Mgmt LLC was a "disinterested person" within the meaning of the Bankruptcy Code.

302. Eidlisz failed to disclose that entities controlled by or affiliated with him, including the Eidlisz Participant Sellers, had sold numerous properties to Gold Participant Purchasers, including Levy Ventures and Zahav Ventures; that those transactions formed part of the Enterprise described herein; that the debtor entities acquired those properties through mortgage-financed transactions involving Enterprise participants; and that Eidlisz, through affiliated entities including Better Mgmt LLC, sought to continue managing many of the same properties after their transfer to the debtor entities and during the bankruptcy proceedings.

303. Eidlisz further failed to disclose his ongoing business relationships with Gold, the Gold Participant Purchasers, and other Enterprise participants; his financial and operational involvement with properties comprising substantial portions of the debtors' bankruptcy estates; and his role in transactions involving allegedly inflated property valuations, concealed transfer histories, and mortgage loans obtained through materially false underwriting information. Those omissions concealed material information from the Bankruptcy Court, creditors, and parties in interest, including Ameritrust.

304. The declarations were executed pursuant to 28 U.S.C. § 1746 and omitted material facts necessary to make Eidlisz's representations regarding disinterestedness, adverse interests, and conflicts truthful and complete in violation of 18 U.S.C. § 152.

305. Upon information and belief, Eidlisz's declarations and related bankruptcy filings were intended to conceal the nature and extent of the Enterprise, obscure the relationships among Enterprise participants, hinder recovery efforts by creditors, preserve assets and property portfolios assembled through the Enterprise's fraudulent mortgage transactions, and shield Enterprise participants from liability arising from those transactions.

306. The bankruptcy-related conduct alleged herein constituted an additional means by which Enterprise participants concealed the Enterprise, protected assets associated with the

fraudulent mortgage transactions, and frustrated the efforts of creditors, including Ameritrust, to recover losses caused by the scheme.

307. The bankruptcy-related misconduct constituted an additional act undertaken in furtherance of the Enterprise and formed part of Defendants' broader pattern of racketeering activity designed to obtain mortgage loan proceeds through fraud, conceal the resulting defaults, and frustrate the efforts of creditors to recover losses caused by the scheme.

**Pattern of Racketeering Activity**

229. Sections 1692(c) and (d) of the RICO Act (18 U.S.C. § 1961 et seq.) provide that "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs 308. Through the conduct described herein, Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity or collection of unlawful debt; and (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."consisting of repeated predicate acts of mail fraud, wire fraud, financial institution fraud, bankruptcy-related concealment and false declarations, and related unlawful conduct affecting interstate commerce.

230. The Defendants conspired to or engaged in a continuous pattern of ongoing racketeering activity, while conducting and participating themselves, or with their associated alter ego enterprises, and/or in the coordination of conduct and operation of various named entity defendants as multiple enterprises acting in concert as a larger organized enterprise.

231. The enterprises individually or together acting as one organized enterprise committed or conspired to commit multiple predicate acts in the state of Maryland against

Ameritrust, an out of state mortgage lender that had at all times operated principally from California or Texas and was formed under Illinois law.

232. Fidelity, REXTAR, and FirstLoans, Inc participated in controlling other entities and affiliates who participated in controlling each of these defendant entities to conspire or to engage in continuous and ongoing racketeering activity involving multiple predicate acts.

233. Taylor, Actie, Eidlisz, Gold, and Lerner participated individually and/or with their alter ego enterprises to conspire or to engage in continuous and ongoing racketeering activity involving multiple predicate acts.

234. The conduct of Defendants participating in the enterprises included falsifying and mailing fraudulent documents in violation of Title 18, United States Code section 1341.

235. Eidlisz fraudulently participated in a federal bankruptcy proceeding involving the various alter ego limited liability companies of Gold in violation of the provisions of Title 11 of the United States Code.

236. The Defendants engaged in financial institution fraud in violation of Title 18, United States Code section 1344.

237. The participation by the Defendants in the enterprises directly led to loan approvals by Ameritrust based on fraudulent information and ultimately to the default of such loans secured by properties with actual valuations far below the inflated valuations established by Defendants that conspired, orchestrated and participated in the scheme.

238. The racketeering activity began as early as, or earlier than, January 2024 and involved at least 90 properties, the acquisition of which was funded by loans made by Ameritrust.

309. Defendants engaged in the foregoing racketeering activity in connection with at least ninety mortgage loan transactions involving the same core participants, common methods, common entities, and common fraudulent practices.

310. The racketeering activity began in 2020 and continued thereafter as part of an ongoing scheme until at least 2026. The pattern was neither isolated nor sporadic– rather it was continuous and built on itself by reinvesting the proceeds of wrongfully obtained loans to purchase additional properties in an effort to repeat its fraudulent scheme. The Enterprise repeatedly employed the same participants, entity structures, lending channel, title company, appraisal professionals, concealment of transfer histories and acquisition costs, false down-payment representations, and post-closing default strategy. The continuity, repetition, multi-year duration, and common methodology of the conduct establish a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 and 1962.

**Investment and Use of Racketeering Income**

311. For purposes of 18 U.S.C. § 1962(a), the Defendant entities were also direct beneficiaries of the racketeering activity and received, retained, controlled, and used income derived from the foregoing pattern of racketeering activity to operate the Enterprise.

312. More specifically, proceeds generated through fraudulently financed mortgage transactions were distributed to Enterprise participants, including seller entities controlled by Lerner and Eidlisz and purchaser entities controlled by Gold.

313. The proceeds generated from earlier fraudulently financed transactions, including but not limited to those detailed in the "Seller/Flipper" Chart in numbered paragraph ninety (90) of the Commercial Lender Complaint, enabled Lerner, Eidlisz, and their affiliated entities to acquire

additional Baltimore-area residential properties, including the Subject Properties identified in Exhibit A.

314. For example, Enterprise participants SLDL Properties, Sunray Management, and 1258 Glyndon, all received loan proceeds from fraudulent transactions in 2023 and 2024 and used those proceeds to further the work of the Enterprise by purchasing various Subject Properties in 2024, including 1124 N Monroe Street, 716 N. Port Street, and 2325 Edmondson Avenue, which subsequently became the subject of a mortgage loans funded by Ameritrust. The special purpose entities would not have had the capital to acquire new properties absent use of the wrongfully obtained loan proceeds from prior sales.

315. The continued operation of the Enterprise depended upon the reinvestment of proceeds generated from prior fraudulent transactions. Without the proceeds generated from the earlier transactions, the Enterprise could not have acquired, financed, or maintained the inventory of residential properties necessary to conduct the subsequent fraudulent transactions that resulted in the full extent of Ameritrust's injuries.

316. The proceeds generated through fraudulently financed mortgage transactions were used the loan proceeds to pay Taylor, Actie, and REXTAR and to secure their repeated involvement in future sales.

317. Ameritrust's injuries were caused not only by the initial fraudulent transactions but also by the Defendants' reinvestment of racketeering proceeds, which expanded and perpetuated the Enterprise and enabled additional fraudulent loans to be originated and funded.

318. By receiving and investing income derived from a pattern of racketeering activity in the operation and expansion of the Enterprise, Defendants violated 18 U.S.C. § 1962(a).

**Continuity and Multiple Victims**

Case 1:26-cv-03574-ELH Document 75-4 Filed 09/09/26 Page 72 of 76

319. The Enterprise's conduct was not limited to the mortgage-loan transactions involving Ameritrust. Upon information and belief, the same core participants, including Lerner, Eidlisz, Gold, Actie, Taylor, and REXTAR, participated in substantially similar mortgage-financing schemes involving other lenders, properties, and transactions.

320. In particular, the Commercial Lender Complaint alleges that Lerner, Eidlisz, Gold, Taylor, Actie, and REXTAR participated in a coordinated mortgage-fraud scheme involving at least fifty-nine (59) mortgage loans secured by Baltimore properties and causing alleged losses exceeding $9 million to Commercial Lender LLC and RCN Capital, LLC.

321. The misconduct alleged in the Commercial Lender Complaint substantially mirrors the conduct alleged herein. According to the Commercial Lender Complaint, entities controlled by Lerner and Eidlisz acquired residential properties at substantially lower prices and quickly resold those properties to entities controlled by Gold at dramatically inflated prices, while appraisals, title information, loan documentation, and settlement materials concealed the recent acquisition history and lower purchase prices.

322. The allegations in the Commercial Lender Complaint further identify the same recurring use of special-purpose entities, the same appraisal professionals, the same title and settlement participants, the same concealment of recent acquisition prices and transfer histories, the same inflated property valuations, and the same use of mortgage lenders' funds to finance transactions unsupported by legitimate market appreciation.

323. The existence of substantially similar alleged conduct directed toward different lenders demonstrates that the Enterprise's activities were not isolated to Ameritrust, but instead constituted an ongoing business model through which Enterprise participants repeatedly sought to obtain mortgage loan proceeds from multiple lending institutions through the same fraudulent methods.

324. The Enterprise's conduct affected multiple victims. In addition to Ameritrust, the allegations asserted in the Commercial Lender action identify alleged injuries to Commercial Lender LLC and RCN Capital, LLC. The involvement of multiple lenders allegedly harmed through substantially identical conduct demonstrates that the Enterprise repeatedly targeted different victims while employing the same participants, methods, and objectives.

325. The conduct alleged herein and in the Commercial Lender Complaint and the Pigtown Complaint further demonstrates continuity because the alleged fraudulent conduct spans multiple years, multiple lending relationships, numerous properties, and well over one hundred mortgage-loan transactions. The Lerner Participant Sellers and Eidlisz Participant Sellers began acquiring the Subject Properties in 2020 and continued to do so until 2024. The alleged misconduct in the Commercial Lender action began no later than 2023, while the conduct alleged in this action continued thereafter through transactions submitted to Ameritrust in 2024. The misconduct alleged in the Pigtown Complaint continued into 2025, and the Subject Properties at issue in this action have been subsequently sold by Gold Participant Purchasers as recently as September 2026. In all, the conduct of the enterprise has spanned six years.

326. The conduct also demonstrates continuity because the Enterprise allegedly continued its operations after completion of the transactions involving any single lender, shifting its activities from one lending source to another while employing substantially the same participants, entity structures, fraudulent representations, appraisal practices, title practices, and transaction methods.

327. Accordingly, the allegations in the Commercial Lender Complaint provide additional evidence that the Enterprise engaged in a continuing pattern of racketeering activity

Case 1:26-cv-03574-ELH Document 5-4 Filed 10/21/26 Page 75 of 75

directed at multiple victims through repeated and related fraudulent mortgage loan transactions, rather than isolated or sporadic acts.

**Causation and Damages**

328. As a direct and proximate result of Defendants' fraudulent scheme and pattern of racketeering activity described herein, Ameritrust approved and funded mortgage loans that it otherwise would not have approved, funded, purchased, or retained.

329. In reliance upon Defendants' materially false appraisals, misleading title reports, concealed transfer histories, false representations concerning borrower equity contributions, and other fraudulent information submitted in connection with the subject loans, Ameritrust funded mortgage loans secured by properties whose actual fair market values were substantially lower than the values represented during the underwriting process.

239.330. The Defendants participated in the scheme for almost two years, as the scheme is still ongoing whileFollowing the loan closings, Gold and the Gold Participant Purchasers seek to alleviate their liability through bankruptcy.defaulted on their mortgage obligations, causing Ameritrust to incur substantial losses.

240. As a direct result of those defaults and pursuant to its contractual obligations, Ameritrust has been forcedrequired to repurchase and holdsnow owns one or more of the defaulted mortgage loans whichthat are the subject of this Complaint.action.

241. The participation by the Defendants in the enterprises has also directly led to Ameritrust being forced to no longer offer loans in Baltimore County given soft investor demand due to the widespread racketeering scheme, which has also impaired Ameritrust's competitiveness in the Maryland marketplace.

331. As a result of Defendants' conduct, Ameritrust has suffered damages including, but not limited to, unpaid principal balances, accrued interest, servicing advances, foreclosure-related expenses, property preservation costs, attorney's fees and expenses, carrying costs, loss-mitigation expenses, diminished collateral value, and other amounts associated with the administration, enforcement, and liquidation of the subject loans.

332. Ameritrust further suffered injury because the collateral securing the subject loans was materially overvalued as a result of Defendants' scheme, causing the value of the collateral recovered by Ameritrust to be substantially less than represented and significantly less than the outstanding indebtedness owed on the loans.

333. The injuries sustained by Ameritrust were foreseeable and were the direct and intended consequence of Defendants' coordinated scheme to induce mortgage lenders to fund loans based on artificially inflated property values and fraudulent transactional information.

334. In addition, Defendants' conduct damaged Ameritrust's business operations and its ability to participate competitively in the Baltimore residential lending market. As a result of losses attributable to the scheme, diminished investor confidence in Baltimore-area collateral, and increased risk associated with loans secured by Baltimore properties, Ameritrust has curtailed its lending activities in that market, resulting in lost business opportunities, lost profits, and competitive injury.

335. Accordingly, Ameritrust has suffered injury to its business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial, but believed to be in excess of 13 million dollars.

**COUNT THREE**
**COMMON LAW FRAUD**
**(Defendants FirstLoans, REXTAR, Taylor and Actie)**

~~242.~~ 336. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~243. Taylor and Actie made affirmative misrepresentations regarding the appraised values to Ameritrust regarding over ninety (90) mortgage loan transactions.~~

337. Taylor and Actie prepared and provided appraisal reports in connection with at least ninety (90) mortgage-loan transactions involving properties that served as collateral for loans funded by Ameritrust as described in Exhibit A.

~~244. Based on the vast discrepancies in the values, some properties increasing 400% in two months, and~~338. As reflected in Exhibits A-C, Taylor and Actie~~'s affirmative~~ made materially false ~~mis~~representations in the appraisal reports concerning the value of the Subject Properties and falsely represented that the ~~appraised~~ properties had not transferred ownership ~~or been listed in for sale in the past 36 months, it is clear Actie and Taylor know the falsity of their statements to Ameritrust or the~~and had not been listed for sale within the preceding thirty-six months, when public land records reflected recent transfers involving the Eidlisz Participant Sellers and Lerner Participant Sellers.

339. By way of example, the appraisal reports for Subject Properties 3413 Lyndale Ave, 716 N Port St., 2325 Edmondson Ave, and 1761 Darley Ave, among many others, contained a certification stating that the Subject Properties "[had] not transferred ownership or been listed ~~in~~ for sale in the past 36 months."

340. Upon information and belief, Taylor and Actie knew those representations were ~~made~~ false at the time they were made or Taylor and Actie acted with reckless indifference to their truth~~,~~. ~~as~~In numerous instances, the appraisal ~~they provided clearly showed the corresponding Eidlisz Participant Purchaser or Lerner Participant Purchase was being~~reports reflected dramatic increases in value over short periods of time, including increases of several hundred percent within a matter of

months, while simultaneously identifying the current holder to record title.owner and other facts that revealed recent transfers.

245. The overinflated values were made in connection with an overarching conspiracy for the purpose of defrauding Ameritrust.

341. Taylor and Actie made these false representations for the purpose of defraudinginducing Ameritrust to rely upon the appraisal reports and their substantially inflated valuations in underwriting and funding the subject mortgage loans.

246.342. Ameritrust Ameritrust reasonably relied upon the appraisal reports and funded the subject loans in reliance onupon the values, transfer-history representations made by Taylor and Actie in their appraisal reports., and other information contained therein.

247. Ameritrust has been diligently trying to resolve the outstanding repurchase demands from the secondary market investors who bought these loans.

248. In light of two Gold Participant Purchasers filing for bankruptcy and including an estimated 270 properties in the bankruptcy, these mortgage loans do not have any readily available buyers and the only offers that are being received result in taking millions of dollars in losses.

343. FirstLoans submitted and caused to be submitted loan applications, appraisal reports, title reports, and other underwriting materials to Ameritrust in connection with the subject transactions. Pursuant to the warranties contained in the Agreement, FirstLoans agreed that Ameritrust could rely on FirstLoans to originate and submit legitimate loan transactions suitable for underwriting and sale on the secondary mortgage market.

249.344. Among other representations, FirstLoans made fraudulent representationsed to Ameritrust on each of the transaction subject to this action, that the appraisal providedreports submitted to Ameritrust, by FirstLoans, and prepared by Actie and Taylor, complied with FNMA's

Appraisal Independence Requirements~~.~~ and that the information provided in connection with the loan applications was accurate and reliable for underwriting purposes.

~~250.~~ 345. The appraisal reports provided to Ameritrust ~~for each~~ in connection to each of the loan transactions ~~subject this action~~at issue did not comply with FNMA Appraisal Independence Requirements.

~~251. FirstLoans knew the appraisals did not comply with FNMA Appraisal Independence Requirements or made such representation with reckless disregard for the truth.~~

~~252. FNMA's Appraisal Independence Requirements were designed, in part, to prevent fraud in appraisal.~~

346. The appraisal reports and title reports provided to Ameritrust in connection with each of the loan transactions at issue contained inaccurate and unreliable information for underwriting purposes, including materially inflated property values, false representations regarding prior transfers of ownership, omissions of recent acquisition prices, omissions of recent transfer histories, misleading chain-of-title information, and other material inaccuracies concerning the subject properties and transactions.

347. FirstLoans knew those representations were false or acted with reckless indifference to their truth because the appraisal reports, title reports, and related loan materials contained inflated property values, omitted recent transfers and acquisition prices, and otherwise contained material misrepresentations and omissions concerning the subject properties and transactions.

348. FirstLoans made those representations for the purpose of inducing Ameritrust to approve and fund the subject mortgage loans.

253. Ameritrust funded the loans in reliance on the representations made by FirstLoans in FirstLoans representations to Ameritrust 349. Ameritrust reasonably relied upon the representations by FirstLoans that the appraisal reports complied with FNMA Appraisal Independence Requirements. and the information provided in connection with the loan applications was accurate and reliable for underwriting purposes. Ameritrust funded the subject loans as a direct result of those representations.

254.350. REXTAR prepared and provided title reports, settlement documentation, and related closing materials for the subject transactions.

351. Each of the title reports prepared and submitted by REXTAR contained the certification that "The only conveyances affecting said land, which recorded within twenty-four (24) months of the date of this report, are as follows[.]"

352. Despite referencing the last twenty-four months, each of the title reports purported to detail a complete list of conveyances of the Subject Properties, and in some cases, such as the title report prepared for Subject Property 3413 Lyndale Avenue, the title reports listed conveyances as early as 1942.

353. However, for many of the Subject Properties identified on Exhibits A-C that were sold within the twenty-four (24) months prior to the Loan Application, REXTAR omitted such prior sale from the title report, rendering REXTAR's certification materially false.

354. By way of example, REXTAR omitted information about prior sales on the title reports for the Subject Properties 3413 Lyndale Avenue, 1124 N Monroe St., and 716 N. Port St.

REXTAR willfully concealed 355. As reflected on Exhibits A-C, the title reports omitted material facts concerning recent transfers of ownership and prior acquisition prices involving the Lerner Participant Sellers and GoldEidlisz Participant Seller's, prior purchase of the

~~properties for the transactions subject to these actions.~~ despite REXTAR's knowledge of the relevant conveyances and the identities of the purported current title holders.

~~255.~~356. ~~REXTARs concealment was willful as~~REXTAR willfully concealed these material facts because, despite the chain of title missing ~~these conveyances~~recent transfers and ~~the~~ prior ~~purchase~~acquisition prices, REXTAR listed the respective Eidlisz Participant Seller or Lerner Participant Seller as the current title holder.

~~256. Ameritrust funded the loans in reliance on the representations made by REXTAR to Ameritrust regarding the prior purchase of the properties by the respective Eidlisz Participant Seller or Lerner Participant Seller.~~

~~257. Ameritrust has been diligently trying to resolve the outstanding repurchase demands from the secondary market investors who bought these loans.~~

357. REXTAR knowingly concealed or omitted this information, or acted with reckless indifference to whether the information was omitted, for the purpose of causing Ameritrust to rely on incomplete title information during the underwriting process.

358. Ameritrust reasonably relied upon the title reports and related transaction documents provided by REXTAR and funded the subject loans without knowledge of the omitted transfer history and prior acquisition price information.

359. Exhibit B identifies the specific appraisal reports prepared by Taylor and Actie containing false representations and omissions concerning materially inflated appraised values, prior ownership transfers and prior acquisition prices; the specific title reports prepared by REXTAR containing false representations and material omissions regarding prior transfers and acquisition prices; and the specific loan applications submitted by FirstLoans containing false

representations, including appraisal reports that did not comply with FNMA Appraisal Independence Requirements.

360. Exhibit B further identifies the relevant misrepresentations by property address, seller entity, borrower entity, date of loan application, date of appraisal, identity of the appraiser, and date of title report prepared by REXTAR.

361. The appraisal reports, title reports, and loan applications were transmitted to and reviewed by Ameritrust during the underwriting process for each subject loan.

362. The misrepresentations and omissions described above were material because they concerned the value of the collateral securing the loans, the ownership and transfer history of the properties, the independence and reliability of the appraisal process, and other facts that Ameritrust considered important in determining whether to approve and fund the subject loans.

363. The misrepresentations were made in connection with a coordinated scheme designed to induce Ameritrust to approve and fund mortgage loans that it otherwise would not have approved or funded.

364. As a direct and proximate result of the fraudulent representations and concealment by FirstLoans, REXTAR, Taylor, and Actie, Ameritrust approved and funded loans that it otherwise would not have approved or funded.

365. Following the closing of the subject loans, numerous Gold Participant Purchasers defaulted on their mortgage obligations, causing substantial losses to Ameritrust. Ameritrust has received repurchase demands relating to those loans and has incurred and continues to incur damages, including repurchase liabilities, unpaid principal balances, loss of collateral value, foreclosure-related expenses, professional fees, attorneys' fees, and other consequential damages.

~~258.~~366. ~~In light~~In addition, the bankruptcy filings of ~~two~~ Gold Participant Purchasers ~~filing for bankruptcy and~~, including ~~an estimated 270~~entities holding properties ~~in the bankruptcy, these mortgage~~acquired through the scheme alleged herein, have significantly impaired Ameritrust's ability to liquidate or sell affected loans and have further increased Ameritrust's losses. The affected loans do not have any readily available buyers and the only offers ~~that are being~~ received would result in ~~Ameritrust taking~~ millions of dollars ~~in~~of losses~~.~~ to Ameritrust.

367. As a direct and proximate result of Defendants' fraud, Ameritrust has suffered damages in an amount to be proven at trial but believed to exceed $13 million.

**COUNT FOUR**
**COMMON LAW FRAUD**
**(Against All Defendants except Fidelity, FirstLoans, REXTAR, Taylor and Actie)**

~~259.~~ 368. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~260. Defendants agreed to accomplish their unlawful property flipping scheme in which~~

369. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers acquired numerous residential properties in and around Baltimore City at ~~market value.~~substantially lower market prices and thereafter agreed

~~261. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers then conspired~~ with Gold and the Gold Participant Purchasers to ~~create a false contract of sale for a significantly~~resell those same properties at dramatically inflated ~~purchase~~ prices. ~~The contract of sale was a deliberate ruse designed to have a lender loan~~

370. In connection with the transactions identified in Exhibit A, Lerner, the Lerner Participant Sellers, Eidlisz, the Eidlisz Participant Sellers, Gold, and the Gold Participant Purchasers ~~money based on the insider and inflated sales price.~~caused contracts of sale, settlement

documentation, borrower contribution information, and related transaction materials to be submitted to Ameritrust reflecting purchase prices that materially overstated the true value of the ninety (90) subject properties.

371. The contracts of sale and related transaction documents falsely created the appearance of legitimate arm's-length transactions occurring at market prices when, in reality, the represented purchase prices were artificially inflated and bore no reasonable relationship to the prices recently paid to acquire the same properties.

372. The Defendants further concealed material information from Ameritrust, including recent acquisition prices, recent transfers of ownership, and the relationships amongst the sellers and purchasers participating in the transactions.

~~262~~373. Gold and the Gold Participant Purchasers~~, through FirstLoans, then applied for the extension of credit~~ submitted or caused to be submitted loan applications, settlement documents, and other materials representing that the ~~contracts with~~transactions were legitimate purchases negotiated at arm's length and supported by bona fide equity and transaction values.

374. Those representations and omissions were false when made.

375. The foregoing representations and omissions concerned material facts, including the actual value of the collateral, recent acquisition prices, recent transfers of ownership, and the nature of the relationship of the parties to the transactions, all of which Ameritrust considered important in determining whether to approve and fund the subject loans.

376. Lerner, the Le~~n~~rner Participant Sellers, Eidlisz, ~~and~~ the Eidlisz Participant Sellers ~~were legitimate arms length contracts.~~, Gold, and the Gold Participant Purchasers knew the representations were false, or acted with reckless indifference to their truth, because they directly participated in the acquisition and resale of the properties, knew the recent acquisition prices,

knew the represented values were artificially inflated, and knew the true relationships among the parties to the transactions.

~~263. They all buttressed the false loan application and fake contract of sale with title reports and appraisals purposefully concealing the prior sale on the open market.~~

~~264. As such, they were able to obtain the extension of credit from Ameritrust, the proceeds of which they all split between them.~~

377. The Defendants knew that Ameritrust was unaware of the true acquisition prices, recent transfer history, and relationships among the parties to the transactions, and knew that disclosure of those facts would have materially affected Ameritrust's underwriting decisions and willingness to fund the loans.

378. The Defendants made and concealed these material facts for the purpose of inducing Ameritrust to approve and fund mortgage loans that it otherwise would not have approved or funded.

379. Ameritrust reasonably relied upon the transaction documents, purchase prices, borrower information, ownership information, and related representations submitted in connection with the loan applications in determining whether to approve and fund the subject loans.

380. Exhibit A identifies the specific transactions giving rise to the fraud alleged herein, including the property address, seller entity, borrower entity, prior acquisition date, prior acquisition price, resale price, loan application date, loan amount, and related transaction information demonstrating the material misrepresentations and omissions described above.

381. As a direct and proximate result of Defendants' fraud, Ameritrust approved and funded loans that it otherwise would not have approved or funded.

~~265. Immediately thereafter, Gold and the~~382. Following the closing of the transactions, numerous Gold Participant Purchasers defaulted on ~~all of the loans and left Ameritrust greatly undercollateralized.~~their mortgage obligations, causing substantial losses to Ameritrust. Ameritrust has incurred and continues to incur damages including repurchase liabilities, loss of collateral value, unpaid principal balances, foreclosure-related expenses, attorneys' fees, professional fees, and other consequential damages.

~~266. Each Defendant committed overt acts in furtherance of the conspiracy and each Defendants contributed to a writing that was ultimately submitted to Ameritrust that contained false and fraudulent information upon which they intended Ameritrust to rely, including, but not limited to, the contract of sale, the loan application, the appraisal, and the title report.~~

383. As a direct and proximate result of Defendants' fraudulent representations and concealment, Ameritrust has suffered damages in an amount to be proven at trial, but believed to exceed $13 million.

**COUNT FIVE**
**NEGLIGENT MISREPRESENTATION**
**(Against Defendant FirstLoans, REXTAR, Actie, and Taylor)**

~~267.~~ 384. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full~~herein.

~~268~~385. Taylor and Actie ~~made affirmative misrepresentations to Ameritrust concerning the~~prepared and provided apprais~~ed~~al ~~values~~reports in connection with ~~more than~~at least ninety (90) mortgage~~-~~-loan transactions~~.~~ involving properties serving as collateral for loans funded by Ameritrust.

~~269.~~ 386. Taylor and Actie knew that the appraisal reports would be submitted to Ameritrust and used by Ameritrust in evaluating, underwriting, and determining whether to fund the subject mortgage loans.

387. In preparing the appraisal reports, Taylor and Actie owed a duty to exercise reasonable care and competence in obtaining, evaluating, and communicating information intended for Ameritrust's use in the loan underwriting process.

388. Each of the appraisal reports contained false information regarding the value of the ninety (90) subject properties and many of the appraisal reports incorrectly represented that the properties had ~~neither~~not transferred ownership and had no~~r~~t been listed for sale within the preceding thirty-six months.

389. Based ~~on~~upon the significant discrepancies ~~in the~~ between recent acquisition prices and the reported appraised values~~—~~, including instances where ~~property~~ values increased by ~~as much as 400% within two months—and Taylor and Actie's affirmative misrepresentations that the appraised properties had neither transferred ownership nor been listed for sale within the past 36 months, it is evident that Taylor and Actie made the representations with at least negligent disregard for the truth.~~several hundred percent within a matter of months, and the omission of recent transfers reflected in publicly available land records, Taylor and Actie failed to exercise reasonable care in preparing the appraisal reports.

390. Each of the properties had been purchased only months earlier in arm's-length transactions for a fraction of the values reported by Taylor and Actie.

~~270.~~ 391. An appraiser~~, when~~ exercising ordinary diligence~~, will assess whether the property they are appraising has been recently sold and will use that~~would have reviewed and considered recent transfers of ownership, recent acquisition prices, and other relevant market information ~~to inform the appraiser's report and~~in preparing an appraisal opinion.

271. Each of the properties at issue had sold in the months preceding the appraisal.

272. Each of the sales on the open market were for a fraction of the appraised value as determined by Taylor and Actie.

273. By failing to review, assess, and include the prior sales in their appraisal opinions and reports, Actie and Taylor negligently misrepresented the properties' value and prior transaction history.

274. In justifiable reliance on the representations contained in the appraisal reports prepared by Taylor and Actie, Ameritrust proceeded to fund the mortgage loans.

275. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.

392. Each of the subject properties had been acquired only months earlier at prices substantially lower than the values reported by Taylor and Actie, yet those prior transactions were omitted or inadequately considered in the appraisal reports.

393. As a result, Taylor and Actie negligently supplied false information concerning the value and transfer history of the subject properties for the guidance of Ameritrust in its lending decisions.

394. FirstLoans submitted and caused to be submitted loan applications, appraisal reports, title reports, and related loan documentation to Ameritrust in connection with the subject transactions.

395. FirstLoans represented that the appraisal reports submitted to Ameritrust complied with FNMA Appraisal Independence Requirements and that the information submitted in connection with the loan applications was accurate and reliable for underwriting purposes.

Case 1:26-cv-03574-ELH Document 85 Filed 09/10/26 Page 89 of 96

396. FirstLoans knew that Ameritrust would rely upon those representations in deciding whether to approve and fund the subject mortgage loans.

397. At a minimum, FirstLoans failed to exercise reasonable care in making those representations because the appraisal reports omitted recent sales, omitted prior acquisition prices, and contained materially inflated valuations that would have been apparent upon reasonable review.

276.398. Further, FirstLoans was, at the very least, negligent in its representations to Ameritrust that the appraisals were prepared in compliance with FNMA's Appraisal Independence Requirements.

277. FirstLoans knew that the appraisals failed to contain the prior sale only months earlier or, in the exercise of reasonable diligence, should have known the appraisals failed to contain the prior sale information.

278. In justifiable reliance on the representations made by FirstLoans, Ameritrust proceeded to fund the mortgage loans.

279. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.

280. REXTAR, at the very least, negligently omitted the prior sale transaction wherein each Eidlisz Participant Seller and each Lerner Participant Seller purchased the properties for a fraction of the price the properties were being resold for.

399. REXTAR prepared and provided title reports, settlement documentation, and related title information for the subject transactions.

400. REXTAR knew that Ameritrust would rely upon the title reports and title information in evaluating ownership history, transaction structure, collateral risk, and whether to fund the loans.

401. In preparing the title reports, REXTAR owed a duty to exercise reasonable care and competence in obtaining and communicating title and ownership information intended for Ameritrust's use.

402. The title reports omitted recent transfers involving the Lerner Participant Sellers and Eidlisz Participant Sellers and omitted prior acquisition prices reflecting that the properties had recently sold for substantially lower amounts.

~~281.~~403. ~~Any~~A reasonabl~~e~~y prudent title company ~~will~~ conducting a title search ~~of the property on which they are providing title information and even the most basic title report will contain information on a sale occurring only a few months earlier.~~would have identified and disclosed the recent transactions and ownership history reflected in the public land records.

~~282. REXTAR failed to disclose the prior sale on its title reports provided to Ameritrust.~~

~~283. In justifiable reliance on the representations made by REXTAR, Ameritrust proceeded to fund the mortgage loans.~~

~~284. Ameritrust has undertaken diligent efforts to address, and resolve, repurchase demands from secondary market investors who acquired these mortgage loans, but the loans now have little to no value and are uncollectible.~~

404. By omitting recent transfers and acquisition prices despite their presence in publicly available land records, REXTAR negligently supplied false and incomplete information concerning the ownership and transfer history of the subject properties.

405. Each Defendant knew that Ameritrust would rely upon the appraisal reports, title reports, loan applications, and other information supplied in determining whether to approve and fund the subject loans and knew that inaccurate information would likely result in financial loss to Ameritrust.

406. The information supplied by Taylor, Actie, FirstLoans, and REXTAR was material because it concerned the value of the collateral securing the loans, the ownership and transfer history of the properties, the reliability of the appraisal process, and other information that Ameritrust considered important in evaluating whether to approve and fund the subject mortgage loans.

407. Ameritrust justifiably relied upon the appraisal reports prepared by Taylor and Actie, the representations and loan application materials submitted by FirstLoans, and the title reports and title information supplied by REXTAR in determining whether to approve and fund the ninety (90) subject mortgage loans.

408. Absent the inaccurate and incomplete information supplied by Defendants, Ameritrust would not have approved and funded the subject mortgage loans.

409. As a direct and proximate result of Defendants' negligent misrepresentations, Ameritrust approved and funded loans that it otherwise would not have approved or funded.

410. Ameritrust has undertaken substantial efforts to resolve repurchase demands asserted by secondary-market investors that purchased the subject mortgage loans. As a result of the material overvaluation of the collateral, the subsequent loan defaults, and the bankruptcy filings involving Gold Participant Purchasers, the affected loans have experienced substantial impairment in value, and Ameritrust has been unable to liquidate, refinance, or otherwise dispose of the loans without incurring significant losses.

**COUNT SIX**
**BREACH OF CONTRACT**
**(Against Defendant Fidelity)**

285. 411. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth in full.herein.

286.412. OnFor each onof the transactions which are the subject ofat issue in this action, Fidelity issued Closing Protection Letters ("CPL") which were drafted on Fidelity's letterhead, signed by a Fidelity's President and Secretary representative, and identified REXTAR as the "Settlement Agent."

287. 413. In each of the Closing Protection LettersCPL, Fidelity "agree[d] to indemnify [Ameritrust] for actual loss of Funds incurred by [Ameritrust] in connection with the closing of the referenced real estate transaction (the "Real Estate Transaction") conducted by the [REXTAR] ..... on or after the Date of this letter, subject to the Requirements and Conditions and Exclusions set forth below."

288. The414. Each CPL contained the following four (4) enumerated requirements:

289. 415. **First,** Fidelity "issues or is contractually obligated to issue a Policy for [Ameritrust's] protection in connection with the Real Estate Transaction[.]"

290. 416. Fidelity did in fact issue title Policies for each of the transactions subject to this action.

291. 417. **Second,** Ameritrust was to be, "a lender secured by or a borrower on the Insured Mortgage on the Title to the Land ..."

292. 418. Ameritrust was in fact a lender secured by the Insured Mortgage on the Title to the Land for each of the transactions subject to this action.

~~293~~419. **Third,** "The aggregate of all Funds [Ameritrust] transmit[ed] to ~~the Settlement Agent or Approved attorney~~[REXTAR] for the Real Estate Transaction does not exceed $5,000,000.00[.]"

~~294.~~ 420. Ameritrust did not transmit to ~~the Settlement Agent~~REXTAR for each of the Real Estate Transactions an amount in excess of $5,000,000.00.

~~295.~~ 421. **Fourth:** ~~(b):~~ "[Ameritrust's] loss is solely caused by: fraud, theft, dishonesty, or misappropriation by the Settlement Agent or Approved Attorney in handling [Ameritrust's] Funds or documents in connection with the closing, but only to the extent that the fraud, theft, dishonesty, or misappropriation adversely affects the status of Title to the Land or the validity, enforceability, or priority of the lien on the Insured Mortgage on the Title to the Land."

~~296.~~422. REXTAR, while acting as Fidelity's designated Settlement Agent, engaged in fraud, dishonesty, and misconduct in connection with the closings by misrepresenting and concealing material information concerning prior transfers of ownership, prior acquisition prices, and the accurate transactional history of the subject properties in documents prepared and supplied in connection with the closings.

423. REXTAR's concealment of prior transfers, prior acquisition prices, and chain-of- title information within documents prepared in connection with the closing was itself sufficient to cause Ameritrust to fund the subject loans and suffer the resulting losses.

424. REXTAR's concealment of prior transfers, prior acquisition prices, and material transactional information was an independent and substantial cause of Ameritrust's losses and was integral to the completion of the subject transactions.

425. REXTAR's fraud and dishonestly rendered the collateral on the mortgage loans effectively worthless and the liens therefore unenforceable.

426. By omitting prior sales from its title report, REXTAR caused Ameritrust to make loans well in excess of the value of the collateral, each on an individual basis. But, when taken in the aggregate, where, across the enterprise, similarly-situated lenders must now foreclose on over a hundred similar properties simultaneously, it creates a flood of inventory into the marketplace and effectively renders the collateral worthless and effectively prevents any foreclosure. In essence, it solidifies the 2020 value of the Subject Properties, which were acquired for no consideration that are identified on Exhibits A-C, and effectively leaves Ameritrust with an unenforceable lien instrument.

~~The term “solely caused by:~~427. The CPL expressly contemplates losses arising from fraud, theft, dishonesty, or misappropriation by ~~the Settlement Agent...” must include the common conspiracy that REXTAR, acting as~~persons other than the Settlement Agent~~, participated in to facilitate the loss~~ by excluding such losses from coverage. Accordingly, the existence of misconduct by other participants does not negate coverage where, as alleged herein, REXTAR itself engaged in fraud, dishonesty, and misconduct in connection with the closings sufficient to be the sole source of the losses incurred.

~~297~~428. Furthermore, ~~the Defendant’s common conspiracy placing the~~REXTAR’s fraudulent conduct resulted in numerous properties ~~in~~being placed into the bankruptc~~ies~~y estates of various Gold Participant Purchaser~~’~~s, ~~bankruptcy case has prevented~~thereby impairing the enforceability and practical realization of Ameritrust's liens ~~on~~secured by the Insured Mortgages on the ~~Title to the Land.~~subject properties.

~~298.~~429. As a result of REXTAR's concealment of prior transfers and acquisition prices, Ameritrust funded loans secured by collateral that was materially overvalued and suffered substantial losses following borrower defaults.~~ Finally,~~ Ameritrust will never ~~to~~be able to collect

the amount of the lien due to REXTAR's willful concealment of the prior transfers and purchase prices.~~.~~

~~299. Said differently, Fidelity Insured Mortgages ranging from $131,250 to $180,000 on properties that REXTAR knew were worth fractions of that amount.~~

430~~0~~. ~~—~~The CPL was provided by Fidelity, as part of its contract of adhesion, and any ambiguities contained therein must be interpreted in a light most favorable to Ameritrust.

~~301. Fidelity has refused to pay on these claims, despite their contractual agreements, as restated herein.~~

431. Despite its contractual obligations under the CPL, Fidelity refused to indemnify Ameritrust for covered losses arising from REXTAR's fraud, dishonesty, and misconduct.

432. Fidelity's failure to provide the indemnification required under the CPL constitutes a material breach of contract.

433. As a direct and proximate result of Fidelity's breach of the CPL, Ameritrust has incurred and continues to incur losses including repurchase liabilities, unpaid principal balances, diminished collateral value, foreclosure-related expenses, servicing advances, professional fees, attorneys' fees, investigation costs, carrying costs, and other damages in an amount to be proven at trial but believed to exceed $13 million.

**COUNT SEVEN**
**COMMON LAW VICARIOUS LIABILITY**
**(Against Defendant Fidelity)**

~~302.~~ 434. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~303. Fidelity, by and through the issuance of Closing Protection Letters, identified REXTAR as the "Settlement Agent" and provided coverage therein for specific wrongful acts conducted on its Agent's behalf.~~

~~304. Fidelity issued such Closing Protection Letters on each of the over ninety (90) loans which are subject of this Action.~~

435. Fidelity expressly authorized REXTAR to act on its behalf in connection with the issuance of title insurance products and otherwise cloaked REXTAR with the indicia of authority to act on its behalf. In connection with the subject transactions, title policies and corresponding schedules on Fidelity letterhead were countersigned by a REXTAR representative identified as an "Authorized Officer and Agent" of Fidelity.

436. In connection with the subject transactions, endorsements on Fidelity letterhead and attached to policies issued by Fidelity were either countersigned by a REXTAR representative or exclusively signed by a REXTAR representative identified as an "Authorized Signatory." In each of these instances, Fidelity authorized REXTAR to create contractual obligations binding upon Fidelity.

437. Through the authority granted to REXTAR to execute title insurance policies, schedules, endorsements, and related title insurance documents on Fidelity's behalf, Fidelity vested REXTAR with authority to create contractual obligations binding upon Fidelity and to alter Fidelity's legal relations with lenders and other participants in the transactions.

438. Fidelity further authorized REXTAR to act as its designated settlement agent in connection with the subject transactions and issued CPLs identifying REXTAR as the designated "Settlement Agent" for each of the mortgage loan transactions that are the subject of this action.

Case 1:26-cv-03574-ELH Document 95-4 Filed 09/10/21 Page 97 of 96

305. in each of the Closing Protection Letters439. In each CPL, Fidelity "agree[d] to indemnify [Ameritrust] for actual loss of Funds incurred by [Ameritrust] in connection with the closing of the referenced real estate transaction (the "Real Estate Transaction") conducted by the [REXTAR] ... on or after the Date of this letter, subject to the Requirements and Conditions and Exclusions set forth below."

306. Furthermore, many of the documents referenced herein which were either prepared by Fidelity itself or were prepared by REXTAR but were drafted as if they were prepared by Fidelity. Specifically, each such fraudulent document appeared to be on Fidelity's letterhead, and many were signed by officers.

307. Fidelity engaged in practices which created unequal bargaining power between Ameritrust and Fidelity and based on public policy should invalidate the exculpatory provisions contained therein.

440. The CPL were drafted by Fidelity and presented to Ameritrust on Fidelity's standardized forms without negotiation of their material terms. To the extent any provision of the CPL is found to be ambiguous, such ambiguity should be construed against Fidelity as the drafter of the form agreements.

441. Upon information and belief, Fidelity authorized REXTAR to issue and execute Fidelity title insurance products, conduct settlement and closing services, prepare closing-related documents, interact with lenders in connection with insured transactions, and perform functions necessary to facilitate the issuance of Fidelity's title insurance products.

442. In performing those functions, REXTAR acted for the benefit of Fidelity by facilitating the issuance of Fidelity title insurance policies and related title insurance products in connection with the subject transactions.

443. Fidelity knowingly permitted REXTAR to use Fidelity's name, title insurance forms, policy forms, endorsements, letterhead, Closing Protection Letters, and other documents identifying Fidelity in connection with the subject transactions.

444. Through those actions, Fidelity held REXTAR out to Ameritrust as Fidelity's authorized agent for purposes of issuing title insurance products and performing settlement-related functions.

445. Accordingly, at all relevant times, REXTAR acted as Fidelity's agent under principles of actual authority, apparent authority, or both.

446. Ameritrust reasonably relied upon Fidelity's manifestations of authority, including Fidelity's designation of REXTAR as Settlement Agent and the issuance of Fidelity title policies and endorsements executed by REXTAR as Fidelity's Authorized Officer and Agent. Ameritrust reasonably believed that REXTAR was acting within the scope of authority granted by Fidelity in connection with the subject transactions.

447. The misconduct alleged herein, including the preparation and dissemination of title reports, schedules, endorsements, and other title-related documents that concealed prior transfers, prior acquisition prices, and material transactional information, occurred while REXTAR was performing the very title, settlement, and closing functions Fidelity authorized REXTAR to perform.

448. To the extent REXTAR lacked actual authority to engage in any of the wrongful conduct alleged herein, Fidelity clothed REXTAR with apparent authority by permitting REXTAR to act and execute documents as Fidelity's "Authorized Officer and Agent" and "Authorized Signatory" and by identifying REXTAR as Fidelity's designated Settlement Agent in each CPL issued to Ameritrust.

449. At all relevant times, REXTAR acted within the scope of the authority granted to it by Fidelity, whether actual, apparent, or both.

~~308. REXTAR had a common law~~450. The agency relationship ~~with~~between Fidelity~~.~~ and REXTAR is consistent with Maryland insurance law, including Md. Code Ann., Ins. § 10-121, which recognizes the authority of title insurance producers and agents to act on behalf of title insurers in connection with title insurance business conducted within the State of Maryland.

~~309. REXTAR's agency relationship was expanded with the passage of Md.Code Ann., Ins. § 10-121(k)(1)(i).~~

~~310. REXTAR held itself out through the issuance of its respective fraudulent documents, giving the appearance that they were acting on behalf Fidelity.~~

~~311. Even if REXTAR did not posses' actual authority by and through its agreements with Fidelity, REXTAR held itself out as Fidelity's agent, creating an apparent agency relationship.~~

451. REXTAR's concealment of prior transfers, prior acquisition prices, and material transactional information, together with the other wrongful conduct alleged herein, occurred within the scope of the authority Fidelity granted to REXTAR.

~~312. REXTAR engaged in the conspiracy as described above, thus~~ 452. Accordingly, Fidelity is vicariously liable for ~~REXTAR's unlawful conduct.~~the acts, omissions, fraudulent conduct, negligent misrepresentations, concealment, and other wrongful conduct committed by REXTAR and alleged throughout this Complaint.

453. As a direct and proximate result of REXTAR's conduct, for which Fidelity is vicariously liable, Ameritrust has suffered damages in an amount to be proven at trial but believed to exceed $13 million.

**COUNT EIGHT**
**AIDING AND ABETTING FRAUD**
**(Against All Defendants Except Fidelity)**

~~313.~~ 454. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~314.~~ 455. Defendants each committed and participated in various tort~~s~~ious ~~laws in the commission of the conspiracy~~acts described throughout this Complaint, including fraud, negligen~~ce,~~t ~~and~~ misrepresentation, concealment, and related wrongful conduct.

456. The underlying tortious conduct aided and abetted by Defendants is described in the fraud, negligent misrepresentation~~.~~, and related counts incorporated herein.

~~315~~457. Each of the Defendants knew about the ~~scheme~~wrongful conduct described ~~above~~herein; actively participated in ~~the scheme; gave~~that conduct; knowingly provided substantial assistance ~~or~~and encouragement to the others participating in the scheme; and committed acts in furtherance ~~thereof~~of the tortious conduct described above, including, but not limited to:

a. FirstLoans originated, packaged, processed, and submitted loan applications and supporting loan documentation to Ameritrust that falsely represented that the transactions were legitimate arm's-length transactions, that the borrowers had made the required equity contributions, that the information supplied to Ameritrust was accurate, and that the loans satisfied Ameritrust's underwriting requirements.

b. REXTAR made false representations and omissions through title commitments, settlement statements, escrow records, closing packages, certifications, disbursement records, and related settlement documentation that concealed material facts regarding prior transfers of the subject properties, prior acquisition prices, the source and disposition of funds, the true nature of the transactions, the

existence of diverted loan proceeds, and the purported borrower contributions reflected in the loan files.

c. Taylor prepared, signed, certified, and delivered false appraisal reports that materially misrepresented the market value of the subject properties and failed to accurately disclose, account for, or analyze prior transfers, prior purchase prices, and other information material to value and lending risk.

d. Actie prepared, signed, certified, and delivered false appraisal reports that materially misrepresented the market value of the subject properties and failed to accurately disclose, account for, or analyze prior transfers, prior purchase prices, and other information material to value and lending risk.

e. Gold and the Gold Participant Purchasers executed ~~fraudulent~~ purchase contracts, loan applications, affidavits, settlement documents, borrower certifications, and closing documents falsely representing that the transactions were legitimate arm's-length transactions, that required borrower funds had been contributed, and that the information submitted to Ameritrust was accurate and complete.

f. Lerner, the Lerner Participant Sellers, Eidlisz, and the Eidlisz Participant Sellers knowingly participated in ~~the fraudulent~~ transactions involving grossly inflated purchase prices while concealing their recent acquisition of the same properties for substantially lower amounts~~,~~ and ~~by~~ execut~~ing~~ed settlement and transfer documents that failed to disclose material facts concerning the true nature and economics of the transactions.

~~316. Ameritrust has suffered significant harm thereby, including in making over ten million dollars in loans that are now uncollectable and undercollateralized.~~

458. Each Defendant knew, or was deliberately indifferent to the fact, that the assistance described above would further the fraudulent scheme, facilitate the approval and funding of mortgage loans by Ameritrust, and contribute to the resulting harm suffered by Ameritrust.

459. Ameritrust reasonably relied upon the representations, omissions, documents, certifications, appraisals, title information, settlement materials, and transaction information supplied, prepared, transmitted, or facilitated by Defendants in approving and funding the subject mortgage loans.

460. As a direct and proximate result of Defendants' substantial assistance and participation in the tortious conduct described herein, Ameritrust funded mortgage loans that it otherwise would not have approved or funded.

461. As a direct and proximate result of Defendants' conduct, Ameritrust has suffered substantial damages, including repurchase liabilities, unpaid principal balances, diminished collateral value, foreclosure-related expenses, servicing advances, carrying costs, professional fees, attorneys' fees, investigation costs, and other consequential damages in an amount believed to exceed $13 million.

**COUNT NINE**
**(BREACH OF IMPLIED COVENANT/DUTY OF GOOD FAITH)**
**(Against Defendant FirstLoans)**

~~317.~~ 462. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~318.~~ 463. The Business Purpose Broker Agreement constituted a valid contract between Ameritrust and FirstLoans~~.~~ that is governed by California law.

~~319. Every contract includes an implied covenant requiring the parties to act in good faith and deal fairly with one another.~~

464. The Agreement contained an implied covenant of good faith and fair dealing requiring that neither party do anything to unfairly interfere with the other party's right to receive the benefits of the Agreement.

465. Ameritrust performed all material obligations required of it under the Agreement.

466. A principal purpose of the Agreement was to permit Ameritrust to evaluate, underwrite, fund, purchase, and sell mortgage loans based upon truthful, accurate, complete, and reliable information submitted through FirstLoans.

~~320. FirstLoans~~467. FirstLoans breached ~~that~~the implied covenant ~~by steering~~of good faith and fair dealing by intentionally, unreasonably, and unfairly frustrating Ameritrust's ability to receive the benefits of the Agreement, including by directing or facilitating appraisal assignments to ~~selected~~ appraisers~~;~~, who generated materially inflated valuations, submitting application packages supported by ~~inflated appraisals;~~inaccurate or misleading information, concealing material information ~~regarding the underlying~~concerning the true nature and economics of the transactions~~;~~, and submitting mortgage-loan applications ~~it knew~~that FirstLoans knew, or reasonably should have known, were unsuitable for sale into the secondary mortgage market~~; and participating in a scheme designed to shift losses to Ameritrust.~~.

~~321.~~ 468. Through this conduct, FirstLoans ~~caused~~deprived Ameritrust ~~significant harm, including, but not limited to the inducement to extend millions of dollars of credit on now uncollectable and undercollateralized loans.~~of the benefit of its bargain under the Agreement and frustrated Ameritrust's ability to make informed underwriting decisions, originate marketable loans, manage underwriting risk, and participate in the secondary mortgage market in the manner contemplated by the Agreement.

469. As a direct and proximate result of FirstLoans' breach of the implied covenant of good faith and fair dealing, Ameritrust suffered damages including repurchase liabilities, loan

losses, diminished collateral value, carrying costs, foreclosure-related expenses, and attorneys' fees where recoverable.

**COUNT TEN**

**(VIOLATION OF THE MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. CODE ANN., REAL PROPERTY §§ 7-401 *et seq.*)**
**(Against All Defendants Except Fidelity)**

~~322.~~ 470. Ameritrust re-alleges and incorporates by this reference each and every foregoing paragraph of this Complaint, as though fully set forth ~~in full.~~herein.

~~323. Plaintiff~~471. Ameritrust is a "mortgage lender" and "person" within the meaning of the Maryland Mortgage Fraud Protection Act.

~~324.~~ 472. The transactions described herein involved "mortgage lending processes" within the meaning of Md. Code Ann., Real Property § 7-401.

~~325.~~ 473. Defendants knowingly participated in a scheme involving false and fraudulent statements, omissions, representations, certifications, appraisals, settlement documents, and loan-origination materials submitted during the mortgage lending process.

~~326. Defendants knowingly participated in a scheme involving false and fraudulent statements, omissions, representations, certifications, appraisals, settlement documents, and loan-origination materials submitted during the mortgage lending process.~~

~~327.~~ 474. Defendants knowingly misrepresented and concealed material~~s~~ facts concerning, among other things, the true value of the subject properties; the true purchase prices and prior transfers of the subject properties; the existence and amount of borrower equity and down payments; the source and disposition of settlement funds; the financial condition and bona fides of the transactions; and the true nature of the transactions submitted to Ameritrust for funding.

~~328.~~ 475. Taylor and Actie knowingly prepared, participated in, or supplied appraisal reports containing false, misleading, or materially omitted information regarding value, market conditions, prior transfers, or other matters material to Plaintiff's lending decisions.

~~329.~~ 476. FirstLoans knowingly originated, processed, packaged, submitted, and facilitated mortgage loan applications and supporting documents containing false statements, misrepresentations, omissions, and fraudulent information.

~~330.~~ 477. REXTAR knowingly prepared, controlled, facilitated, or participated in settlement services, escrow services, title services, closing services, settlement statements, and disbursements that concealed material facts and facilitated the fraudulent mortgage lending scheme.

~~331.~~ 478. The Gold Participant Purchasers, Lerner Participant Sellers, Eidlisz Participant Sellers, and their affiliated entities knowingly participated in transactions involving inflated values, false loan documentation, false down-payment representations, concealed transfer histor~~y~~ies, and other material misrepresentations made during the mortgage lending process.

~~332.~~ 479. Defendants knowingly made deliberate misstatements, misrepresentations, and material omissions through appraisal reports, title reports, settlement documentation, contracts of sale, borrower-contribution certifications, loan applications, and related documents submitted during the mortgage lending process in violation of Md. Code Ann., Real Property § 7-402~~(a).~~.

~~333.~~480. Defendants knowingly created and produced documents for use during the mortgage lending process, including appraisal reports, title reports, settlement statements, loan applications, borrower certifications, contracts of sale, and related mortgage-loan documentation, that contained deliberate misstatements, material misrepresentations, and omissions concerning, among other things, property values, prior transfers of ownership, prior acquisition prices, borrower equity contributions, the source and disposition of funds, and the true nature of the subject

transactions in violation of Md. Code Ann., Real Property § 7-402. Defendants created and supplied such documents with the intent that Ameritrust would rely upon the false and misleading information contained therein in evaluating, approving, funding, insuring, closing, and purchasing the subject mortgage loans.

~~Defendants~~ 481. Defendants knowingly used, transmitted, or facilitated the use of deliberate misstatements, misrepresentations, and material omissions ~~during the~~ with the intent of inducing Ameritrust to approve and fund the subject mortgage ~~lending process~~loans in violation of Md. Code Ann., Real Property § 7-402~~(a)~~.

~~334.~~ 482. Defendants knowingly received proceeds, funds, fees, commissions, settlement charges, appraisal fees, broker compensation, sale proceeds, or other benefits derived directly or indirectly from mortgage fraud in violation of Md. Code Ann., Real Property § 7-402.

~~335.~~ 483. Defendants knowingly assisted, conspired with, solicited, and facilitated other~~s~~ participants in committing acts constituting mortgage fraud in violation of Md. Code Ann., Real Property § 7-402.

484. Defendants' conduct was undertaken for the purpose of obtaining mortgage-loan proceeds and other financial benefits through the mortgage lending process and resulted in Ameritrust funding loans that it otherwise would not have approved or funded.

485. Exhibit A identifies the specific transactions giving rise to the mortgage fraud alleged herein, including the property address, seller entity, borrower entity, prior acquisition date, prior acquisition price, resale price, loan amount, appraisal information, title report information, and related facts demonstrating the false statements, misrepresentations, and omissions described above.

~~336~~486. Ameritrust reasonably relied upon the integrity of the mortgage lending process and upon the information, documents, appraisals, settlement materials, and representations supplied by Defendants.

~~337.~~ 487. As a direct and proximate result of Defendants' violations of the Maryland Mortgage Fraud Protection Act, Plaintiff suffered substantial damages, including loan losses, repurchase liabilities, investigation expenses, carrying costs, attorneys' fees, and other damages according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ameritrust Mortgage Corporation respectfully requests that judgment be entered in its favor and against Defendants, and each of them, and requests the following relief:

(a) For compensatory damages in an amount ~~of $14,076,00.00;~~ to be proven at trial, but presently believed to exceed $13,898,350.00, comprised of the loan balances, plus interest, fees, and costs;

(b) For consequential damages according to proof;

(c) For restitution, disgorgement, and recovery of all ~~benefits unjustly~~ funds, fees, commissions, profits, loan proceeds, settlement proceeds, appraisal fees, origination fees, and other benefits unjustly received and retained by Defendants as a result of the conduct alleged herein;

(d) For treble damages pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

(e) For treble damages pursuant to Md. Code Ann., Real Property § 7-406;

(f) For judgment imposing joint and several liability against those Defendants found jointly responsible for the damages alleged herein, to the fullest extent permitted by law;

(g) For punitive damages against those Defendants whose conduct is found to

constitute actual fraud, fraudulent misrepresentation, malice, or other conduct for which punitive damages are recoverable under Maryland law;

(~~g~~h) For rescissory, equitable, and restitutionary relief as the Court deems appropriate;

(~~h~~i) For an accounting of all funds, fees, commissions, appraisal fees, origination fees, settlement fees, loan proceeds, diverted funds, and other money received by Defendants in connection with the transactions that are the subject of this action;

(~~i~~j) For imposition of a constructive trust upon any proceeds, profits, fees, commissions, or other property traceable to the wrongful conduct alleged herein;

(~~j~~k) For avoidance and recovery of any transfers, distributions, or proceeds determined to have been wrongfully diverted from loan proceeds funded by Ameritrust;

(~~k~~l) For pre-judgment interest at the highest rate permitted by law;

(~~l~~m) For post-judgment interest as allowed by Maryland law;

(~~m~~n) For costs of suit incurred herein;

(~~n~~o) For reasonable attorneys' fees where authorized by contract, statute, equity, or other applicable law, including but not limited to ~~the Business Purpose Broker Agreement, the RICO Act~~18 U.S.C. § 1964(c), Md. Code Ann., Real Property § 7-406, ~~and any~~the Business Purpose Broker Agreement, applicable indemnity ~~provisions;~~ provisions, and other contractual or statutory fee-shifting provisions;

(p) For a declaration of the parties' rights, obligations, indemnity responsibilities, repurchase obligations, and coverage obligations under the Business Purpose Broker Agreement, Closing Protection Letters, title insurance products, and related agreements;

(q) For all contractual remedies available under the Business Purpose Broker Agreement, Closing Protection Letters, title insurance products, and related agreements, including indemnification, repurchase obligations, loan losses, advances, collection expenses, attorneys' fees, investigation costs, costs of enforcement, and all other recoverable amounts;

(~~o~~r) For such other and further legal or equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: ~~September 9~~October 21, 2026

*/s/ Gregory L. Arbogast*
Gregory L. Arbogast, Esq. (AIS #1012140026)
Rebekah P. Nickerson (AIS #2012180005)
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland 21231
Tel.: 410-230-0660
Fax: 410-230-0667
GArbogast@coleschotz.com
RNickerson@coleschotz.com

Tiffany Castillo (*pro hac vice forthcoming*)
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Tel: 201-561-7037
Fax: 201-489-1536
Tcastillo@coleschotz.com
*Attorneys for Plaintiff*